**HUNTON ANDREWS KURTH LLP**
Katherine P. Sandberg, Esq. (State Bar No. 301117)
ksandberg@HuntonAK.com
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone:  (415) 975-3700
Facsimile:   (415) 975-3701

*[Additional counsel listed on next page]*

Attorneys for Plaintiff
Spotlight Ticket Management, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPOTLIGHT TICKET MANAGEMENT, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> CONCIERGE LIVE, LLC, a Georgia corporation; <br><br> Defendant. | CASE NO.: 2:24-CV-00859-WLH-SSC <br><br> *Assigned to the Hon. Wesley L. Hsu* <br><br> **JOINT STIPULATION REGARDING PLAINTIFF SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL** <br><br> Hearing Date: December 4, 2025 <br> Hearing Time: 11:00 a.m. <br> Courtroom: 790 <br><br> Action Filed: January 31, 2024 <br> Discovery Cut-Off: December 10, 2025 <br> Pretrial Conference: April 17, 2026 <br> Trial: May 4, 2026 |

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

*Hunton Andrews Kurth LLP*
*50 California Street, Suite 1700*
*San Francisco, California 94111*

---

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

**HUNTON ANDREWS KURTH LLP**

Edward T. Colbert, Esq. (*Pro Hac Vice*)
ecolbert@HuntonAK.com
Erik C. Kane, Esq.(*Pro Hac Vice*)
ekane@HuntonAK.com
2200 Pennsylvania Avenue NW
Suite 900
Washington, DC 20037-1701
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

**HUNTON ANDREWS KURTH LLP**

Christopher M. Pardo, Esq. (*Pro Hac Vice*)
cpardo@HuntonAK.com
60 State Street, Suite 2400
Boston, Massachusetts 02109
Telephone:  (617) 648-2800
Facsimile:  (617) 433-5022

**Hunton Andrews Kurth LLP**
**50 California Street, Suite 1700**
**San Francisco, California 94111**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

1

# TABLE OF CONTENTS

2

**Page**

3    I.    SPOTLIGHT'S INTRODUCTORY STATEMENT ........................................... 1

4    II.   CONCIERGE LIVE'S INTRODUCTORY STATEMENT ............................... 4

5    III.  DISPUTED DISCOVERY REQUESTS .......................................................... 6

6          A.    Spotlight's Request for Production No. 18 ..................................... 6

7          B.    Spotlight's Interrogatory No. 5 ...................................................... 7

8    IV.   SPOTLIGHT'S POSITION ........................................................................... 8

9          A.    Legal Standard ............................................................................... 8

10         B.    Concierge Live's General Ledger and Other Financial Documents

11               Are Relevant to the Determination of Damages to Both Spotlight's

12               Affirmative Claims and the Counterclaims, and Also May

13               Evidence Material Misrepresentations by Concierge Live ....................... 8

14         C.    Additional Financial Records Are Required To Verify The

15               Accuracy Of Concierge Live's Facially Suspect Documents ................. 10

16         D.    Spotlight Requires Additional Assurances Given Concierge Live

17               and its Counsel's Pattern of Past Misrepresentations in Federal

18               Court and Financial Misconduct ............................................................... 12

19   V.    CONCIERGE LIVE'S POSITION ............................................................... 15

20         A.    Sufficiency ................................................................................... 16

21         B.    Reliability/Fabrication................................................................... 18

22               1.    Spotlight's false "created for purposes of the litigation"

23                     argument .......................................................................... 18

24               2.    Spotlight's false "refused to produce contemporaneous

25                     versions" argument ......................................................... 18

26               3.    Spotlight's false "discrepancies" argument.................................. 20

27               4.    Spotlight's false "misrepresented as audited" argument.............. 20

28

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, California 94111

5.    Spotlight's false "evasiveness" argument......................................21

6.    Spotlight's unrelated ad hominem attacks....................................22

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Pursuant to Local Rule 37-2, Plaintiff Spotlight Ticket Management, Inc. ("Spotlight" or "Plaintiff") and Defendant Concierge Live, LLC ("Concierge Live" or "Defendant") hereby submit the following Joint Stipulation Regarding Plaintiff's Motion to Compel the production of financial records.

## I.  SPOTLIGHT'S INTRODUCTORY STATEMENT

While discovery closes in under a month, Concierge Live continues to obfuscate and stonewall the production of critical financial information that is admittedly in its possession, refusing to produce source records as maintained in the usual course of its business, and instead providing documentation that it created for litigation purposes.

In August 2025, 15 months after Spotlight requested financial documentation relating to Concierge Live's business, Concierge Live produced bare bones "financial documents" purporting to satisfy the requests.  Decl. of Christopher M. Pardo ("Pardo Decl."), ¶¶ 2-5.  Since August, Spotlight has repeatedly met and conferred with Concierge Live in an effort to obtain specific records as they were kept in the ordinary course of business.  *Id*,. ¶¶ 6-8, 11-14, Exs. 1-6.  However, Concierge Live vacillated among (i) promising to produce financial documents kept in the course of ordinary business, (ii) refusing to do so, and eventually (iii) even disclaiming their existence.  *Id.*

Putting aside that they were literally created for litigation, the unaudited and rudimentary records produced by Concierge Live raised numerous questions about its activities that Spotlight cannot analyze without more complete records.  By way of example, the produced records show (i) unexplained large payments to companies owned by Defendant's principals, (ii) random costs that were not tied to revenues, and (iii) assorted suspect large items such as "Guaranteed Minimum Payments" independent of any salary-based compensation categories.  *Id.*, ¶ 9.  These details are critical given that the documents purport to show Concierge Live both operating at a healthy profit margin but then operating at a loss based on those overheads.  *Id.*  Such unusual financial information needs to be validated, vetted, and tested as it is directly relevant to damages.

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

At the same time, despite Concierge Live's refusal to provide actual financial information as maintained in the usual course of business, Spotlight identified that Concierge Live's own document production supposedly submits to customers "Audited Financials" in numerous places, presumably for the purpose of establishing its

> To Whom It May Concern:
>
> Per your request, attached are the following documents:
>
> - Audited Financial Statements for 3 consecutive years for Concierge Live, LLC as well as 2023 Profit & Loss and Balance Sheets reviewed by our auditors at Verdant Accounting, Omaha, NE.

soundness as a potential business partner, such as the following example: *See* Pardo Decl., Ex. 9. Despite these various claims to have and be providing "Audited Financials" to prospective customers as part of RFP processes or proposals, counsel for Concierge Live now claims (including directly to the Court, *see infra* at pp. 2-3, 8-9) that such "Audited Financials" do not actually exist. *See id.*, ¶ 11, Ex. 4.

Forced to take Concierge Live at its word that audited financials do not exist, Spotlight instead sought Concierge Live's general ledger for the years 2020-2025, from which the summary financial reports were purportedly derived, and the documents which Concierge Live was submitting to customers and prospective customers purporting to be "Audited Financials" so that they could be compared. *See id.*, ¶¶ 12-13, Exs. 4-5. But Concierge Live refused to produce that data unless Spotlight agreed to a tit-for-tat arrangement to produce further financial documents on its end, *despite Spotlight having timely produced its own (real) audited financials* as maintained in the usual course of business for the years 2018-2024. *See id.*, ¶¶ 13, 18, Ex. 6.

After reaching impasse, the parties participated in a discovery conference before Magistrate Judge Stephanie Christensen on October 27, 2025 ("Conference"). *Id.*, ¶ 13. When put on the spot by the Court, counsel for Concierge Live denied the existence of audited financials altogether. *See infra* at p. 10 ("**MR. HEISENBERG [to the Court]:**

---

2

So very simply, they've asked about audited. And, as you've heard, *we have said we do not have audited*." (emphasis added); THE COURT [referring to the demanded general ledgers]: …*[Y]ou need to have a good reason why you're not going to produce these financials."*).

Per the Court's guidance at the Conference, on October 29, Spotlight's counsel conferred further as to whether Concierge Live would commit to producing the financial documents. Pardo Decl., ¶ 14, Ex. 8. Concierge Live's counsel responded that he would produce the purported "Audited Financials" provided to prospective customer City National Bank ("CNB") but he did not see the need to produce anything further. *Id.* But the "Audited Financials" provided to CNB—finally produced on October 31—*were not actually audited financials and merely appear to be the same type of report created for this litigation*. *Id.* ¶ 16. Further, there are facial discrepancies between the 2022 Profit and Loss Statement produced to Spotlight by Concierge Live in this case and that provided to CNB for the same time period. *Id.* On November 5, Spotlight further attempted to confer but Concierge Live again refused to produce its general ledger or any other supposed financials maintained in the usual course of business. *Id.* ¶ 17.

As the Court recognized, Spotlight is not comfortable taking Concierge Live at its word, not only given the misrepresentations apparently being made about its financials to customers versus what it is saying in this Court, or the unusual nature of what it did provide to Spotlight, but also an alarming pattern of in-court misrepresentations and similar hedging by its attorney and the same players in this case. Aside from Concierge Live's principals being investigated and sued by multiple state attorneys general for making misrepresentations to the markets in which they operated (similar to the false advertising and unfair competition allegations here, *see infra* at p. 11), while representing Drew Gainor (an "advisor" to Concierge Live since 2017) and Gainor's former company, Seat Scouts (which is now owned by related third-party Automatiq), Attorney Heisenberg and the clients he represented (including Mr. Gainor)

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

3

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

1    were admonished by Judge Sidney H. Stein of the Southern District of New York

2    multiple times for underhanded practices, misleading conduct and lack of candor to the

3    tribunal. *See infra* at p. 10 (among other excerpts, "MR HEISENBERG: Your Honor, I

4    certainly did not intend to mislead. THE COURT: And you always tell me that. Let's

5    stop now.").  Attorney Heisenberg is again involved in a situation where these same

6    actors and their affiliates are accused of engaging in unlawful and deceitful business

7    practices, and then are also engaged in conduct intended to frustrate the judicial process.

8         At bottom, Concierge Live admits that it has possession of the general ledger and

9    other financial documents maintained in the usual course of its business, and has not

10   asserted any valid objection to production.  Concierge Live should be required to do so.

## II.    CONCIERGE LIVE'S INTRODUCTORY STATEMENT

12        Spotlight has engaged in a six-year advertising campaign promoting its supposed

13   "exclusive Ticketmaster integration," its supposed contractual right to that exclusivity,

14   and Concierge Live's supposed lack of integration. Ticketmaster has confirmed that

15   these were not true. (Doc. 100-1, p.1345)  Through this false advertising, Spotlight has

16   secured tens of millions in wrongful profits.  Spotlight's motion is a contrived dispute

17   meant to distract from those merits.

18        Access to a company's general ledger is not available based only on a

19   "speculative benefit." A party seeking the ledger must show "why [existing]

20   information is not sufficient, and [offer] proof … suggesting that [defendant] fabricated

21   data." *Foundation for Global Sports Development v. United States Olympic Committee*,

22   2021 WL 6618556, at *12 (C.D. Cal. 2021). Instead, Spotlight offers a series of false

23   statements, half-truths, and innuendo.  It starts with the first paragraph, in which

24   Spotlight's asserts that it has only received financials created "for purposes of

25   litigation." That is not true. Concierge Live has provided financials as kept in the

26   ordinary course of business.  When Spotlight's feigned concern that the initial

27   production included financial dated after the date of the litigation, Concierge Live

28

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

quickly supplemented its production with earlier *versions, also created in the ordinary course of business, that were contemporaneously dated prior to the litigation*. Yet Spotlight, undeterred, persists in the false mantra that the financials were created for purposes of litigation.

When Spotlight finally does acknowledge having received those contemporaneous files, it states that "there are discrepancies between the 2022 Profit and Loss Statement produced by Concierge Live in this case (CL034282) and the 2022 Profit and Loss Statement provided to CNB in 2023 (CL034406)." (Mot. at 3). This is an implicit admission that the other years are consistent. As to the claimed "discrepancies" from 2022, Spotlight does not reveal the details of its salacious allegation or attach the two exhibits. The reason is that there is no inconsistency. The version CNB received was a *preliminary* version of the 2022 financial statement prepared on March 17, 2023. The final 2022 Report comes from April 2023. The ***only*** change between March and April was that Concierge Live credited an additional $308 to the March figure. Having gone through the effort of comparing each of the financial statements, one might think that Spotlight would report its actual findings. But, consistent with the entire motion, Spotlight prefers innuendo to facts.

Going even further afield to raise alarm about issues that do not even relate to the general ledger, Spotlight alleges two instances in which Concierge Live provided clients due diligence financial statements that Spotlight *admits* were facially unaudited, meaning they "do not contain a certification or any other indication that they were reviewed by an auditor." (Pardo Dec. at 16). Truist Bank does not require audited reports[1], but Spotlight suggests that Concierge Live may have sought to mislead Truist Bank in order to gain some "preference." Spotlight fails to disclose that Concierge

---

[1] Ex. A to the accompanying Declaration of Christoph Heisenberg ("Heisenberg Dec."), asking for "Audited or Unaudited/Company prepared Financial Statements from the past three years."

Live's transmission of the financial statements to Truist Bank explicitly stated that the documents were not audited. (Heisenberg Dec. Exh. B).

Further refuting Spotlight's innuendo that Concierge Live is engaged in "monkey business," Concierge Live has offered to provide its general ledger entries if Spotlight would provide its own general ledger entries. Concierge Live's offer shows that it has nothing to hide, and Spotlight's refusal shows that it does not believe that a general ledger is needed to provide details to analyze damages. Spotlight is pursuing this motion as a fishing expedition for a last-minute defense or as a back-door vehicle to throw mud, all in an effort to divert attention from its own false advertising that has caused Concierge Live tens of millions in damages.

## III.    DISPUTED DISCOVERY REQUESTS

### A.    Spotlight's Request for Production No. 18

**Request No. 18:** Documents sufficient to show Your monthly sales, revenue, direct and allocated costs, and profits (net and gross) for your ticket management services within the United States for the last five years.

**Supplemental Response to Request for Production No. 18:[2]**

Concierge Live incorporates by reference its General Objections. Concierge Live further objects to this Request on the grounds that it is overbroad, unduly burdensome, and disproportionate to the needs of the case. Concierge Live objects to this Request on the basis that documents are commercially sensitive and proprietary, and will not be produced without appropriate protections. Concierge Live also objects on the basis that information prior to May 2019 is not relevant to this action.

Concierge Live objects to the Request as it is overly broad, containing no limitation to a relevant time period, and seeks information from periods not relevant to

---

[2] After the Court granted-in-part and denied-in-part Concierge Live's Motion to Dismiss on August 30, 2024 but before Spotlight filed its Second Amended Complaint, Concierge Live served objections to Spotlight's discovery requests on the grounds that no live claims existed.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

the dispute.  Unless stated otherwise in the response, Concierge Live's responses are for the period January 31, 2021 to the date of this response. See Cal. Civ. Proc. Code, § 338, subd. (a)); Code Civ. Proc. § 339(1); *Al-Ahmed v. Twitter, Inc.*, 648 F. Supp. 3d 1140 (N.D. Cal. 2023).

Given the foregoing objections and Concierge Live's General Objections, Concierge Live will produce non-privileged documents sufficient to show monthly sales, revenues, costs and profits.

**B.    Spotlight's Interrogatory No. 5**

**Interrogatory No. 5:** Identify Your monthly sales, revenue, and profits (net and gross) for your ticket management services within the United States for the last five years.

**Supplemental Response to Interrogatory No. 5:** Concierge Live incorporates in this response its General Objections. Concierge Live objects to this interrogatory on the ground that it is compound and/or is comprised of subparts constituting more than one interrogatory. Concierge Live further objects on the grounds that the information requested is commercially-sensitive, and Concierge Live will not produce any confidential information until entry of an appropriate attorneys'-eyes-only protective order.

The request is overly broad, seeks information that is not relevant to any party's claim or defense, and is not proportional to the needs of the case because it is not specific to any clients, nor any time period during which there was advertising or promotion of having integration with Ticketmaster.

Subject to the foregoing general and specific objections, Concierge Live responds as follows:

Concierge Live is willing to meet and confer with Spotlight/Ticketmaster, for the purpose of agreeing to a bilateral exchange of records pursuant to Fed.R.Civ.Pro. 33(d) that are sufficient to provide responsive information for relevant periods upon entry of

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

7

1  an appropriate attorneys'-eyes-only protective order.

2  **IV.    SPOTLIGHT'S POSITION**

3      **A.    Legal Standard**

4      Federal Rule of Civil Procedure 26(b)(1) permits discovery of "any

5  nonprivileged matter that is relevant to any party's claim or defense and proportional to

6  the needs of the case."  The Federal Rules of Civil Procedure feature "liberal discovery

7  principles" and that when defendants seek to limit discovery, they "carry a heavy burden

8  of showing why discovery" should be denied.  *Better Care Plastic Tech. Co. v. Stop C-*

9  *19, LLC*, No. 521CV00216JWHSPX, 2022 WL 2037117, at *2 (C.D. Cal. Mar. 7,

10  2022).  The relevance standard is commonly recognized as one that is necessarily broad

11  in scope in order 'to encompass any matter that bears on, or that reasonably could lead

12  to other matter that could bear on, any issue that is or may be in the case.'"  *Clark v.*

13  *City of Los Angeles*, No. CV2010768CASPVC, 2021 WL 4731353, at *4 (C.D. Cal.

14  Aug. 23, 2021).  "The proportionality inquiry [in Rule 26(b)(1)] focuses, at bottom, on

15  analyzing the marginal utility of the discovery being sought."  *Tubio v. Adidas Am. Inc.*,

16  No. CV 22-6424 GW (PVCX), 2023 WL 9420334, at *2 (C.D. Cal. Nov. 27, 2023).

17      **B.    Concierge Live's General Ledger and Other Financial Documents Are**

18          **Relevant to the Determination of Damages to Both Spotlight's**

19          **Affirmative Claims and the Counterclaims, and Also May Evidence**

20          **Material Misrepresentations by Concierge Live**

21      The information in Concierge Live's general ledger and other financial

22  documents maintained in the usual course of its business is highly relevant to the

23  determination of damages and, based on what has been disclosed in discovery, may

24  evidence material misrepresentations to customers and prospective customers in the

25  market space at issue.

26      The general ledger is likely to allow for analysis and understanding of the

27  balances reflected in Concierge Live's internally-prepared financial statements.  A

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

general ledger detail report would be helpful even if a full set of financial statements were provided by Concierge Live because it would provide a more granular view of Concierge Live's activities, which is necessary to determine damages sustained by Spotlight. Moreover, a claim of monetary recovery evaluates the incremental profits of the wrongdoer and is typically accomplished by detailed analytical analysis of expense line items.

To date, Concierge Live has provided only certain internally-prepared profit and loss summaries and balance sheets which were either prepared for litigation purposes or misrepresented to prospective customers or customers as "Audited Financials," which it now claims do not exist at all. While those documents should all be produced so that they can be compared to the actual financial records (and assessed to the extent they purport to customers to be something they are not), these documents are woefully insufficient for Spotlight and its expert to analyze Concierge Live's financial performance, and raise questions about Concierge Live's activities which Plaintiff is unable to answer.

For example, between 2018 and 2020, Concierge Live's revenues declined by more than ▇▇ percent ($▇▇▇▇▇▇▇▇▇), but then increased by more than ▇▇ times (from $▇▇▇▇▇▇▇) between 2020 and 2024. Spotlight requires sufficient information to assess whether such revenue fluctuations were due to Concierge Live's alleged wrongful activities. Moreover, Concierge Live's internally prepared financial summaries show only one line for cost of goods sold. Cost of goods sold is one of the largest reported balances for each year, however, without any of the actual information that would be included in the ledgers (and presumably in real "Audited Financials"). Thus, it is not possible to understand its components and, by extension, analyze Concierge Live's operations and level of profitability.

There is no other way for Spotlight to obtain the necessary information about Concierge Live's financials. Concierge Live now claims that it does not maintain

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

audited financials, and it is now apparent that the "audited" financials they purportedly sent to a prospective customer were the same type of internally-generated reports that they produced to Spotlight (albeit inconsistent with what was produced to Spotlight). Apart from documents Concierge Live created for this litigation, it has articulated no other source in which the relevant financial information may be contained, and has not offered to provide Spotlight with any such source.   Instead, it has refused to provide that information.

## C.    Additional Financial Records Are Required To Verify The Accuracy Of Concierge Live's Facially Suspect Documents

Moreover, Spotlight needs assurances as to the accuracy of the financial information which Concierge Live did produce.  The documents provided contain inconsistencies, lack sufficient information, and contain suspect line items.  For example, the P&L documents do not break down direct versus allocated overhead. One of the P&L documents also lists "minimum guarantee payments" of $███ per year without indicating to whom the payments are made or whether they are a direct expense for corporate ticket management.  Based on the documents provided, Concierge Live appears to be operating at a very profitable ██% margin, yet allegedly has administrative expenses exceeding that margin.  In addition, there are discrepancies between the 2022 Profit and Loss Statement produced by Concierge Live in this case and the 2022 Profit and Loss Statement it provided to CNB in 2023, which was just produced after months of demands being refused.  *See* Pardo Decl., ¶ 16.

Even though Spotlight is not required to show that the made-for-litigation financial summaries are suspect before trustworthy documents become discoverable, here there are reasons to question veracity; at the very least, there is "*some dispute* as to the completeness" of the information, and it is "*not clear*" that the P&Ls "contain all relevant [] information."  *Besco v. City of Longview*, No. 3:15-CV-05493-RJB, 2016 WL 1077266, at *3 (W.D. Wash. Mar. 18, 2016).  That is enough to establish

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

Spotlight's compelling need for the general ledgers and all other purported financial documents being provided to prospective customers, as evidenced in the discovery produced to date (*i.e.*, the purported "Audited Financials" or other financial representations being made to customers). *Id.*

District Courts in the Ninth Circuit have ordered parties to produce general ledgers in similar circumstances. *See, e.g.*, *Top Brand LLC v. Cozy Comfort Co. LLC*, No. CV-21-00597-PHX-SPL, 2022 WL 15519587, at *2 (D. Ariz. Oct. 27, 2022) (ordering production of general ledger which would allow defendants to "sort through the discrepancies and otherwise verify the financial data they have already obtained from plaintiffs); *Acosta v. Austin Elec. Servs. LLC*, 324 F.R.D. 210 (D. Ariz. 2017) (holding that defendant's production of "income statements" drawn from the general ledger was insufficient and ordering production of the general ledger).

The only basis for Concierge Live's refusal to provide its general ledger is that Spotlight declined to reciprocate with its own general ledger. But aside from the fact that this is Spotlight's motion and Concierge Live's grievances (however specious) are not before the Court, the Magistrate already recognized the disparity in the parties' financial productions obviating that argument:

> **THE COURT:** -- [Spotlight] already had an independent entity verify that they're not lying. ***And they say of you, you don't have that, and we're not taking you at your word because we think that there is monkey business happening in here.***
>
> So they want to tell the truth to the jury. They want to know how much you've made, your client has made on this product that they say is violative. ***So you need to have a good reason why you're not going to produce these financials***.

Pardo Decl. Ex. 7, 34:4-11 (emphasis added).

The level of detail in Spotlight's financial reports is irrelevant where they have

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

already been vetted.  By contrast, Concierge Live's supposed financials were produced for litigation, not kept in the ordinary course, and are facially suspect.  Any argument that "parity" exists should be rejected out of hand.  But, in any event, this is not Concierge Live's motion to demand anything.

### D.    Spotlight Requires Additional Assurances Given Concierge Live and its Counsel's Pattern of Past Misrepresentations in Federal Court and Financial Misconduct

The pattern of in-court misrepresentations and similar hedging by Concierge Live's counsel, Attorney Heisenberg, together with the same players at issue in this case, raise additional concerns for Spotlight.  It appears that Concierge Live and Automatiq are operating in concert with each other to prevent the disclosure of information relating to the ties between the common owners/actors among the companies and certain of these same individuals—***and the same lawyer now representing Concierge Live, Christoph Heisenberg***—have previously been sanctioned, punished and/or admonished for engaging in misconduct in federal court in not-so-different circumstances.

While representing Drew Gainor (one of the supposed "third party" targets of discovery who is obfuscating discovery here even though he has been an "advisor" to Concierge Live since 2017) and Gainor's former company, Seat Scouts (which is now owned by Automatiq), Attorney Heisenberg and the clients he represented were admonished by Judge Sidney H. Stein of the Southern District of New York multiple times for underhanded practices, misleading conduct, and lack of candor to the tribunal, demonstrated by the below excerpts from the public record in that case alone:

- "The Court concludes by noting its increasing concern over Seat Scouts' underhanded maneuvers and essentially complete lack of candor with the Court."[3]

[3] *Broker Genius Inc. v. Seat Scouts LLC and Drew Gainor*, 17-CV08627 (SHS), Mem.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

- "MR HEISENBERG: Your Honor, I certainly did not intend to mislead. THE COURT: And you always tell me that. Let's stop now."[4]

- "THE COURT: I'm very perturbed, and it's not the first time. Mr. Heisenberg, you speak very rationally. To not disclose the fact that indeed it was you who put that in the trial record is very disturbing."[5]

This is reminiscent of Concierge Live and its counsel's continued obfuscation regarding the existence of audited financials. Attorney Heisenberg has now unequivocally stated that Concierge Live does not have audited financials:

> **THE COURT:** Mr. Heisenberg, what say you?
>
> **MR. HEISENBERG:** So very simply, they've asked about audited.
>
> And, as you've heard, ***we have said we do not have audited***.

Pardo Decl. Ex. 7, 33:2-5 (emphasis added). On the other hand, Concierge Live has represented to third parties that it does have audited financials, even sending documents to a bank that it described as "audited financial statements" "reviewed by our auditors at Verdant Accounting":

> To Whom It May Concern:
>
> Per your request, attached are the following documents:
>
> - Audited Financial Statements for 3 consecutive years for Concierge Live, LLC as well as 2023 Profit & Loss and Balance Sheets reviewed by our auditors at Verdant Accounting, Omaha, NE.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

---

and Order, 2020 WL 3250298 (S.D.N.Y. June 16, 2020) (Pardo Decl., Ex. 10).

[4] *Broker Genius Inc. v. Drew Gainor and Seat Scouts LLC*, Plaintiff's Reply Memorandum of Law in Further Support of its Cross Motion for an Order of Contempt and Sanctions, 2019 WL 8584837 (S.D.N.Y. Dec. 3, 2019), at p. 13 (citing Nov. 26, 2019 Trial Transcript at 36:5-14) (Pardo Decl., Ex. 11).

[5] *Id.*

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

1  Pardo Decl., Ex. 9.  However, the purported "Audited Financials" provided to CNB—

2  which were finally produced on October 31—*were not actually audited financials and*

3  *merely appear to be the same type of summary report created for this litigation*.  Pardo

4  Decl., ¶ 16.

5  Similarly, as is evidenced in Concierge Live's own production, Truist—another

6  financial institution—required Concierge Live to provide audited financials as part of

7  its RFP process to gain preferential status, and Concierge Live supposedly provided

8  these documents:

9  

10   

11  

12  

13  Pardo Decl., Ex. 12.  *Conveniently, although Concierge Live won the Truist business,*

14  *they have not produced any so-called "audited financials" provided to Truist.*  Pardo

15  Decl., Ex. 13.

16  These suspect actions only amplify Spotlight's concerns when coupled with the

17  fact that Concierge Live's principals were previously investigated and sued by multiple

18  state attorneys general for making misrepresentations to the markets in which they

19  operated (similar to the allegations set forth  in this lawsuit of false advertising and

20  unfair  competition) (*see,  e.g.,*  https://www.northcentralpa.com/news/refunds-

21  available-after-ags-office-reaches-settlement-with-online-ticket-

22  vendor/article_f536d97e-2d52-11eb-81d1-7b9750b4e20e.html (last viewed November

23  6,  2025)[6],  https://www.ticketnews.com/2019/01/broker-genius-trial-seat-scouts-

24  judgement/ (last viewed November 6, 2025)[7], in addition to engaging in financial

25  _____

26  [7] After entering a preliminary injunction against Seat Scouts and Drew Gainor, the Court

27  entered an order of contempt against them "for blatantly violating the preliminary

28  injunction." 2020 WL 3250298, *Broker Genius Inc. v. Seat Scouts LLC and Drew*

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

14

1    crimes,[8] Spotlight needs to ensure it is receiving accurate financial information from
2    Concierge Live, which already is facially suspect, inconsistent and/or misleading.

3    **V.    CONCIERGE LIVE'S POSITION**

4          While a "general ledger contains information that is 'unquestionably relevant' ",
5    its production is intrusive and burdensome, and therefore it is not compelled where its
6    necessity is purely speculative. *G.P.P., INC. v. Guardian Protection Products, Inc*,
7    2020 WL 3868461, at *3 (E.D.Cal. 2020)("the Court is persuaded that the production
8    of GIS's general ledger would be overly burdensome given its likely, and at this point
9    purely speculative, benefit.") Therefore, the party seeking the ledger must show "why
10   [existing] information is not sufficient, and [] proof … suggesting that [defendant]
11   fabricated data." *Foundation for Global Sports Development*, 2021 WL 6618556, at
12   *12.  This is particularly true when, as here, the demand constitutes a last-minute hail-
13   Mary for a full fishing expedition without purpose. *Id*. ("as a purely practical matter,
14   GSD's MTC, brought on the eve of the discovery cut-off, simply was not brought soon
15   enough for USOC to realistically comply with any order requiring production of its
16   entire general ledger.")

17         Spotlight's refusal to provide its own general ledger confirms that a general
18   ledger is not required to obtain "sufficient" details for purposes of a damage model. Its
19   argument is solely a challenge to reliability.  For that, its arguments are misleading (and
20   often factually false), such as the repeated starting premise that it only has been provided
21   financial statements created for "purposes of litigation." Spotlight then acknowledges
22   that, contrary what it represented to the Court before, it has received contemporaneous
23   files predating the litigation. In the end, Spotlight resorts to pure mud-throwing, which
24   it does not even attempt to tie to this motion in any way.

25
26   _____
     *Gainor*, 17-CV08627 (SHS), Memorandum and Order (S.D.N.Y. June 16, 2020).
27   [8]  *See*  https://www.justice.gov/usao-sdny/pr/ceo-and-president-premium-ticket-resale-
     business-pleads-guilty-running-multimillion (last viewed November 6, 2025).
28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

## A.   Sufficiency

The primary question in evaluating the request for a general ledger is whether the existing financial data provides *sufficient* detail. *Foundation for Global Sports Development*, 2021 WL 6618556, at *12. Spotlight makes a half-hearted run at this argument. That is because Concierge Live has requested the same information from it, so if sufficiency were the issue, Spotlight would have to reciprocate. Spotlight has expressly refused to exchange general ledgers, on the grounds that financial statements suffice.

> *I thought Friday morning's email to you and Katherine addressed the open document issues raised in her letter, particularly the issues surrounding exchange of financial data underlying the p/ls. Essentially, we are willing to do bilateral discovery -- whether on aggregate expense categories or even on individual general ledger entries. We certainly agree to produce all revenues (Saas or otherwise) for the identified clients in our request, and for those you identify. I know you have raised the issue, for example, or certain expenses (presumably to determine if they are direct COGS or other). I question whether that requires the full general ledger of every expense, but as long as we have access to your client's general ledger for all of its expenses, we will reveal the same to you.*

(Heisenberg Dec. Ex. E.)   Spotlight takes that position even as its current production is woefully lacking detail when compared to Concierge Live's production. Spotlight has provided a single line-item for revenues, costs and profits.  See Heisenberg Dec. Ex. C at Spotlight_40767). In contrast, Concierge Live's financial statements show 65 individual component revenue entries, and 92 individual component expense items. (Heisenberg Dec. Ex.D at CL0000284-286).

Spotlight betrays that the sufficiency argument is not real, switching its argument from sufficiency to reliability, arguing that "[t]he level of detail in Spotlight's financial reports is irrelevant where they have ***already been vetted***." (Mot. at 1, 11)(emphasis added). The "level of detail" is relevant to the sufficiency, while vetting goes to

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

16

reliability.

As a result, Spotlight's attempts to argue sufficiency are feeble. Spotlight's notes that Concierge Live's revenues declined between 2018 and 2020, but then increased between 2020 - 2024.  Revenue changes have *nothing* to do with the general ledger, as they are reflected in macro issues, not micro individual entries.  Moreover, the dip in revenues in 2020 and subsequent growth, which Spotlight suggests to be suspicious, are mirrored in Spotlight's own financials, which is hardly surprising because both companies earn revenues from clients managing tickets to sporting and entertainment events, and those were cancelled in 2020 due to Covid.

Spotlight continues, arguing that Concierge Live's financials "show only one line for cost of goods sold."

> *Cost of goods sold is one of the largest reported balances for each year,*
> *however, without any of the actual information that would be included*
> *in the ledgers (and presumably in real "Audited Financials").*

(Mot. at 9).   None of that is true. First, Spotlight's suggestion that "real" audited statements provide more details is demonstrably false.  Spotlight's "Audited Financials" provide *fewer* details, with its profit and loss Statement of Operations for 2024 containing only a single aggregate "Cost of Revenue" item. (Heisenberg Dec. Ex. C), In contrast, Concierge Live's financials provide more than 80 line items. (Heisenberg Dec. D). Indeed, Spotlight is able to cite specific cost items, such as "unexplained large payments to companies owned by Defendant's principals," and "assorted suspect large items such as 'Guaranteed Minimum Payments'." (Pardo Dec., ¶ 9). Spotlight presents no explanation for its characterization of these as "unexplained" or "suspect." (See Spotlight Mot. at 1). Any information Spotlight claims to seek would not be found in the general ledger, but through deposition questions. Put another way, if Spotlight believed that the general ledgers are necessary to construct damage/disgorgement remedies (which both parties seek), then it would be required to provide its general

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

ledger to Concierge Live. Concierge Live has offered to exchange general ledgers with Spotlight. Spotlight rejected that exchange. That is why Spotlight switches from arguing insufficiency to arguing reliability.

## B.    Reliability/Fabrication

The primary thrust of Spotlight's motion is a narrative meant to cast doubt on the *reliability* of the financial statements, or more likely, air irrelevant arguments based entirely on false statements, mischaracterization of facts, and innuendo. None of that holds up to the slightest scrutiny.

### 1.    Spotlight's false "created for purposes of the litigation" argument

Spotlight starts by repeatedly asserting the falsehood that the financial reports were "produced" (Pardo Dec. ¶5) or "generated" (*id.*, ¶ 9) *for purposes of the litigation*. Spotlight's word-choice is nicely ambiguous, meant to suggest that the data itself was manipulated for the litigation. However, Spotlight has been corrected repeatedly,[9] but persists in misstating that they "were literally created for litigation," (Mot. at 1) or "made-for-litigation." (*id.*, 10). Repeating a misleading statement does not make it true.

### 2.    Spotlight's false "refused to produce contemporaneous versions" argument

In another attempt to suggest impropriety where none exists, Spotlight falsely states that Concierge Live delayed or even refused to provide contemporary financial

---

[9] By September 8th letter, Concierge Live advised Spotlight that "the financial statements provided by Concierge Live *are the company's official records*, and that it does not have audited financial statements. *Concierge Live is able to generate further component line entries and will provide those later this week*." (Pardo Dec. Ex. 3, n.1)(emphasis added). Giving Attorney Pardo the fullest benefit of the doubt, he perhaps misinterpreted this statement when he characterized it to the court as "Concierge Live's counsel admitted [the financial statement] were produced for purposes of litigation." See October 31, 2025 Declaration that (Doc. 99-1 ¶11). It is less clear why this misunderstanding continues to be cited throughout the present motion.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

statements to demonstrate that they match the ones that it provided to Spotlight. The opposite is true. Spotlight has been provided with contemporaneous files confirming the underlying data records that were *printed* "for litigation" match the financial records maintained in the ordinary course. Spotlight first raised a demand for the CNB files at the October 27th IDC with the Court. When the Court suggested that Concierge Live provide the requested confirmatory files, Concierge Live readily agreed to do so. Even as Concierge Live's counsel was boarding a plane on October 29th for the deposition of Spotlight's C.E.O., it committed to producing the CNB documents on October 31st:

> *As to the CNB CL financials, I have assembled them and will begin processing them eta Friday when I'm back.*

(Heisenberg Dec. Ex. F). This did not stop Spotlight from drafting a lengthy email that ignored counsel's statement and instead used it as pretext to justify Spotlight's unwillingness to proceed with long-scheduled depositions:

> *In light of your refusal to answer a very straightforward question and the fact that Concierge Live has not provided any financial information*

(*id.*) Concierge Live did produce the files on October 31st, but Spotlight also ignored that actual production and instead represented to the Court, in its Ex Parte application to continue the trial and discovery deadlines, representing to the Court that it had ***not*** received contemporaneous financial statements. (See October 31, 2025 Declaration of Christopher Pardo ¶12 ("At the present, Defendant has refused to provide even the most basic financial discovery, instead *giving only* a rudimentary ledger with no supporting documents that Concierge Live's counsel later admitted was created for purposes of this litigation. *No actual financial documents maintained in the course of Concierge Live's business have been produced as a result*."). Spotlight now acknowledges that, at the time of that filing, it already had received the requested financial statements contemporaneously sent to CNB. (November 8, 2025 Declaration of Christopher Pardo ¶15).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

JOINT STIPULATION REGARDING PLAINTIFF
SPOTLIGHT TICKET MANAGEMENT, INC.'S MOTION TO COMPEL
Case No.: 2:24-CV-00859

Spotlight also attempts to suggest Concierge Live's delayed in offering financial disclosures, omitting that it has been *Concierge Live* that has been pushing Spotlight for this discovery since September. (Pardo Dec. Ex. 3).

### 3. Spotlight's false "discrepancies" argument

Now that Spotlight has multiple versions of financial statements contemporaneously prepared and sent before any litigation, it has been able to compare them. The only issues it identifies are for a single year, the 2022 financials, as to which Spotlight contends that "there are discrepancies between the 2022 Profit and Loss Statement produced by Concierge Live in this case (CL034282) and the 2022 Profit and Loss Statement provided to CNB in 2023 (CL034406)." (Pardo Dec. at 16). Spotlight does not explain further, letting the word "discrepancies" suggest a lot.

Spotlight's refusal to explain is because there is no "discrepancy"[10] between the March 2023 version provided to CNB, and the final statement from April 2023. Instead, there is a single adjustment of *$308.71* from revenue added to the March 2023 *preliminary* 2022 financial statement (sent to CNB), and Concierge Live's 2022 financial statements finalized in April 2023 (produced herein). Once again, the facts do not match Spotlight's innuendo.

### 4. Spotlight's false "misrepresented as audited" argument

Moving completely away from any "reliability" argument related to the general ledger, Spotlight cites supposed "misrepresentations" by Concierge Live in responding to customer due diligence from Concierge Live providing clients with what Spotlight acknowledges to be financial statements facially are unaudited, as "[t]he financial records provided to CNB do not contain a certification or any other indication that they were reviewed by an auditor." (Pardo Dec. 16). A bank knows what audited financials are –they involve an *auditor.* That flimsy theory runs into a complete dead end against

---

[10] A discrepancy means inconsistency. There is nothing inconsistent between preliminary results that are updated or adjusted before being finalized.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

the facts.  Truist does not require audited financial statements, and Spotlight's theory is only that Concierge Live sought to receive a "preference."

> *Similarly, as is evidenced in Concierge Live's own production, Truist— another financial institution—required Concierge Live to provide audited financials as part of its RFP process to gain preferential status, and Concierge Live supposedly provided these documents.*

Pardo Decl., Ex. 12.  Even that theory is dispelled by the fact that Concierge Live transmitted the financials and expressly drew attention to the fact that the files were <u>not</u> audited:

> *As relatively small/mid-sized companies, we don't keep regular Statements of Cash Flows and our other financial clients; JP Morgan, Comerica, Thomson Reuters, Investors Bank, etc. have been fine with that.  Should you need more info, we can always connect you to our accounting firm.*

(Heisenberg Dec. Ex. B).  It bears noting that Spotlight has had these records since June 15, 2025, and if it truly believed it was relevant, had the full opportunity to ask Truist or CNB if they were "misled." Unsurprisingly, Spotlight has failed to pursue discovery into this tangential theory. Only in late October, 2025, when Ticketmaster confirmed Concierge Live's API integration, has Spotlight invented it.

### 5.    Spotlight's false "evasiveness" argument

In an effort to bolster this false narrative, Spotlight suggests that Concierge Live was attempting to hide the fact that its financial statements are unaudited. Spotlight spends a great deal of time on the issue, insinuating that Concierge Live was not forthcoming about the fact that its financial statements are unaudited. (Mot. at 2). Spotlight's motion even goes so far as suggesting that Concierge Live only "admitted" not having audited financial statement after being "put on the spot by the Court" at the October 27th informal discovery conference.  (See Mot., *supra* at 2).  Yet, the email

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

(Exhibit 2 to the Pardo Declaration) submitted by Spotlight shows that Concierge Live had already confirmed this fact to Spotlight on September 8, 2025. Having unaudited financials is not problematic in any fashion, and as shown above, Concierge Live freely disclosed this to the few parties that even requested financial statements during their due diligence.

### 6.    Spotlight's unrelated ad hominem attacks

Spotlight ultimately drops all pretense of connecting arguments to the reliability of Concierge Live's financial statements, and simply slings mud. In guilt-by-association, it cites misdeeds of Concierge Live's former owner, even though he had nothing to do with the current owners and has not been involved in the company since 2017. How that former owner might be related to the company's 2020-2025 financials is not explained. Plumbing the depths of past cases, Spotlight cites to dopped investigations, vacated opinions, other unproven allegations. For example, Spotlight attempts to tar Mr. Volpone by citing the *Broker Genius v. Seat Scout* action, but fails to disclose that Mr. Volpone was dismissed from that case. (See May 14, 2018 Order, Docket 120).  By Spotlight's standard, the allegations of fraud and trade libel against Spotlight and its senior managers Anthony Knopp, Kenneth Hanscom, and Joseph Greiner, including allegations that survived a motion to dismiss (see *Stubhub, Inc. v. Spotlight Ticket Management, Inc., Anthony Knopp, Kenneth Hanscom, Joseph Greiner, Jen-ban Ho, and Matthew Huff*, 2024 WL 2958798 (Cal.Super. 2024)) would give cause to compel Spotlight's general ledger. We presume that those gentlemen would argue that these unsuccessful allegations are irrelevant here. Not content, however, Spotlight even resorts to citing two investigations into Covid-refund policies of Volpone's other companies, even where those investigations did not proceed any further.

Spotlight even alleges acts by Hinckley & Heisenberg LLP, without any supporting tissue connecting it to Concierge Live's financials.  There is no explanation

as to how the firm, which never represented Concierge Live before January 2024, might have altered or falsified the company's 2021-2023 financials (leaving aside that Spotlight's only allegations are the single $308 adjustment referenced above).

In sum, Spotlight offers no evidence to meet the legal standards for the intrusive examination of six years of every transaction by Spotlight. Instead, the motion's purpose appears simply to be a vehicle for throwing mud to distract from its own literally- false advertising campaign that has caused damages of tens of millions to Concierge Live during that period.

DATED: November 13, 2025

**HUNTON ANDREWS KURTH LLP**

By:  */s/ Katherine P. Sandberg*
      Christopher M. Pardo
      Edward T. Colbert, Esq.
      Erik C. Kane, Esq.
      Katherine P. Sandberg
Attorneys for Plaintiff
Spotlight Ticket Management, Inc.

**HINCKLEY & HEISENBERG LLC**

By:  */s/ Christoph C. Heisenberg*
      Christoph C. Heisenberg
Attorneys for Defendant Concierge Live, LLC

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, California 94111

## <u>ATTESTATION</u>

I, Katherine P. Sandberg, attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

Dated: November 13, 2025

By:   */s/ Katherine P. Sandberg*
      Katherine P. Sandberg

24