HINCKLEY & HEISENBERG LLP
Christoph C. Heisenberg,
NY Bar No. 2395010 (*pro hac vice*)
 *cheisenberg@hinckley.org*
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601
Telephone: 212.845.9094
Facsimile: 212.820.9790

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ERIC J. LORENZINI, State Bar No. 218433
 *elorenzini@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Defendant and
Counterclaimant Concierge Live LLC

[*Additional Counsel listed on following page*]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SPOTLIGHT TICKET MANAGEMENT, INC. d/b/a TICKETMANAGER,<br><br>Plaintiff,<br><br>v.<br><br>CONCIERGE LIVE LLC,<br><br>Defendant.<br><br>———————————<br><br>CONCIERGE LIVE LLC,<br><br>Counterclaimant.<br><br>v.<br><br>SPOTLIGHT TICKET MANAGEMENT, INC. d/b/a TICKETMANAGER,<br><br>Counter-defendant. | CASE No. 2:24-cv-00859-WLH-SSC<br><br>**JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:     February 6, 2026<br>Time:     1:30 p.m.<br>Crtrm:   9B<br>Judge:   Hon. Wesley L. Hsu<br><br>Action Filed:     January 31, 2024<br>Trial Date:       May 4, 2026<br><br>**\*REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL\*** |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

HUNTON ANDREWS KURTH LLP
KATHERINE P. SANDBERG, State Bar No. 3011117
  *ksandberg@HuntonAK.com*
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

HUNTON ANDREWS KURTH LLP
EDWARD T. COLBERT
  *ecolbert@HuntonAK.com*
ERIK C. KANE
  *ekane@HuntonAK.com*
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

HUNTON ANDREWS KURTH LLP
Christopher M. Pardo
  *cpardo@HuntonAK.com*
60 State Street, Suite 2400
Boston, MA 02109

Counsel for Plaintiff and Counter-
defendant Spotlight Ticket Management,
Inc.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

# **TABLE OF CONTENTS**

Page

I.    DEFENDANT CL'S MOTION FOR SUMMARY JUDGMENT ................... 1

A.    Defendant CL's Introduction on its Motion ........................................... 1

B.    Spotlight's Introduction on Defendant's Motion ................................... 4

C.    STATEMENT OF UNDISPUTED FACTS ............................................ 5

1.    Defendant Concierge Live's Statement ..................................... 5

(a)    Background on Ticketing Platforms and Ticket Management Services ................................................ 5

(b)    Types of Integrations ................................................ 6

(c)    Spotlight's 2016 Agreement with Ticketmaster .............. 6

(d)    Spotlight's Integrations ............................................ 6

(e)    CL's Integration with Ticketmaster ............................ 7

(f)    CL's Advertising and Promotional Materials ................. 7

(g)    Spotlight's Advertising and Promotional Materials .......... 8

(i)    Significance of Integrating with Ticketmaster ......... 8

(ii)    Spotlight's Claimed "Exclusive Right to Integrate" ...................................................... 8

(iii)    Spotlight's "Exclusive Ticketmaster Integration" Claim ......................................... 8

(iv)    Spotlight's Claim that CL Lacked Ticketmaster Integration ............................... 9

(v)    Spotlight's Advertisements of Its Web Integrations (and Manual Process) as "Integration" .......................................... 9

(h)    CL's Lost Business Opportunities .................................. 10

2.    Opposing Party Spotlight's Statement ....................................... 10

(a)    It is Undisputed That Defendant Does Not Use the Trade Desk API to Interface with Ticketmaster ............. 10

(b)    It is Undisputed That Defendant Has Not Stopped Telling Customers it is "Integrated" with Ticketmaster ....................................................... 13

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

II.    LEGAL STANDARD ........................................................................ 15

III.    ANALYSIS ...................................................................................... 16

    A.    Moving Party Defendant CL's Argument ............................... 16

        1.    CL Is Entitled to Summary Judgment on Its Counterclaims. ................................................... 16

            (a)    CL Is Entitled to Judgment on Its Lanham Act Counterclaim. ................................. 16

                (i)    Spotlight's Statements of Fact in Commercial Advertising. ......................... 17

                (ii)    Spotlight's Statements Were Literally False. ........ 17

                (iii)    The 2016 Agreement Did Not Provide Spotlight with Exclusive Right to Integrate with Ticketmaster. ................................. 18

                (iv)    Spotlight Did Not Have Exclusive Ticketmaster Integration. ........................ 18

                (v)    Spotlight's Claims of Exclusivity Were Literally False. ........................ 18

                (vi)    Spotlight's Literally False Statements Confused Consumers. ........................ 18

                (vii)    Spotlight's False Statements Were Material. ......... 19

                (viii)    Spotlight Caused Its False Statements to Enter Interstate Commerce. ........................ 20

                (ix)    CL Suffered Harm as a Result of Spotlight's False Advertisements. ........................ 20

            (b)    CL is Entitled to Summary Judgment on Its California False Advertising Counterclaim. ................ 20

            (c)    CL is Entitled to Summary Judgment on Its Unfair Competition Counterclaim. ................ 21

            (d)    CL is Entitled to Summary Judgment on Its Intentional Interference with Prospective Economic Advantage Counterclaim. ................ 21

            (e)    CL Requests for a Damage Phase. ................ 22

         2.    CL Is Entitled to Summary Judgment Dismissing Spotlight's Second Amended Complaint. ................ 23

            (a)    CL is Entitled to Summary Judgment Dismissing Spotlight's Lanham Act Claim. ................ 23

8031213.1
ii

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

(i) Spotlight Has Identified No Promotional Speech. .......23

(ii) Spotlight's Remaining Allegations of Oral Advertising Are Unsupported and Are Non-Actionable Generalities. ..............24

(iii) Spotlight, an Outsider to CL's Ticketmaster Relationship, Lacks Standing to Argue Ticketmaster's Rights. ..........................25

(b) Spotlight Has Failed to Establish Any Falsity. ........26

 (i) Spotlight Has Failed to Establish Any Customer Deception. ...............................26

 (ii) Spotlight's Unclean Hands Bar It from Disputing CL Advertising Its Web Integration as "Integration." ............................27

(c) CL Is Entitled to Summary Judgment Dismissing Spotlight's UCL And FAL Claims. .................29

(d) CL Is Entitled to Summary Judgment Dismissing Spotlight's Tortious Interference With Contractual Relations Claim. ...........................29

(e) CL Is Entitled to Summary Judgment Dismissing Spotlight's Tortious Interference with Prospective Business Claim. .............................29

3. Spotlight's Claims Are Barred by Statute of Limitations and Laches. ....................................30

(a) Spotlight's Lanham Act and False Advertising Claims Are Barred by the Four-Year Statute of Limitations. ...................................30

(b) Spotlight's Tortious Interference Claims Are Barred by the Two-Year Statute of Limitations. .................30

B. Opposing Party Spotlight's Argument. ..........................31

1. Summary Judgment Cannot be Granted on Defendant's First Counterclaim (False Advertising) Because There are, at a Minimum, Genuine Issues of Material Fact .....31

2. Summary Judgment Cannot be Granted on Defendant's Second, Third, or Fifth State Law Counterclaims for the Same Reasons Judgment is Inappropriate on Its Federal Claim. .................................35

3. Summary Judgment *Can* be Granted on Spotlight's First Claim (False Advertising), Just Not in the Way Defendant Thinks ...................................36

4.  Defendant's "Unclean Hands" Defense Bears No Relation to the Spotlight's Lanham Act Claim .......................................... 40

5.  Summary Judgment Cannot be Granted Against Count IV (Tortious Interference with Contractual Relations) or Count V (Tortious Interference with Prospective Business) Because There are, at a Minimum, Genuine Issues of Material Fact .......................................... 43

6.  Defendant's "Statute of Limitations" Defense Against Count I is Not Real and Cannot Bar the Continuing Torts Alleged .......................................... 44

    (a)  Spotlight's Lanham Act Claim (Count I) is Not Subject to a Statute of Limitations, and the Defense of "Laches" Cannot Bar the Continuing Torts Alleged Here .......................................... 44

    (b)  Summary Judgment Cannot be Granted Against Spotlight's State Law Claims (Counts II, III, IV, and V) .......................................... 46

IV.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT .......................................... 49

    A.  Plaintiff's Introduction for Plaintiff's Motion .......................................... 49

    B.  Defendant's Introduction for Plaintiff's Motion .......................................... 51

V.  STATEMENT OF UNDISPUTED FACTS .......................................... 54

    A.  Plaintiff's Statement of Facts .......................................... 54

        1.  Spotlight and Its Close Relationship with Ticketmaster .......................................... 54

        2.  The Nature of the Corporate Ticket Management Market .......................................... 55

        3.  Defendant and Its Failed Efforts to Integrate with Ticketmaster .......................................... 56

        4.  Defendant's Literally False Claims About "Integration" .......................................... 61

    B.  Defendant CL's Statement of Facts .......................................... 63

        1.  There are Several Methods of Achieving System Integration .......................................... 63

        2.  Ticketmaster's APIs Constitute a Direct Integration .......................................... 64

        3.  CL Was Granted, Not Refused, Permission to Integrate with Ticketmaster's APIs .......................................... 65

        4.  CL's Integration Did Not "Fail"; CL Established the TradeDesk API Integration Before Transferring Management of CL's API to Seat Scouts .......................................... 65

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

(a)   In April 2019, Ticketmaster Approved CL's Use of the TradeDesk and TicketInfo APIs Through Seat Scouts. ...................................................................... 66

5.   Ticketmaster Has Confirmed CL's Completion of its TradeDesk and TicketInfo Integrations. ........................................ 67

6.   CL's Web Integration Constitutes Another Form of Integration. ....................................................................................... 67

7.   Ticketmaster's Prior Hearsay Statements, Since Recanted, Do Not Dispute CL's Integration. .............................................. 68

(a)   Ticketmaster's Clarification of the April 2025 Letter .......................................................................... 68

VI.   ANALYSIS ................................................................................................ 69

A.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I ............................................................................................ 69

1.   Plaintiff's Argument ...................................................................... 69

(a)   Summary Judgment Should Be Granted on Count I Because Defendant's Advertising Claims About Supposedly Having "Ticketmaster Integration" Are Literally False .................................................................... 69

(b)   Defendant's Claim of "Ticketmaster Integration" is Unambiguous ................................................................. 70

(c)   Defendant's Claim of "Ticketmaster Integration" is False .................................................................................... 72

(d)   The Grant of Summary Judgment is Appropriate ........... 74

2.   Defendant CL's Response ............................................................. 77

(a)   Spotlight's Motion Fails Because it Cannot Establish Falsity. ............................................................. 77

(i)   CL's Definition of "Integration" Includes Indirect Integrations and Web Integrations. ......... 77

(ii)   CL's API Integration is Direct. ............................ 78

(iii)   Ticketmaster Cannot Show Falsity Through Hearsay Statements that are Not Probative of CL's TradeDesk Integration. ................................. 79

A)   Ticketmaster's Hearsay Statements are Inadmissible. ................................................. 79

B)   Ticketmaster has Since Withdrawn or Clarified Its Earlier Statements .................... 80

|  | | (iv) | The Conclusory Characterizations from Former Employees are not Admissible Evidence. | 82 |
|  | | (v) | Spotlight's Attempt to Portray CL's Web Integration As Not Being an Integration Also Fails. | 84 |
|  | | (vi) | Spotlight Lacks Standing to Argue Supposed Violations of Ticketmaster's Terms of Use. | 85 |
|  | (b) | | Spotlight Can Show No Advertising. | 86 |
| B. | | | PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST COUNTERCLAIM | 87 |
| 1. | | | Plaintiff's Argument | 87 |
|  | (a) | | Partial Summary Judgment Should Be Granted on the First Counterclaim Because Even Under Defendant's Definition, Its Systems are Not "Integrated" With Ticketmaster | 87 |
| 2. | | | Defendant's Response | 89 |
| VII. | | | CONCLUSION | 89 |
| A. | | | CL's Brief Conclusion | 89 |
| B. | | | Opposing Party Spotlight's Brief Conclusion | 90 |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

### Cases

*AECOM Energy & Constr., Inc. v. Ripley,* 348 F. Supp. 3d 1038 (C.D. Cal. 2018) 19

*Ambre v. Joe Madden Ford*, 881 F. Supp. 1187 (N.D. Ill. 1995) ...........................37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................15

*Apex.AI, Inc. v. Langmead,* 2024 WL 1117055 (N.D. Cal. 2024) ........................34

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) .........................23

*Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 878 (Cal. 2013)...........................48

*Boon Rawd Trading Int'l v. Paleewong Trading Co., Inc.*, 688 F.Supp.2d 940
   (N.D.Cal.2010) ............................................................................................47

*Burns v. Talon Grp., Inc.,* 2007 WL 9724464 (D. Ariz. 2007)...............................35

*Carney v. Adams*, 592 U.S. 53 (2020)...................................................................26

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)......................................................88

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)
   .................................................................................................23, 38, 75

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525
   (9th Cir. 1991) .............................................................................................82

*Danjaq, LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001)....................................45

*Del Mar Woods v. Philadelphia Indemnity Insurance Company*, 791 F.Supp.3d 1170
   (S.D. Cal. 2025) ...........................................................................................80

*Dish Network L.L.C. v. Jadoo TV, Inc.*, 2023 WL 4004115 (N.D. Cal. 2023) .........83

*Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.,* 411 F.
   Supp. 3d 905 (N.D. Cal. 2019)....................................................................19

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132 (9th
   Cir. 2001).....................................................................................................16

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48 (2d Cir. 2002)

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

.............................................................................................38

*First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) .24, 38

*FLIR Systems, Inc. v. Sierra Media, Inc.*, 903 F. Supp. 2d 1120 (D. Or. 2012) .......19

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987) ......27, 42

*Gen. Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647 (S.D.N.Y. 1997) ................18

*Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Ass'n*, 19 Cal. App. 5th 399 (2018)..............................................................................................22

*Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935 (C.D. Cal. 2005) ..................38, 75

*Gordon v. Cate*, 2014 WL 848212 (N.D. Cal. Feb. 28, 2014).................................82

*Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 19-56008, No. 19-56072, 2021 WL 3702243 (9th Cir. Aug. 20, 2021) ...........................................22

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73 (S.D.N.Y. 1980) ....28, 85

*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989)..............76

*Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169 (D. Or. 2008).......22

*Heitkoetter v. Domm*, 2025 U.S. Dist. LEXIS 159971 (E.D. Cal. 2025)...........75, 76

*Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001)..............22

*ImprimisRx, LLC v. OSRX, Inc.*, 2023 WL 8604148 (S.D. Cal. 2023)..............44, 45

*In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F. Supp. 915 (C.D. Cal. 1994)..........................................................................................17

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010)..................................15

*In re Outlaw Laboratory, LLP*, 463 F. Supp. 3d 1068 (S.D. Cal. 2020)..................47

*In-N-Out Burgers v. Smashburger IP Holder LLC*, 2019 WL 1431904 (C.D. Cal. 2019) .............................................................................................70

*Intamin, Ltd. v. Magnetar Techs. Corp*, 623 F. Supp. 2d 1055 (C.D. Cal. 2009).....27

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002).......43

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.* 304 F.3d 829 (9th Cir. 2002)......30, 45

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002)..............................................................................................74

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

*Jordache Enter., Inc. v. Brobeck, Phleger & Harrison*, 958 P.2d 1062 (Cal. 1998) 48

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)...................22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ..........76

*Long Island Med. & Gastroenterology Assocs., P.C. v. Mocha Realty Assocs., LLC*, 143 N.Y.S.3d 56 (2021)..................................................................................35, 43

*Longbridge Fin., LLC v. Mut. of Omaha Mortg., Inc.*, 2025 U.S. Dist. LEXIS 91179 (S.D. Cal. 2025) ................................................................................................75

*Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892 (9th Cir. 1993)...............35, 44

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........16

*Monster Energy Co. v. Vital Pharms., Inc.*, 2022 WL 1599712 (C.D. Cal. 2022) ...38

*Mutual Pharm. Co. v. Ivax Pharm., Inc.*, 457 F. Supp. 2d 925 (C.D. Cal. 2006).....19

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997)....................74

*Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514 (7th Cir. 2012) ..............................38

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008)............25, 40, 46

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099 (9th Cir. 2000) ................................................................................................................88

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms, Co.*, 290 F.3d 578 (3d Cir. 2002)........................................................................70

*Novation Sols., Inc. v. Issuance Inc.*, No. 2:23-CV-00696-WLH-KSX, 2023 WL 6373871 (C.D. Cal., Aug. 16, 2023)..................................................................17

*Novell, Inc. v. Unicom Sales, Inc.*, 2004 WL 1839117 (N.D. Cal. 2004) .................46

*O'Very v. Spectratek Techs., Inc.*, 2003 WL 25781235 (C.D. Cal. 2003)................46

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990)....................29

*Page v. United States*, 729 F.2d 818 (D.C. Cir.1984) ............................................46

*Parks v. McEvoy*, 2015 WL 435463 (N.D. Cal. Feb. 2, 2015)................................82

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010) ........................................18

*Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925 (7th Cir. 1984)...................45

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000) .................20

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

*PMC, Inc. v. Saban Ent., Inc.*, 45 Cal. App. 4th 579 (1996).....................................29

*Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6 (1st Cir. 2003) ...........................................................................................................24

*Pom Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085 (C.D. Cal. 2016) ...............................................................................................................passim

*Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) ...................................23

*Ramirez v. Navarro*, 2024 WL 1874993 (9th Cir. 2024) .........................................47

*Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067 (N.D. Cal. 2025) .........................................................................................................23, 24

*Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347 (9th Cir. 1963)..........42

*Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir. 1996) ............................................................................................................22

*Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003) ...........................................19

*S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014)...................................42

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039 (S.D. Cal. 2019) ...................................................................................20

*Sears v. Russell Road Food and Beverage, LLC*, 460 F.Supp.3d 1065 (D. Nev. 2020) ...........................................................................................................46

*Sectra Comm. AB v. Absolute Software, Inc.*, 2024 WL 4593019 (W.D. Wash. 2024) ...............................................................................................................75

*Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125 (2020) ...............................21

*Simpson Strong-Tie Company Inc. v. MiTek Inc.*, 2021 WL 1253803 (N.D. Cal. 2021) ...........................................................................................................40

*Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 2008 WL 913279 (N.D. Cal. 2008) ...........................................................................................................46

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)...17, 26, 31, 70

*Star-Brite Distrib., Inc. v. Gold Eagle Co.*, 2016 WL 4470093 (S.D. Fla. 2016).....46

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

*Tartan Films USA v. U2 Home Ent., Inc.*, CV 05-3021 SVW (PLAx), 2006 WL 8434411  (C.D. Cal. May 17, 2006) ........................................................................ 18

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102 (9th Cir. 2006) ........................................................................ 30

*Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144 (2d Cir. 2007) .............. 19

*Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711 (S.D.N.Y. 2000) ........................................................................ 35

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011) .................... 75

*Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974) ............................................ 31

*Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292 (4th Cir. 2017) ............................... 25

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168 (N.D. Cal. 2007) ........................................................................ 24

*Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302 (9th Cir. 1982) ......... 43

*Western Sugar Coop. v. Archer-Daniels-Midland Co.*, 2015 WL 12683192 (C.D. Cal. 2015) ........................................................................ 40

*William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255 (9th Cir. 1995) .................... 19

*Yeager v. Bowlin,* 495 F. App'x 780 (9th Cir. 2012) ............................................... 44

*Zox LLC v. Zox*, 2021 WL 4816664 (C.D. Cal. 2021) ............................................. 47

### Federal Cases

15 U.S.C. §§ 1051 ........................................................................ 44

Cal. Code Bus. & Prof. § 17500 ........................................................................ 21

### Out of State Cases

Cal. Civ. Pro. Code, §339 ........................................................................ 31

Fed. R. Civ. P. 56(a) ........................................................................ 31

### Statutes

1A Callman on Unfair Competition, Trademarks & Monopolies (4th Ed.) § 5:43 .. 21

Basics, 1 Callmann on Unfair Comp., Tr. & Mono. § 5:18 (4th ed.) ........................ 17

8031213.1

*McCarthy on Trademarks and Unfair Competition* § 31.33 (4th ed. 2001) .............46

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Defendant-Counterclaimant Concierge Live LLC ("CL") submits the following memorandum in support of its motion for partial summary judgment against Spotlight Ticket Management, Inc. d/b/a TicketManager ("Spotlight").

## I.    DEFENDANT CL'S MOTION FOR SUMMARY JUDGMENT

### A.    Defendant CL's Introduction on its Motion

Spotlight and CL are technology companies that offer ticket management software to corporate clients. CL's and Spotlight's technologies provide a centralized, one-stop hub to their clients through which the clients can manage their tickets, which may be held in third-party ticketing platforms such as Ticketmaster, AXS, SeatGeek, and Tickets.com.

In 2024, Spotlight sued its competitor, CL, on the theory that Spotlight's 2016 Registered Vendor and Affiliate Agreement with Ticketmaster (the "2016 Agreement") granted it complete exclusivity in the corporate ticket management market segment. The Court summarized Spotlight's allegations as follows:

> In October 2016, Plaintiff entered into an exclusive agreement with Ticketmaster, LLC ("Ticketmaster"), … in which Plaintiff "was granted the exclusive right to directly integrate its technology with Ticketmaster's software and systems platform." (Id. ¶ 22). This agreement granted Plaintiff the exclusive right to have Ticketmaster "integration."

*Spotlight Ticket Management, Inc. v. Concierge Live LLC*, No. 2:24-cv-00859-WLH-SSC, 2024 WL 4866813 (C.D. Cal. Aug. 30, 2024). When produced in this litigation, however, the 2016 Agreement bore no resemblance whatsoever to Spotlight's allegations. Ticketmaster's corporate witness, David Scarborough, confirmed as much:

> Q.   …is it accurate to say that Spotlight was granted the exclusive right to directly integrate its technology with Ticketmaster software and system platform?
>
> A:  We can go back and read the agreement. The exclusive agreement wasn't what you just said, it was that we would not go

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

out and license another company to do ticket management in the first 12 months in 2016 to 2017.

Joint Appendix of Facts ("JAF") ¶ D26.

Spotlight's mischaracterizations of its exclusivity to the Court echo its false advertising to the public. Spotlight falsely promoted itself as having paid Ticketmaster for an "exclusive Ticketmaster integration." Spotlight also engaged in a smear campaign against CL, telling the public that CL lacked a Ticketmaster integration or, worse yet, that CL's access to Ticketmaster was illicit. But in early 2018, Ticketmaster provided CL integration through several of its application programming interfaces ("APIs") for corporate ticket management services, and Ticketmaster has confirmed that "[s]ince approximately April 2019, Concierge Live has used [Ticketmaster's] TradeDesk API in connection with its corporate ticket management services." *Id.* ¶¶ D13, D17.

In light of Spotlight's ongoing false advertising and resulting harm to CL's business, CL filed counterclaims against Spotlight. CL's counterclaims are based on three sets of literally false statements repeatedly made by Spotlight in its extensive advertising and promotional campaigns:

- Spotlight's 2016 Agreement provided it an exclusive right to integrate with Ticketmaster;

- Spotlight has an "exclusive Ticketmaster integration" or the "only" Ticketmaster integration in the corporate ticket management segment; and

- CL lacks a Ticketmaster integration and/or that any connection was the product of some illicit conduct by CL.

Because these statements are literally false, CL is entitled to summary judgment on Counterclaims One through Three and Five (i.e., all counterclaims other than the claim for intentional interference with contract.).

CL also is entitled to summary judgment dismissing Spotlight's Second

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Amended Complaint ("SAC"). Spotlight's false advertising claims fail because (a) CL has, in fact, been integrated with Ticketmaster both by API integration and web integration through Broker Genius, Inc. d/b/a Automatiq ("Automatiq"), a ticket management platform, (b) CL has not even advertised that it is "integrated" with Ticketmaster since 2021, and (c) even if CL did so advertise, it would be truthful because CL is integrated with Ticketmaster through both the TradeDesk APIs and web integration. Spotlight cannot argue that web integration does not constitute integration, because, at the same time, between 2019 and 2021, Spotlight *itself* advertised that it was "integrated" with other ticketing platforms via web integration.

Spotlight's other principal theory of tortious interference—that CL's integration with Ticketmaster violated Spotlight's exclusivity rights as outlined in the 2016 Agreement and that CL's integration was illegitimate —also fails. Ticketmaster has confirmed that (a) CL does have the legal right to integrate with it and (b) Spotlight no longer held any exclusivity under the 2016 Agreement once the exclusivity provision of that agreement expired in 2017. Moreover, Spotlight concedes that Ticketmaster did not breach the 2016 Agreement by granting CL access to its APIs. Simply put, no Spotlight rights have been violated.

Spotlight's literally false advertisements have severely impaired CL's ability to compete fairly. Spotlight saturated the market with a literally false claim that it is the only company with Ticketmaster integration, and clients exposed to that message have been misled into believing that CL could not provide corporate ticket management services. Spotlight's false advertising campaign has resulted in tens of millions of dollars in profits to it at CL's expense.

CL respectfully submits that the undisputed facts entitle it to partial summary judgment on Spotlight's claims and CL's counterclaims, and asks the Court to set a hearing and/or trial on CL's remedies.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**B.    Spotlight's Introduction on Defendant's Motion**

> "Half the truth is often a great lie"
> Benjamin Franklin, *Poor Richard Improved*, 1758

In its moving papers, Defendant (Concierge Live) far stretches the bounds of zealous advocacy.  With selective citations, Defendant seeks to create the impression that its ticket management system uses Ticketmaster's "Trade Desk API" to establish a direct connection with Ticketmaster and make transactions.  *See* p. 3 ("Concierge Live is integrated with Ticketmaster through … the TradeDesk API[]"); *see also id.*, pp. 7-8, 18, 25-27, 29-30.  But that is <u>not</u> what is actually happening.

To the contrary, it is undisputed that since at least 2019, <u>all</u> of Defendant's automated ticket management transactions have been routed through a third-party intermediary named "Seat Scouts" (now, "Automatiq").  Every single one.  Defendant even *admitted* as much in its corporate deposition.  JAF, No. P82 ("Q. And that would be 100 percent of the time?  A. Generally speaking.").  But despite submitting more than six hundred pages of "evidentiary support," Defendant does not even *mention* that fact in its filings, nor does it acknowledge its own testimony on this point.

Defendant also seeks to mislead by suggesting that it no longer tells prospective clients that its "Concierge Live" ticket management system is "integrated" with Ticketmaster.  *See, e.g.,* p. 8 ("Since [late 2021], no print advertising or promotional materials have referenced 'integration.'"); *see also id.*, pp. 3, 23-25, 27.  Once again, though, that is a deceptive half-truth.  After all, if Defendant, years ago, *had* completely stopped telling customers that its system had "Ticketmaster Integration," why would Spotlight have filed this case?  And why wouldn't Defendant just try to end it by voluntarily agreeing not to make any such statements in the future?

The reality is Defendant *hasn't* stopped advertising to prospective customers that it has a "Ticketmaster Integration"—it just no longer does it in *formatted writings* (*e.g.*, printed presentations).  But as Defendant well knows, it continues to make those same false claims in face-to-face sales pitches.  Defendant's CEO (Brian Basloe) can

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

even be seen *on video* doing just that, over and over.  Further, at his deposition, Mr. Basloe admitted that Defendant still regularly tells prospective customer that its "Concierge Live" platform is "integrated" with Ticketmaster even though Ticketmaster has told them for years that such statements are "unequivocally false." JAF, No. P87; *see also* JAF, No. P86.

A motion based on half-truths is not a serious pleading.  Rather than file a brief in which it objectively sets out undisputed facts and then argues the applicability of the relevant law to them, Defendant paints a picture of a world that does not exist and tells us to reject the evidence of our eyes and ears (and of the Record).

As Spotlight explains in its own Motion for Summary Judgment, there is one critical, undisputed fact in this case relevant to summary judgment: Defendant continues to tell prospective clients that its corporate ticket management system is "integrated" with Ticketmaster even though Defendant routes <u>all</u> automated Ticketmaster-related requests (*e.g.*, ticket transfers) through a third-party (Automatiq, formerly Seat Scouts).  *See* JAF Nos. P82, P86-101.  And because the use of a third-party intermediary in that manner does not—under Defendant's own definition, JAF No. P168—constitute an "integration," Defendant's continued claims of a "Ticketmaster Integration" are literally false and should be enjoined.

## C.     STATEMENT OF UNDISPUTED FACTS

### 1.     Defendant Concierge Live's Statement

#### (a)     Background on Ticketing Platforms and Ticket Management Services

Ticketmaster is a ticketing platform that sells tickets for entertainment and sports events through a variety of means, including on its website and its mobile applications. JAF ¶ D1. To help facilitate the purchase, resale, transfer, and management of tickets, Ticketmaster provides third-party entities with access to its website, mobile applications, computer systems, and specialized tools via various APIs and partnership programs. *Id.* ¶ D2.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Ticketmaster has two internal groups, each offering different ticket management APIs. *Id.* ¶ D5. Its Resale Group offers APIs that include the TradeDesk and Ticket Info APIs, which are designed to give ticket resellers the ability to access and manage their ticket inventory and orders (collectively, the "TradeDesk APIs"). *Id.* ¶¶ D4, D5.

A separate group, known as the Partnership Group, provides "Nexus Partners" with access to a separate set of APIs, now known as the Nexus APIs. *Id.* ¶ D3. The Nexus APIs provide certain additional features and analytics. *Id.*

### (b) Types of Integrations

Two software platforms are "integrated" when they are able to work together and share data. *Id.* ¶ D45. For ticketing, this may involve use of APIs, but also can occur through what is known as, and what Spotlight refers to as, web integration. *Id.* ¶¶ D50, D51. A web integration is a process by which data is accessed and transmitted through the user's account on the internet. *Id.* ¶ D50.

### (c) Spotlight's 2016 Agreement with Ticketmaster

On October 6, 2016, Spotlight and Ticketmaster entered into the 2016 Agreement. *Id.* ¶ D22. The 2016 Agreement registered Spotlight as a vendor to provide ticket management services to Ticketmaster's clients. *Id.* ¶ D23. Incidental to that vendor role, Ticketmaster granted Spotlight access to a single group of APIs, the Nexus APIs, which are a set of specific APIs that enable third-party vendors to provide extra services to Ticketmaster's clients. *Id.* ¶¶ D22, D23. The only exclusive right provided in the 2016 Agreement was that Ticketmaster agreed, for the first year *only*, not to hire any other vendor to perform these services. *Id.* ¶¶ D24, D25. That exclusive partnership ended on October 6, 2017. *Id.* ¶ D26.

### (d) Spotlight's Integrations

Spotlight's API integration with Ticketmaster is based on Ticketmaster's "Nexus API." *Id.* ¶ D22. Spotlight advertises as having a complete integration with Ticketmaster. *Id.* ¶ D38. ████████████████████



Spotlight has no integration whatsoever with Paciolan, and uses an entirely manual process to manage tickets to that market. *Id*. ¶ D49.

### (e) CL's Integration with Ticketmaster

Beginning in 2018, Concierge Live requested use of TradeDesk API for the purpose of permitting corporate clients to manage and transfer their tickets. *Id*. ¶ D9. Since approximately April 2019, Concierge Live has used the TradeDesk API in connection with its corporate ticket management services. *Id*. ¶¶ D12, D13. Supplementing its API integration, CL also integrates with Ticketmaster through Automatiq, which provides real-time web integration with ticket markets. *Id*. ¶¶ D18, D19.

Ticketmaster has confirmed that CL is integrated with Ticketmaster through its TradeDesk and TicketInfo APIs. *Id*. ¶ D13. After going live with its integration in July 2019, CL's advisor, Drew Gainor, wrote to Ticketmaster in November 2019, advising it that CL "recently completed a very tight integration" with Ticketmaster's APIs. *Id*. ¶ D8.

### (f) CL's Advertising and Promotional Materials

Starting in June 2019, as CL completed its Ticketmaster integration, CL's

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    promotional materials referenced its ability to "Leverage Modern Ticket

2    Technology" and provide "Ticket platform integration (Ticketmaster, SeatGeek,

3    etc.)" through which CL provided automated inventory uploads and mobile ticket

4    transfers. *Id.* ¶ D57.

5        In late 2021, CL dropped the phrase "Ticket platform integration" from its

6    promotional materials and focused instead on its software's functionality—the

7    ability to offer "automated inventory uploads" from external ticketing platforms and

8    to provide mobile transfers of those tickets. *Id.* ¶ D58. Since then, no print

9    advertising or promotional materials have referenced "integration." *Id.*

10    **(g)    Spotlight's Advertising and Promotional Materials**

11    **(i)    Significance of Integrating with Ticketmaster**

12    ████████████████████████████████████████████████

13    ████████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ████████████████████████████████████████████████

16    █████████████████████

17    **(ii)    Spotlight's Claimed "Exclusive Right to Integrate"**

18    Spotlight's advertising from 2018 to the present centers on its claim that it has

19    an exclusive *right* to integrate with Ticketmaster. *Id.* ¶ D43. Spotlight represented to

20    clients that the 2016 Agreement provided it a right to that exclusive integration. *Id.*

21    But any right to exclusivity ended in 2017. *Id.* ¶ D26. Nevertheless, Spotlight

22    continued to inform its clients that "we pay Ticketmaster for this exclusivity." *Id.* ¶

23    D43.

24    **(iii)    Spotlight's "Exclusive Ticketmaster Integration"**

25    **Claim**

26    Aside from advertising a supposed "right" of exclusivity, Spotlight has also

27    advertised that it, in fact, has actual exclusive integration with Ticketmaster for all

28    corporate ticket management purposes. *Id.* ¶¶ D38–D41. Spotlight intended the

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    phrase "exclusive Ticketmaster Integration" to communicate that no other company

2    in the corporate ticket management market, including CL, had any integration with

3    Ticketmaster. *Id*. ¶ D42.

4        Spotlight used this "Exclusive Ticketmaster Integration" claim as a core part

5    of its advertising and promotion. *Id*. ¶¶ D38–D41. These representations were a

6    standard component of its pitch to each new potential customer. *Id*. Spotlight

7    repeated and reinforced these messages through emails with potential clients. *Id*.

8    Spotlight disseminated these claims not only to potential customers, but also to

9    existing clients whose contracts were due for potential renewal. *Id*.

10       Spotlight has continued to make these claims even as the instant lawsuit

11   continued. *Id*.

12       **(iv)    Spotlight's Claim that CL Lacked Ticketmaster**

13              **Integration**

14       In addition to the claim that "no other company" had a Ticketmaster

15   integration, Spotlight expressly told customers that *CL did not have actual*

16   integration with Ticketmaster. *Id*. ¶ D44. When potential clients would inquire,

17   Spotlight explicitly asserted that CL lacked a Ticketmaster integration, going so far

18   as to accuse CL of lying to customers: "I heard Concierge Live is going around

19   telling their clients and prospects that they are close to a Ticketmaster integration,

20   which is blatantly false." *Id*. ("Lot of companies will come in and tell you

21   everything you want to hear and unfortunately, will lie about this.").

22       **(v)    Spotlight's Advertisements of Its Web Integrations**

23              **(and Manual Process) as "Integration"**

24       From 2019 to at least the end of 2021, ██████████████████

25   ████████████████████████████████████████

26   ████████████████    *Id*. ¶¶ D49–D51. These claims were repeatedly made in

27   print materials stating that it "[i]ntegrates with AXS, Paciolan, and SeatGeek

28   ticketing providers." *Id*.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**(h)    CL's Lost Business Opportunities**

Spotlight's representations that it has exclusive integration with the Ticketmaster platform and that "no other" company could provide these services, combined with direct assertions that CL lacked that integration, have deterred numerous Spotlight clients from considering using CL as their provider. *Id.* ¶ D56. Although CL has approached many of these firms, they have declined to employ CL, in reliance on Spotlight's statements that no other company could provide this integration—or worse, that CL was misrepresenting having an integration with Ticketmaster. *Id.*

**2.    Opposing Party Spotlight's Statement**

Although Defendant has recited a full litany of disputed "facts" above, its Motion basically turns on just two of them.  The first is that Defendant's "Concierge Live" ticket management software supposedly "integrates" and shares data with Ticketmaster's systems through Defendant's use of the "Trade Desk API." *See* pp. 3, 7-8, 18, 25-27, 29-30.  And the second is that Defendant suddenly stopped telling prospective clients in late 2021 that its software is "integrated" with Ticketmaster. *See* pp. 3, 8, 23-25, 27.  Both of these, though, are demonstrably false.

**(a)    It is Undisputed That Defendant Does <u>Not</u> Use the Trade Desk API to Interface with Ticketmaster**

As Spotlight detailed in its Motion for Summary Judgment (pp. 56-61, 72-23, 88), Defendant's computer systems do <u>not</u> "talk" with Ticketmaster—there is no exchange of data.  JAF, No. P60-62.  Rather, every Ticketmaster-related request a customer makes using the "Concierge Live" system is forwarded by Defendant's computer system to a third-party intermediary (Seat Scouts / Automatiq). *Id.*, No. P82.[1]  It is only the *intermediary* that interacts and exchanges data with Ticketmaster. *Id.*

---

[1] Defendant's corporate designee said that certain "edge cases" are not sent to

10

These facts are undisputed—Defendant <u>admits</u> that is how its system works and Ticketmaster has just re-affirmed it. JAF, Nos. P82, P154-155. And in a candid moment, Defendant even acknowledged that because Defendant forwards all of its Ticketmaster-related requests to an intermediary (Seat Scouts / Automatiq), and only the intermediary interacts with Ticketmaster, it is actually *the intermediary* that is allegedly "integrated" with Ticketmaster—<u>not</u> Defendant:

> [W]hen someone makes an action in Concierge Live, we make an API call to Automatiq, and then Automatiq chooses which of **its integrated channels** to use to send the mobile transfer, or whether it's through, colloquially, the TradeDesk channel or the web integration channel.

JAF, No. P60 at Kane Dec., ¶ 5, Ex. 4, 104:10-19[2] (emphasis added); *accord* JAF, No. P124 at Kane Dec., ¶ 12, Ex. 11, 89:20-90:25; JAF, No. P84[3]; ("[A]n integration is two systems communicating with each other; so I would say the request from Concierge Live to [Automatiq's] system is one integration, and then the request [Automatiq is] sending over to Ticketmaster would be another integration."); *but see* JAF, Nos. P151("Trade Desk users do not integrate their systems with Ticketmaster's systems."); *see also* JAF, No. P144.

The contrary illusion Defendant seeks to create in its papers—namely, that <u>its</u> system is the one that talks to and exchanges data with Ticketmaster—is just untrue. *See* JAF, Nos. P60-62, P82; *cf.* p. 7 ("Since [] April 2019, Concierge Live has used

---

Automatiq because they require "manual intervention," particularly where the computerized interaction itself fails. JAF No. P82. Those exceptions can be disregarded, however, because no one is suggesting that manually executing ticket transfers because of a technology failure is an "integration."

[2] Mr. Basloe was testifying on behalf of Defendant pursuant to Federal Rule 30(b)(6) on a number of topics, including the process by which Defendant's Concierge Live system "interacts with Ticketmaster, including but not limited to, use of any APIs, automated scripts or code, or use of a third party intermediary that connects to Ticketmaster." *See* JAF, No. P81.

[3] Mr. Gainor was a co-founder of Defendant and is currently a part-owner and the Chief Product Officer of Automatiq. JAF, No. P83.

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  the TradeDesk API in connection with its corporate ticket management services.").
2  Defendant could never get "Trade Desk" to work, JAF, No. P45, which is why it
3  outsourced all its Ticketmaster-related functions to Automatiq / Seat Scouts. *See id.*,
4  No. P82.  But Defendant only mentions the role Automatiq plays when discussing
5  "web automation"—<u>not</u> when talking about "its" supposed use of the "Trade Desk"
6  API.[4]  *See* p. 18 ("At all times, [Defendant] has had an <u>actual API integration</u> with
7  Ticketmaster … [Defendant's] web integration through Automatiq constitutes
8  *another form* of integration.") (emphasis added).  It is almost as if Defendant thinks
9  it can hide the truth as to what is going on by not talking about Automatiq.

10

---

11  [4] Instead, Defendant suggests that because Automatiq, when it submits requests to
12  Ticketmaster, appends an API "token" specific to Defendant that tells Ticketmaster
   which account to bill, JAF, No. P83 at Pardo Dec., ¶ 7, Ex. 6, 165:23-168:5, 187:14-
13  188:5, that means that *Defendant* is itself interfacing with Ticketmaster.  *See* JAF, No.
14  P83 at Pardo Dec., ¶ 6, Ex. 5, 51:2-11, 125:12-22.  But that is like saying if you gave
   your friend your credit card to go to a nice restaurant, *you* actually went out to dinner.
15  It does not matter what the restaurant receipt says or that you ultimately paid—if you
16  weren't there, you weren't there.

17   In support of this Walter Mitty fantasy, Defendant relies heavily on a letter (not
   evidence) in which Ticketmaster's outside litigation counsel supposedly "confirmed"
18  that Defendant "ha[s] used [the Ticketmaster] TradeDesk API" since approximately
19  April 2019.  *See* pp. 7, 25.  But unless outside counsel (who was merely responding
   to a subpoena) had asked its client to perform an internal review of its IP records, it
20  could not have known that <u>Automatiq</u> was actually the one accessing Ticketmaster's
21  systems.  That explains the discrepancy in tone between the letter sent by outside
   counsel (Heisenberg Decl. Ex. 2) and the one sent just a few months earlier by
22  Ticketmaster's *in-house* counsel, who, unlike outside counsel, *had* conducted an
23  "internal review" of Defendant's account, leading her to conclude that the way
   Defendant was operating was <u>not</u> an "integration."  *See* JAF, No. P119 ("Based on
24  the Counterclaims and Ticketmaster's own internal review of Concierge Live's
   account, it is apparent that Concierge Live is knowingly misrepresenting to third
25  parties that Concierge Live has an integration with Ticketmaster for corporate ticket
26  management services, which is patently false.").  Moreover, the actual Ticketmaster
   witness designated to testify about TradeDesk in this case, Phil Volini, testified that
27  (i) Concierge Live was not "using" the TradeDesk API and, regardless, (ii) it is not
28  an "integration" with Ticketmaster's systems.  JAF, Nos. P149-158.

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

The core of Defendant's summary judgment motion as relates to the Parties' use of the term "integration" can basically be distilled to two facts. The first is that Spotlight's ticket management platform interacts and exchanges data with Ticketmaster's computers when a client initiates a Ticketmaster-related request (such as a transfer), JAF, No. P6, meaning the systems are "integrated." *See id.*, No. P168. The second is that Defendant's platform does <u>not</u> interact or exchange data with Ticketmaster to make client-initiated transactions—that work is done by a third-party (Seat Scouts / Automatiq). *Id.*, Nos. P60-62. Defendant's platform, therefore, is <u>not</u> "integrated" with Ticketmaster, *cf. id.*, No. P168, and it is unlawful for Defendant to tell customers otherwise.

### (b)   It is Undisputed That Defendant Has <u>Not</u> Stopped Telling Customers it is "Integrated" with Ticketmaster

Even though it is unlawful for Defendant to tell customers that its "Concierge Live" platform is "integrated" with Ticketmaster when it is not, 15 U.S.C. § 1125(a), that is <u>exactly</u> what Defendant continues to do. In its brief, Defendant suggests this deception is no longer happening, *see, e.g.,* pp. 3, 23-25, 27, but Defendant's story about having supposedly turned over a new leaf was notably limited to media that leaves a paper trail. *See* p. 8("Since [late 2021], no <u>print</u> advertising or promotional materials have referenced 'integration.'") (emphasis added).

Caught red-handed through the discovery process, Defendant had to admit that it is still *telling* prospective clients that it has an "integration" with Ticketmaster, even though Ticketmaster <u>rebuked Defendant</u> to stop making that "patently false" claim. *See* pp. 23-24; JAF, No. P87; *cf.* JAF, No. P119 (April 2025 Ticketmaster letter). Defendant tries to downplay this, claiming its employees are only shown on video misleading customers about integration "two or three" times. *See* p. 23. In reality, though, that number is more like eight. JAF, No. P89. But what is more important is that those eight videos are out of the *mere fifteen* "training recordings" Defendant produced during discovery. *Id.* So, if Defendant's employees (and, specifically, its

13

CEO) have been caught **more than half the time** on the "training" tapes it produced claiming Defendant has an "integration" with Ticketmaster, how often are they saying that when the cameras are not recording?[5]

Nor are these recordings merely examples of Defendant's employees "respond[ing] to individual customers' questions," as Defendant pretends. *Cf.* p. 23; JAF, No. P88 (claiming Defendant only talked about it "on an ad hoc basis, if [they] were asked"). In most of the videos, Defendant makes its false claims about "integration" within its **practiced sales pitch**, not as part of a client back-and-forth.[6] *See* JAF, Nos. P90-97. And we can tell from customer emails and other records produced during discovery, that these were not one-off events. Long after it supposedly stopped in "late 2021" (*cf., e.g.*, pp. 8, 27) Defendant continued (and still continues today) to promote its "Concierge Live" platform as "integrated" with Ticketmaster—it is just that *those* particular sales pitches were evidently not recorded for "training" purposes. *See* JAF, No. P99 at Kane Dec., ¶ 57, Ex. 56 ("Hey Brian, Will you just *remind me* of the ticketing companies y'all integrate with[?]); Pardo Dec., ¶ 19, Ex. 18 ("Thanks, Brian! … I know *you mentioned* you guys are allowed to integration [sic] Ticketmaster into your system"); Pardo Dec., ¶ 20, Ex. 19 ("Evaluation: Concierge Live," "Pros … External Integrations: Ticketmaster"); Pardo Dec., ¶ 21, Ex. 20 ("I *thought you guys had* a Ticketmaster integration on your end already.") (emphasis added to all); *see also* JAF, Nos. P68, P86-87, P99-100 (collecting additional examples).

---

[5] Further, it is notable how polished Defendant's CEO (Mr. Basloe) is in two of the videos (which were recorded five months apart) when he calls integration "the secret to [Defendant's] sauce." JAF, Nos. P94, P97. That is not a phrase one suddenly makes up on the spur of the moment. Mr. Basloe's practiced delivery suggests that this was not the first (or even the second) time he had uttered those words.

[6] Lying when answering a question, of course, is still lying. As such, those instances should not be treated any differently, especially when there's a pattern of behavior.

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    In June 2021, Ticketmaster told Defendant in no uncertain terms that its claim

2  about having an integration with Ticketmaster was "not true" and it needed to stop

3  saying otherwise.  *See* JAF, Nos. P49, P77, P115.  Defendant, though, did not stop

4  making those false claims—it just tried to hide its deception.  JAF, No. P87.  And

5  Defendant's refusal to conform its sales pitches with the truth continues today.  In

6  April 2025, after investigating the claims Defendants was making in this case,

7  Ticketmaster <u>demanded</u> that Defendant stop saying it had a Ticketmaster

8  "integration," which Ticketmaster called "unequivocally false."  JAF, Nos. P76,

9  P119.  Nonetheless, Defendant still persists with its conduct.  *Accord* JAF, No. P87.

## II.    <u>LEGAL STANDARD</u>

11    A motion for summary judgment must be granted when "the pleadings, the

12  discovery and disclosure materials on file, and any affidavits show that there is no

13  genuine issue as to any material fact and that the movant is entitled to judgment as a

14  matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

15  247–48 (1986). The moving party bears the initial burden of identifying the

16  elements of the claim or defense and evidence that it believes demonstrates the

17  absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

18  (1986). The moving party is not required to produce evidence showing the absence

19  of a genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  Rather, their burden is

20  satisfied merely by showing an absence of evidence to support the non-moving

21  party's case.  *Id*.  The burden shifts to the nonmoving party to establish a genuine

22  issue of fact.  *Id*. at 323.

23    The court must draw all reasonable inferences in the light most favorable to

24  the nonmoving party. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

25  2010) (citing *Anderson*, 477 U.S. at 255). Where, taken in that light, the record

26  "could not lead a rational trier of fact to find for the nonmoving party, there is no

27  'genuine issue for trial,'" and the court must grant summary judgment. *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steelworkers of Am. v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir. 1989). To survive a summary judgment motion, the non-movant must instead "do more than simply show that there is some metaphysical doubt as to the material facts"; it "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). That is to say, the non-movant must present specific "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

Cross-motions for summary judgment "must be considered on [their] own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## III.    ANALYSIS

**A.    Moving Party Defendant CL's Argument**

> **1.    CL Is Entitled to Summary Judgment on Its Counterclaims.**

> > **(a)    CL Is Entitled to Judgment on Its Lanham Act Counterclaim.**

"The elements of a false advertising claim under the Lanham Act are: [1] a false statement of fact by the defendant in a commercial advertisement about its own or another's product; [2] the statement actually deceived or has the tendency to deceive a substantial segment of its audience; [3] the deception is material, in that it is likely to influence the purchasing decision; [4] the defendant caused its false statement to enter interstate commerce; and [5] the plaintiff has been or is likely to

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (brackets added); *see also Novation Sols., Inc. v. Issuance Inc.*, No. 2:23-CV-00696-WLH-KSX, 2023 WL 6373871, at *7 (C.D. Cal., Aug. 16, 2023) (quoting *Southland Sod Farms*, 108 F.3d at 1139).

### (i)    Spotlight's Statements of Fact in Commercial Advertising.

As discussed above, Spotlight advertised and promoted the following statements in its commercial advertising.

° Exclusive Right to Integrate with Ticketmaster. JAF ¶ D43; *see supra*, § I.C.1.g.ii.

° Exclusive Ticketmaster Integration. JAF ¶ D38–D42; *see supra*, § I.C.1.g.iii.

° CL Lacks Integration. JAF ¶ D44; *see supra*, § I.C.1.g.iv.

### (ii)    Spotlight's Statements Were Literally False.

There are two types of falsity, and the claimant "may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. "[T]he court itself may determine meaning when considering literal falsity of the content without use of extrinsic evidence." § 5:18. Interpreting an advertisement—Basics, 1 Callmann on Unfair Comp., Tr. & Mono. § 5:18 (4th ed.); *In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F. Supp. 915 (C.D. Cal. 1994) (in false advertising action, court may consider as matter of law whether alleged misrepresentation in advertisement is actionable statement of fact or mere puffery, and may also determine meaning of ad on its face with no reliance on extrinsic evidence).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

### (iii)    The 2016 Agreement Did Not Provide Spotlight with Exclusive Right to Integrate with Ticketmaster.

Spotlight has represented to both the public and this Court that the 2016 Agreement provided it an exclusive right to integrate with Ticketmaster. That statement is literally false. JAF ¶ D43.

### (iv)    Spotlight Did Not Have Exclusive Ticketmaster Integration.

Claims of being the "exclusive" or "sole" product are actionable. *See, e.g.*, *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 932 (9th Cir. 2010) (involving allegations of misleading consumers into believing that the defendant was the "sole" inventor); *Tartan Films USA v. U2 Home Ent., Inc.*, CV 05-3021 SVW (PLAx), 2006 WL 8434411, at *1 (C.D. Cal. May 17, 2006) (granting leave to file an amended claim based on defendants' advertising of being the sole and exclusive distributor in North America); *Gen. Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647, 666 (S.D.N.Y. 1997) (finding, on a motion for preliminary injunction, that plaintiff was likely to prevail on the merits of Lanham Act claim that defendant made a "literally false" assertion that it was the "exclusive" and "original" distributor of Dominican Cohiba cigars).

### (v)    Spotlight's Claims of Exclusivity Were Literally False.

At all times, CL has had an actual API integration with Ticketmaster. JAF ¶¶ D13, D17. Ticketmaster has acknowledged that CL has an API integration and that it is legitimate. *Id.* ¶¶ D13, D14. Similarly, CL's web integration through Automatiq constitutes another form of integration. *Id.* ¶ D18. Spotlight has acknowledged that web integration is a legitimate form of integration, which it itself uses. *Id.* ¶ D51.

### (vi)    Spotlight's Literally False Statements Confused Consumers.

"[W]here a statement is literally false or the defendant intentionally set out to deceive, . . . actual deception" is presumed. *Factory Direct Wholesale, LLC v.*

1  *iTouchless Housewares & Prods., Inc.,* 411 F. Supp. 3d 905, 924 (N.D. Cal. 2019)

2  (quoting *AECOM Energy & Constr., Inc. v. Ripley,* 348 F. Supp. 3d 1038, 1056

3  (C.D. Cal. 2018)); *In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV

4  17-1474 JVS (DFMx), 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019); *Mutual*

5  *Pharm. Co. v. Ivax Pharm., Inc.,* 457 F. Supp. 2d 925, 933 (C.D. Cal. 2006);

6  *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) ("If [the

7  defendant] intentionally misled consumers, we would presume consumers were in

8  fact deceived and [the defendant] would have the burden of demonstrating

9  otherwise."); *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 157 (2d Cir.

10  2007). "A domino effect occurs when there is a genuine issue of fact as to whether

11  the advertisement is literally false. A presumption is created in the plaintiff's favor

12  with respect the remaining elements that are typically contested in Lanham Act false

13  advertising cases." *FLIR Systems, Inc. v. Sierra Media, Inc.*, 903 F. Supp. 2d 1120,

14  1132 (D. Or. 2012).

15    As demonstrated above, Spotlight's statements were literally false; as such,

16  consumer confusion is presumed. *See* Section III.A.1.a.ii–v, *supra*. The presumption

17  also arises from Spotlight's acknowledgement that it *intended* its advertising to

18  convey that CL had no Ticketmaster integration. *Id*. ¶ D42.

19    Even if consumer confusion may not be presumed, there is evidence that

20  consumers were actually confused. Customers have cited Spotlight's supposed

21  exclusive integration with Ticketmaster as the reason for their decision to stay with

22  Spotlight and not employ CL. *Id.* ¶ D56.

23    **(vii)   Spotlight's False Statements Were Material.**

24    Under the Lanham Act, false or deceptive advertising is material where "it is

25  likely to influence the purchasing decision." *Rice v. Fox Broad. Co.*, 330 F.3d 1170,

26  1181 (9th Cir. 2003), *overruled on other grounds by Skidmore as Trustee for Randy*

27  *Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1067 (9th Cir. 2020).

28    "With respect to materiality, when the statements of fact at issue are shown to

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000); *see San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1052 (S.D. Cal. 2019) (noting that materiality is "presumed" when "a statement is literally false").

██████████████████████████████████████████

██████████████████████████████████████████

████    JAF ¶ D55. As a direct and proximate result of Spotlight's false and misleading statements about its "exclusivity" rights and of CL's actual services, certain clients have remained with Spotlight despite CL offering better prices and better services. *Id.* ¶ D56.

### (viii) Spotlight Caused Its False Statements to Enter Interstate Commerce.

There is no genuine dispute that Spotlight caused its literally false statements to enter interstate commerce. Spotlight sent emails or attached promotional materials containing each of the statements to potential clients located throughout the United States. *Id.* ¶¶ D34–D37.

### (ix) CL Suffered Harm as a Result of Spotlight's False Advertisements.

Spotlight's false representations concerning its supposed exclusive integration with Ticketmaster such that "no other" company could provide these services, combined with assertions that CL lacked that integration, have caused CL to lose business to Spotlight, with those companies citing Spotlight's supposed "exclusive Ticketmaster integration" as a factor. *Id.* ¶ D56. Further, numerous Spotlight clients did not engage or respond to CL's efforts based on the false premise that it cannot offer Ticketmaster integration. *Id.* Consequently, Spotlight's revenues and profits are due in part to the diverted sales caused by its false advertising. *Id.*

### (b) CL is Entitled to Summary Judgment on Its California False

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**Advertising Counterclaim.**

California's False Advertising Law ("FAL") prohibits businesses from disseminating statements that are "untrue or misleading." Cal. Code Bus. & Prof. § 17500, *et seq.*; *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1136 (2020) ("To prevail on a claim under the false advertising law, she must show that "members of the public are likely to be deceived" and must do so as adjudged through the eyes of "the reasonable consumer") (cleaned up). The FAL's provisions mirror the Lanham Act. *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 348 (2010).

Because CL has established Spotlight's false advertising claim under the Lanham Act, it is also entitled to relief under the FAL.

### (c)    CL is Entitled to Summary Judgment on Its Unfair Competition Counterclaim.

California's Unfair Competition Law ("UCL") prohibits "unlawful, unfair, or fraudulent" conduct in business activities. Cal. Bus. & Prof. Code § 17200, *et seq*. Spotlight has engaged in unfair competition by misrepresenting its supposed exclusive right to integrate with Ticketmaster, thereby misleading potential clients into a belief that only Spotlight possessed the ability to offer Ticketmaster integration. 1A Callman on Unfair Competition, Trademarks & Monopolies (4th Ed.) § 5:43 ("A false claim of exclusive rights is an act of unfair competition").

### (d)    CL is Entitled to Summary Judgment on Its Intentional Interference with Prospective Economic Advantage Counterclaim.

For intentional interference with prospective economic advantage, the plaintiff must plead and prove: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of

8031213.1

21

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Ass'n*, 19 Cal. App. 5th 399, 429 (2018) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)) (internal quotation marks omitted).

Spotlight interfered with CL's potential relationships with customers. JAF ¶¶ D44, D56. As a direct result of Spotlight's actions, as described above, CL has lost business to Spotlight due to the latter's false representations to CL's potential clients. *Id.* ¶ D56. Even when CL has won certain customers' business, it has been for a reduced price due to Spotlight's misrepresentations. *Id.*

### (e)    CL Requests for a Damage Phase.

For the reasons discussed above, CL requests partial summary judgment in its favor on its Counterclaims One through Three and Five, and on Spotlight's SAC. Under the Lanham Act, a plaintiff may be entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). CL requests the Court set a trial on damages and its remaining counterclaim, as well as a hearing on the equitable remedies of injunctive relief and disgorgement of profits. *See Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 19-56008, No. 19-56072, 2021 WL 3702243, *2 (9th Cir. Aug. 20, 2021) (A successful claimant is entitled to disgorgement of the violator's profits). CL also seeks permanent injunctive relief barring Spotlight's further dissemination of the false statement, as well as corrective advertising to address ongoing consumer confusion. *See, e.g.*, *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1182 (D. Or. 2008) (granting defendant's summary judgment motion on false advertising claim under the Lanham Act and finding that "[c]orrective advertising may be appropriate to remedy consumer confusion caused by false advertising messages") (citing *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir. 1996)); *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

2.    **CL Is Entitled to Summary Judgment Dismissing Spotlight's Second Amended Complaint.**

(a)    **CL is Entitled to Summary Judgment Dismissing Spotlight's Lanham Act Claim.**

Although the SAC contains general challenges to CL's alleged statements of being integrated with Ticketmaster, its specific allegations are that CL made four false statements:

> (i) Concierge Live has the same integration with Ticketmaster as Spotlight, (ii) Concierge Live has the contractual right from Ticketmaster to use Ticketmaster's API for commercial purposes, (iii) Concierge Live has the same functionality as Spotlight, and (iv) Spotlight's relationship with Ticketmaster is merely a marketing agreement.

SAC ¶ 46. Spotlight's claims fail for multiple reasons.

(i)    **Spotlight Has Identified No Promotional Speech.**

"Not all commercial speech is promotional." *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020). The Lanham Act requires, *inter alia*, statements in commercial speech that are sufficiently disseminated to the relevant purchasing public. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). "To be sufficiently disseminated" for the purposes of the Lanham Act, "the actions must be part of an organized campaign to penetrate the relevant market, which typically involves widespread dissemination within the relevant industry." *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067, 1097 (N.D. Cal. 2025) (quoting *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021)).

"Advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication. In normal usage, an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not." *First Health Grp. Corp. v.*

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  *BCE Emergis Corp.*, 269 F.3d 800, 803–04 (7th Cir. 2001). Therefore, "[a] handful

2  of statements to customers does not trigger protection from the Lanham Act unless

3  'the potential purchasers in the market are relatively limited in number.'" *Walker &*

4  *Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007)

5  (quoting *Coastal Abstract Serv., Inc.*, 173 F.3d 725; *Podiatrist Ass'n, Inc. v. La*

6  *Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003) ("To constitute

7  advertising or promotion, commercial speech must at a bare minimum target a class

8  or category of purchasers or potential purchasers, not merely particular

9  individuals.")).

10        Here, Spotlight has not provided any evidence of CL's *written* advertising or

11  promotional materials that contain allegedly false statements. Because of the

12  absence of any print advertising or promotional materials, Spotlight shifted its focus

13  to "oral misrepresentations." ECF No. 63 at 9. Even then, Spotlight has not adduced

14  any customer testimony concerning the supposed face-to-face meetings or any false

15  statements made during such meetings. The only evidence presented by Spotlight

16  are two or three recorded instances in which CL, during a product demonstration,

17  responded to individual customers' questions by accurately stating that it was

18  integrated with Ticketmaster. JAF ¶¶ D59–D63 (citing Declaration of Brian Basloe

19  in Support of Defendant's Motion for Summary Judgment ¶ 5); *see generally*

20  Section III.A.1.a.v (discussing CL's API and web integrations with Ticketmaster).

21  These responses do not constitute false advertising or promotion, as they do not

22  constitute the required "organized campaign," *Realtek Semiconductor Corp.*, 769 F.

23  Supp. 3d at 1097, or affirmative dissemination to a class or category of purchasers.

24  Moreover, the statements were true. *See supra*, III.A.1.a.v.

25              **(ii)    Spotlight's Remaining Allegations of Oral Advertising**

26                       **Are Unsupported and Are Non-Actionable**

27                       **Generalities.**

28        Whatever other arguments Spotlight may advance in support of its false

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  advertising claims are not supported by evidence. With respect to Spotlight's first

2  and third allegations that CL advertised having the "same" integration or

3  functionality as Spotlight, there is no such evidence. To the contrary, evidence

4  shows that CL consistently distinguished its own system from Spotlight's, telling

5  potential customers they were *not* Nexus partners with Ticketmaster. JAF ¶ D59–

6  D63. Further, the CL user-manual materials that Spotlight has incorrectly

7  characterized as promotional materials reflect the product's actual functionalities,

8  which differ from those offered by Spotlight. SAC, Exs. A–K.

9    Beyond the lack of any direct evidence, Spotlight's allegations do not even

10  present actionable statements of fact. "[A] statement that is quantifiable, that makes

11  a claim as to the 'specific or absolute characteristics of a product,' may be an

12  actionable statement of fact while a general, subjective claim about a product is non-

13  actionable puffery." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th

14  Cir. 2008). A generalized statement that something is the "same"—the way Pepsi is

15  the same as Coke—lacks any measurement. Non-specific general statements are not

16  actionable. Spotlight has presented no evidence that CL called Spotlight's 2016

17  Agreement "merely a marketing" agreement; even if there is supporting evidence,

18  the statement is the kind of subjective opinion that cannot be an actionable statement

19  of fact. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 303 (4th Cir. 2017)

20  (holding that the defendant's statement concerning the availability of the plaintiff's

21  products was "simply opinion or puffery").

22    **(iii) Spotlight, an Outsider to CL's Ticketmaster**

23      **Relationship, Lacks Standing to Argue Ticketmaster's**

24      **Rights.**

25    Spotlight's allegation concerning the "contractual right" claim fails for

26  multiple reasons. After learning of CL's actual integration, Spotlight pivoted and

27  began to assert that CL lacked permission to use Ticketmaster's APIs. ECF No. 83-1

28  at #1111 ("Concierge Live does not even have a legal right to engage in corporate

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ticket management directly with Ticketmaster. That is the central point in this case."). *First*, Spotlight has presented no evidence that CL claimed to have a contractual right from Ticketmaster to use its APIs. *Second*, Ticketmaster has recently confirmed under oath that CL's use is not prohibited by its terms of use. JAF ¶ D13. *Third*, Spotlight attempted to pivot to a third argument—that although CL had permission, its use *may* violate Ticketmaster's terms of use, *e.g.*, SAC ¶ 77—is meritless because Spotlight lacks standing to imagine violations or take legal positions on behalf of Ticketmaster. The lack of standing is founded on the fact that Spotlight cannot litigate Ticketmaster's rights, because Ticketmaster would be bound by any adjudication, and therefore have to be a party to such dispute. *See* Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 2E-2 ("In general, the claim must relate to plaintiff's own legal rights and interests, rather than the legal rights or interests of third parties.") (citing *Carney v. Adams*, 592 U.S. 53 (2020)). This lack of standing is particularly appropriate here, where Ticketmaster has rejected Spotlight's theory (despite heavy lobbying by Spotlight), with Mr. Volini confirming under oath that CL's use of the TradeDesk API was authorized and not prohibited by Ticketmaster's Terms of Use. JAF ¶¶ D13, D14.

**(b)    Spotlight Has Failed to Establish Any Falsity.**

CL has been integrated with Ticketmaster since 2019. *See* Section III.A.1.a.v, *supra*. It also has had a web integration during that period. *Id.* Moreover, as will be discussed below, unclean hands bar Spotlight from disputing that web integration is a form of "integration." *See* Section III.A.2.b.ii, *infra*.

**(i)    Spotlight Has Failed to Establish Any Customer Deception.**

Where a statement is not literally false, Spotlight must show that a substantial segment of recipients were deceived by CL's statements. *Southland Sod Farms*, 108 F.3d at 1139. Spotlight has not offered any evidence of customers actually being misled. To the contrary, the evidence shows that customers choosing CL believe that

they are receiving exactly the integration and functionality that CL advertised. JAF ¶ D64–D65. Of CL's more than a hundred customers, Spotlight has identified only a tiny fraction (three) that have returned to Spotlight, and even for those, Spotlight has not tied their departure to any issues concerning CL's integration with Ticketmaster. *Id.* ¶ D65.

### (ii) Spotlight's Unclean Hands Bar It from Disputing CL Advertising Its Web Integration as "Integration."

In the Ninth Circuit, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the [plaintiff's inequitable] conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). Most district courts have interpreted this to mean that there are just two elements to the defense: (1) inequitable conduct by the plaintiff; (2) that has a sufficiently close nexus to the plaintiff's own claims. *See, e.g.*, *Pom Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016); *Intamin, Ltd. v. Magnetar Techs. Corp*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009). "Though equitable in nature, the unclean hands doctrine bars claims for money damages as well as those for equitable relief." *POM Wonderful LLC*, 166 F. Supp. 3d at 1091.

Spotlight is unable to identify any print advertising in which CL promoted its Ticketmaster integration. The only materials stem from 2019 until late 2021, when CL advertised its API and web integration as "integration." JAF ¶ D57. During that same period, *Spotlight* also advertised its own web integrations with AXS and SeatGeek as "integration." *Id.* ¶ D50, D51, D53. In late 2021, both companies refined their materials. Spotlight changed its description of its web integrations from "integration" to "automation," and CL altogether removed any reference to "integration." *Id.* ¶¶ D54, D58.

Spotlight's conduct is inequitable. During the exact period at issue, Spotlight itself was advertising its web integrations with AXS, SeatGeek as "integrations." JAF ¶ D53. Yet, Spotlight's lawsuit disputes CL's ability to describe its own

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    integrations, that include, *inter alia*, its web integration, *in the exactly same way as*
2    *Spotlight*, as an "integration." Spotlight's own conduct on this issue—describing its
3    own web integrations (and even its manual process) as "integration" but arguing that
4    CL's web integrations are not—constitutes unclean hands. This essentially mirrors
5    the facts in a leading "unclean hands" advertising case, *Haagen-Dazs, Inc. v. Frusen*
6    *Gladje Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980), in which relief was barred by
7    unclean hands because the plaintiff engaged in the same advertising (i.e., presenting
8    itself as having Scandinavian origin) as the defendants.

9         Spotlight's inequitable conduct continues. ███████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████ *id.* ¶ D54, Spotlight falsely alleged in the SAC that CL was

13   advertising "integration" even though CL's revised promotional decks also used the

14   term "automation" rather than "integration."  For example, the SAC alleges that, in

15   late 2021, CL provided a deck "*stating that Concierge Live had integration* with

16   Ticketmaster." SAC ¶ 97 (emphasis added). Spotlight repeated that allegation in its

17   Interrogatory responses. Declaration of Christoph Heisenberg in Support of

18   Concierge Live LLC's Motion for Summary Judgment, Ex. 5. But CL showed the

19   Court that the cited deck did *not* contain the word "integration" anywhere. ECF No.

20   54-2 at #809. In response, in contradiction to its decision to use the term

21   "automation" in its own advertising, Spotlight brazenly told this Court that

22   "representations of automated processes with major ticketing platforms would be

23   perceived as integration with such platforms." ECF No. 63 at #905.

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████

26   ███████████████████

27   ██████████████████████████████

28   ████████████████████████████████  Its

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  strategic attempt to now renounces its own representations to benefit its litigation

2  position constitutes the epitome of "unclean hands."

### (c)    CL Is Entitled to Summary Judgment Dismissing Spotlight's UCL And FAL Claims.

5  Spotlight's FAL and UCL claims rely on the same alleged wrongful

6  conduct—false advertising. Those claims fail for the same reasons discussed above.

7  *See* Section III.A.1.a *supra*.

### (d)    CL Is Entitled to Summary Judgment Dismissing Spotlight's Tortious Interference With Contractual Relations Claim.

10  "[A] cause of action for intentional interference with contract requires an

11  underlying enforceable contract. Where there is no existing, enforceable contract,

12  only a claim for interference with prospective advantage may be pleaded." *PMC,*

13  *Inc. v. Saban Ent., Inc.*, 45 Cal. App. 4th 579, 601 (1996).

14  Spotlight alleges interference with the supposed exclusivity in its 2016

15  Agreement, but that Agreement provides no such exclusivity. JAF ¶ D24–D25.

16  Because the 2016 Agreement contained no such rights, CL has not interfered with

17  Ticketmaster's contract in any way. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50

18  Cal. 3d 1118, 1126 (1990).

### (e)    CL Is Entitled to Summary Judgment Dismissing Spotlight's Tortious Interference with Prospective Business Claim.

21  Spotlight's false allegations of exclusivity also bar its fifth cause of action.

22  CL's actual integration with Ticketmaster in 2018 was not inconsistent with

23  Spotlight's rights, and therefore would not support a claim for tortious interference

24  with prospective business relations. JAF ¶ D66. There also was no independent

25  wrongful conduct because, as set forth above, there was no false advertising or

26  unfair competition. Section I.C.1.e–f, *supra*.

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**3.    Spotlight's Claims Are Barred by Statute of Limitations and Laches.**

**(a)    Spotlight's Lanham Act and False Advertising Claims Are Barred by the Four-Year Statute of Limitations**

Spotlight's Lanham Act claims are barred by its two-part laches test. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.* 304 F.3d 829, 835-836 (9th Cir. 2002) ("While laches and the statute of limitations are distinct defenses, a laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable. . . . However, if suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable."). The analogous statute of limitations for the Lanham Act's false advertising claim is three years under the FAL and four years under the UCL. Section 17500 (FAL) is cross-referenced in Section 17200, so the limitations period for "false advertising claims is effectively four-years." California Antitrust & Unfair Competition Law (Third), Volume 2: Unfair Competition (State Bar of California, 2003 Daniel Mogin & Danielle S. Fitzpatrick, eds.) note 2, at 72. Thus, the most analogous state law limitation period is four years.

Laches runs "from the time the plaintiff knew or should have known about its potential cause of action." *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). Spotlight knew at least as early as April 2018 that CL was telling customers it was developing its Ticketmaster integration, and, at least as early as June 12, 2019, that CL was promoting having a Ticketmaster integration. *See* JAF ¶¶ D67–D69. Spotlight believed those advertisements were false, but did not take legal action until four-and-a-half years later, on January 31, 2024, when it filed the initial Complaint. *Id.* ¶ D70.

**(b)    Spotlight's Tortious Interference Claims Are Barred by the**

**Two-Year Statute of Limitations.**

Spotlight's fourth and fifth causes of action also fail because they are barred by the two-year statute of limitations. Cal. Civ. Pro. Code, §339, subd. (1); *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974). The alleged interference stems from CL's use of its Ticketmaster TradeDesk API integration, but that API was provided in 2018 and 2019. *See* Section III.A.1.a.v, *supra*. That conduct falls far outside the statute of limitations.

**B.    Opposing Party Spotlight's Argument**

Relying on "facts" that do not exist, Defendant argues it is entitled to summary judgment on essentially every claim and counterclaim (plus a couple of affirmative defenses for good measure). A wish list, however, is not a serious motion.

**1.    Summary Judgment Cannot be Granted on Defendant's First Counterclaim (False Advertising) Because There are, at a Minimum, Genuine Issues of Material Fact**

To prevail on summary judgment, Defendant would have to establish that there is no genuine issue of material fact as to any of the five elements (falsity, deception, materiality, distribution, and injury) of its false advertising claim. *See, e.g.,* Fed. R. Civ. P. 56(a); *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 WL 4222045, *10 (S.D. Cal. 2008); *Southland Sod Farms*, 108 F.3d at 1139. Defendant, however, cannot even get past the first, which suggests it never intended to file a serious motion. Rather, in throwing out so much clutter, it appears Defendant's real goal is to try to pull focus away from the *legitimate* (and narrowly-focused) summary judgment issue raised in Spotlight's motion—namely, whether Defendant's use of a third-party intermediary to perform all Ticketmaster-related functions constitute an "integration" even under the broad definition Defendant has proposed. *See* pp. 69-77.

Regardless, wade through the clutter we must. This brings us to Defendant's affirmative "false advertising" argument. Defendant claims (pp. 8-10, 16-18) that Spotlight has made three types of statements in communications with clients that

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Defendant calls "literally false." These were that Defendant "lacks [Ticketmaster] integration," that Spotlight *has* "exclusive Ticketmaster integration," and that Spotlight has the "exclusive *right*" to integrate with Ticketmaster. *See* p. 16. The problem for Defendant, however, is that each of these statements is absolutely <u>true</u>.

As explained in Spotlight's motion (pp. 56-61, 71-73, 88), Defendant's "Concierge Live" platform is <u>not</u> integrated with Ticketmaster. Once again, the key undisputed fact here is that Defendant's computers do not "talk" to Ticketmaster's computers or "work with" them to exchange data, JAF, Nos. P60-62, P82, which is essential for there to be an "integration," even under Defendant's own definition. *See* JAF No. P168 ("In the context of two technology applications, a general description [of 'integration'] is a process by which two applications can work with one another.").

To be sure, Spotlight maintains its position that how Defendant's intermediary (Automatiq) interfaces with Ticketmaster is *also* not an "integration," especially under the proper definition of the term.[7] *See* JAF, No. P167; *see also* pp. 31-32. Still, it must be noted that, as a legal matter, were this Court to disagree and hold that operating through an intermediary might qualify as an "integration" under Defendant's definition, it would still need to (1) resolve whether Automatiq's interface with Ticketmaster constitutes an "integration" under *Spotlight's* more accurate definition (*but see supra*), and (2) determine whether Automatiq in fact has such an "integration" given its admitted "web crawling" and "scraping" in violation

---

[7] Because Defendant is the party seeking summary judgment here, technically the proper definition of "integration" to apply would be the one advanced by <u>Spotlight</u> (*see* JAF, No. P167)—otherwise there would be an issue of material fact. *Cf.* pp. 62-63, n.7 (in its own cross-motion, Spotlight accepted and applied Defendant's "exceedingly broad" definition to avoid an issue of fact). For the convenience of the Court, however, Spotlight, without waiving any rights, applied Defendant's own definition of "integration" when analyzing Defendant's lack of an "integration" with Ticketmaster because **it does not matter**—under no definition is working through an intermediary an "integration." Properly applying Spotlight's own definition to Defendant's affirmative motion creates a separate fact dispute, as explained herein.

of Ticketmaster's terms of use (JAF, Nos. P63-67, P124-125, P129-131, P139-144), which automatically terminated its permission to use such software. JAF, Nos. P157-158. As all of these facts are undisputed—*in Spotlight's favor*—in such a scenario where going through an intermediary might constitute an integration, the Court would need to resolve these issues *before* deciding Defendant's motion.   Defendant's ignoring these issues when asking the Court to myopically opine on the existence of an "integration" does not make them disappear.   These facts and legal issues Defendant is trying to avoid mentioning alone prevent summary judgment for Defendant.

But all that matters now for the denial of Defendant's motion is that when Spotlight tells customer that Defendant "lacks [Ticketmaster] integration," that statement is absolutely true, irrespective of whose definition of "integration" is applied.   *Accord* JAF, Nos. P76, P119 (Ticketmaster described Defendant's claim of having an integration with it as "unequivocally false"); JAF, No. P151.

It is also undeniably true that Spotlight's system <u>is</u> the "exclusive" and "sole" product with Ticketmaster Integration in the corporate and event management space. JAF, Nos. P4-9, P122-123, P165; *cf.* pp. 17-18.   Indeed, despite submitting hundreds of pages of documents, Defendant has not identified any other company operating in this industry that even *claims* to have "Ticketmaster Integration."   *See id.*   Therefore, because Defendant *lacks* "integration" (*see supra*), or even if there were just a genuine issue over that fact (but there isn't, *see, e.g.,* pp. 56-61, 71-73, 88), Defendant cannot possibly prove that Spotlight's true statement is "literally false."

Lastly, there is also no falsity in statements that Spotlight has the "exclusive right" to "integrate" with Ticketmaster.   To start, it appears that Defendant has only identified one customer email (Heisenberg Decl., Ex. 36) that uses the phrase "exclusive right to integrate," *and* that statement was made for the sole purpose of explaining this litigation (which raises the question of litigation privilege; *see, e.g.,*

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

*Apex.AI, Inc. v. Langmead,* 2024 WL 1117055, *3–4 (N.D. Cal. 2024)).[8]  But even if one were to conclude that Spotlight *did* engage in "commercial advertising or promotion" by sending a litigation-related email using that phrase, Defendant has not shown that the subject statement was "material," let alone "literally false."

To establish "materiality," Defendant relies exclusively on the presumption that attaches when a party makes a literally false statement about an inherent quality or characteristic of its product.  *See* pp. 18-19; *see also, e.g., POM Wonderful*, 2008 WL 4222045 at *11 ("A plaintiff may establish [the] materiality requirement by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'") (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (internal quote omitted).  But possessing the exclusive contractual right *to offer* a feature in a product is not an inherent quality or characteristic <u>of</u> that product, especially if the product actually *has* the feature.[9]

Even more fundamental, though, Spotlight's statement that it has the "exclusive right" to integrate with Ticketmaster is <u>true</u>.  Defendant gives incredibly short shrift to this point—it simply cites an answer a Ticketmaster employee gave in response to a question that called for a legal conclusion (and to which Spotlight properly objected).  *See* pp. 6-8, 17-18.  At no point does Defendant try to *interpret* the contract

---

[8] The only other documents Defendant cites (*see* JAF, No. 43) use different phrases with different meanings.  One (Heisenberg Decl., Ex. 20) refers to Spotlight as having an "exclusive <u>agreement</u> with Ticketmaster" in the corporate space, which is also true.  JAF, Nos. P4-9, P122-123, P165.  And the other (Heisenberg Decl., Ex. 35) uses the phrase "Exclusive Ticketmaster Integration," which was addressed above.  The only other support Defendant cites is the testimony of a Spotlight employee who testified that he has on occasion told customers that Spotlight "paid Ticketmaster *for an* exclusive integration" (Heisenberg Dec., Ex. 46 at 59:4-9) (emphasis added), which is <u>not</u> the same thing as representing that Spotlight has the "exclusive right."

[9] Put another way, given that Spotlight's system is the only product with Ticketmaster Integration in this space, *see supra*, why would a customer care *why* other parties do not have that feature?  What would matter to them (*i.e.*, what would be "material") is that Spotlight's platform is the only system that *has* this "quality or characteristic."

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

under New York law (which governs; *see* JAF, No. P102)—a dense topic that typically takes up the entirety of a summary judgment motion.

Given that Defendant does not address contract interpretation in its motion at all, Spotlight will not belabor this point.  Suffice it to say, Spotlight believes that the agreement (when read as a whole) *does* give it the "exclusive right" to integrate with Ticketmaster, which is an exclusivity it has had since execution and still has today.  JAF, Nos. P102-111; *see also, e.g., Long Island Med. & Gastroenterology Assocs., P.C. v. Mocha Realty Assocs., LLC,* 143 N.Y.S.3d 56, 62 (2021) (considering "the context of the agreement as a whole" to assess exclusivity); *Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 723 (S.D.N.Y. 2000) (same).  At a minimum, however, the cited provision is ambiguous, making the question of contract interpretation inappropriate to resolve on a summary judgment.  *E.g.*, *Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993) ("If [a contract provision is ambiguous], ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact").

### 2.  Summary Judgment Cannot be Granted on Defendant's Second, Third, or Fifth State Law Counterclaims for the Same Reasons Judgment is Inappropriate on Its Federal Claim

Although Defendant also moves for summary judgment on three of its four state law claims, *see* pp. 20-22, it only gives them a cursory treatment and does not treat any as a standalone claim.  Instead, Defendant argues that <u>if</u> Spotlight's representation that it is the only party in its space with "Ticketmaster Integration" is proven literally false, it should win on its state law claims as well.  *See id. cf.* p. 20; *see also* pp. 20-22, *supra* (discussing each).

Some of asserted state law claims are more nuanced than Defendant implies.  *Cf., e.g., Burns v. Talon Grp., Inc.,* 2007 WL 9724464, *4 (D. Ariz. 2007) (discussing intentional interference).  But there is no need for the Court to consider factual subtleties or additional missing elements at this time.  Because Defendant cannot

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   show that Spotlight engaged in false advertising under the Lanham Act, *see supra*,

2   Defendant's state law claims fail as well given they were inextricably linked.[10]

### 3.   Summary Judgment *Can* be Granted on Spotlight's First Claim (False Advertising), Just Not in the Way Defendant Thinks

In addition to moving for summary judgment on its Counterclaims, Defendant also seeks summary judgment on Spotlight's claims, albeit without acknowledging the different burdens of proof associated with each.  Regardless, what is most notable about Defendant's argument is that it does not seek judgment on the claim (Count I) *as alleged*—it seeks judgment on a version Defendant *prefers*.

As Spotlight explains in its cross-motion (pp. 56-61, 72-73, 88), this Court can and should grant summary judgment in favor of Spotlight on its Lanham Act claim (Count I) because there can be no genuine dispute that Defendant tells prospective clients that its ticket management system is "integrated" with Ticketmaster even though, in reality, it routes all automated Ticketmaster-related requests through a third-party intermediary.  *See* JAF, Nos. P68, P86-87, P90-101.  Under Defendant's own definition, such an arrangement is therefore not an "integration" because the two companies' systems do not "work with one another" and exchange data.  *See* JAF, No. P168 ("a general description [of 'integration'] is a process by which two [technology] applications can work with one another"); *see also* pp. 31-32, *supra*; *accord* JAF, No. P60 at Kane Dec., ¶ 5, Ex. 4, 104:10-19; 84; *see also* JAF, Nos. P149-151, P154-155, P166.

However, rather than respond to Spotlight's base argument, Defendant pretends that its false statements about "being integrated with Ticketmaster" are somehow not

---

[10] Defendant also directly links its false advertising claim (First Counterclaim) to its request for summary judgment on two of *Spotlight's* state law claims (Counts II and III).  *See* p. 29 (Section III.A.2(c)) (referencing "Section IV.A.1(a)").  The different standards of proof notwithstanding, that means that if this Court denies Defendant summary judgment on its First Counterclaim, it can disregard Defendant's arguments not only as to *its* state law claims, *see above*, but as to Counts II and III as well.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    at issue and that Spotlight instead can *only* rely on four "specific" statements in the

2    "Background" section of the Second Amended Complaint. *See* p. 23 (suggesting that

3    this Court can disregard its false statement about being integrated with Ticketmaster

4    because Spotlight supposedly only made "general challenges" to them). But that, of

5    course, is not how summary judgment works. If Defendant had filed a serious motion

6    as to Count I, it would have tried to show that Spotlight could not sustain its Lanham

7    Act claim based on *any* statements Spotlight is challenging—not just the ones on

8    which Defendant wants to focus. *Accord, e.g., Ambre v. Joe Madden Ford*, 881 F.

9    Supp. 1187, 1193 (N.D. Ill. 1995) (denying summary judgment where moving party

10    did not address each of the theories alleged to support the claim) (citing authority).[11]

11    More basic, though, *even if* Spotlight could only rely on the specific statements

12    set out in the Complaint (rendering discovery a pointless process), Defendant fails to

13    mention that Spotlight *clearly alleged* that Defendant made "repeated representations

14    that [its] Concierge Live [platform] is integrated with Ticketmaster's platform," and

15    further asserted that those statements were "false, untrue, and misleading[.]" *Sec. Am.

16    Compl.*, ¶ 124; *see also id.*, ¶¶ 120, 126. The specific allegations in the "Background"

17    on which Defendant focuses are just *examples* of the kinds of false statements that

18    support the claim—they were not presented as standalone claims, nor were they meant

19    to represent and enumerate the universe of Defendant's malfeasance. After all, when

20    Defendant tell customers that it has "the same integration" or "the same functionality"

21    as Spotlight, *cf.* p. 23, it is falsely and affirmatively representing that its own system

22    *is* "integrated" with Ticketmaster, which is the core issue in this case. *See Sec. Am.*

23    *Compl.*, ¶ 124. Likewise, when Defendant tells customers it has "the contractual right

24

25    _____

26    [11] Although the *Ambre* court applied the pre-2010 version of Rule 56, its logic still holds. The only real difference is that courts now have the discretion to grant judgement as to only a part of a claim or defense. *See* Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56(g); *cf. Ambre*, 881 F. Supp. at 1193 ("an order granting summary judgment must dispose of an entire claim as opposed to a single portion of the claim").

27

28

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    … to use Ticketmaster's API," *see* p. 23, that is an actionable statement as well (albeit

2    more likely "misleading" rather than "literally false") because it implies Defendant *is*

3    *actually using* "Ticketmaster's API" <u>to</u> integrate.  *But see* JAF, Nos. P60-62.

4        Nor is it accurate for Defendant to suggest that its employees (including its

5    CEO) can lie with impunity so long as they do it when pitching clients "face-to-face,"

6    rather than in writing.  *See* pp. 23-24 (citing *First Health Group Corp. v. BCE Emergis*

7    *Corp.*, 269 F.3d 800, 803-804 (7th Cir. 2001)).  Indeed, not only is Defendant's cited

8    authority out-of-circuit, distinguishable, and seriously flawed, *cf., e.g., Gonzalez v.*

9    *Allstate Ins. Co.*, 2005 WL 5891935, *8 (C.D. Cal. 2005) (describing *First Health* as

10   "inconsistent with the Ninth Circuit approach because the court in [*Coastal Abstract*

11   *Serv. v. First American Title,* 173 F.3d 725 (9th Cir.1999)] held that face-to-face

12   communication, if made in the right context, could constitute promotion."); *Monster*

13   *Energy Co. v. Vital Pharms., Inc.*, 2022 WL 1599712, *12 n.10 (C.D. Cal. 2022)

14   ("[the] Seventh Circuit rule excluding 'person-to-person pitch[es]' [] has not been

15   adopted by the Ninth Circuit"),[12] this Court has <u>already addressed</u> this issue, holding

16   that oral sales presentations of the type the Parties make in this niche industry are

17   "actionable commercial speech."  Dkt. No. 68 at 8-9; *accord Gonzalez*, 2005 WL

18   5891935 at *7; *see also Monster Energy*, 2022 WL 1599712 at *7 (actionable

19   "promotion" can include "sales presentations to buyers").  And since the Court issued

20   its ruling, the evidence has only mounted that lying about "integration" is a central

21   part of Defendant's sales approach.  *See, e.g.,* JAF, Nos. P94, P97 (in two separate

22   client pitches, Defendant's CEO described its supposed integration with Ticketmaster

23   using the same phrase— "the secret to [Defendant's] sauce").

---

24
25   [12] *See also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57–
     58 (2d Cir. 2002) (criticizing and rejecting the *First Health* approach); *Neuros Co.,*
26   *Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 521-22 (7th Cir. 2012) (walking back *First Health*
27   and saying that it "d[id] not hold that 'advertising or promotion' is always limited to
     published or broadcast materials—an interpretation that would put us at odds with all
28   seven other federal courts of appeal to have considered the issue").

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Furthermore, Defendant's representations that there is no evidence in the record it told customers (1) its platform was "integrated" with Ticketmaster, *see* p. 24-25, or that (2) it offered the "same" integration and functionality as Spotlight, *see id.*, are equal parts baseless and disingenuous. Defendant knows full well what it told customers, and it also knows—given it *produced* the documents during discovery—that there is *plenty* of evidence of such conduct in the record. There are not just "two or three"[13] instances on tape of Defendant boasting of Ticketmaster "integration," *cf.* p. 24, there are <u>eight</u> … out of only fifteen "training" videos produced. *See* JAF, Nos. P89-97. And on top of *that*, not only are there are other documents (including client emails) that show that Defendant was continuing to promote its platform as "integrated" with Ticketmaster even when (or, perhaps, because) the cameras were not rolling, *see* JAF, Nos. P68, P86-88, P99-101; *see also* pp. 13-15, *supra*, <u>multiple corporate customers</u> are also <u>on record here confirming</u> that Defendant pitched its "Concierge Live" platform as offering the "same" integration and functionality as Spotlight, among other serious misrepresentations (like Spotlight's integration being a mere "marketing agreement" with Ticketmaster). *See* JAF, No. P100 (collecting client testimony).[14]

---

[13] That Defendant pretends not to know how many times it talked about "integration" on the tapes its lawyers reviewed, marked, and produced is peak dissonance.

[14] *See, e.g.,* JAF, No. P100 at *Declaration of Allison Kelly*, ¶¶ 2 [Grant Thorton], 10 ("I recall Concierge Live pitching that they had an integration and partnership with Ticketmaster … [and] that Spotlight only had a marketing agreement with Ticketmaster"), 13 ("I also remember Concierge Live pitching that it could do everything Spotlight could do, including providing the same Ticketmaster integration and features"); *Declaration of Azra Burden*, ¶¶ 2 [Citrix], 10 ("I was led to believe that the Concierge Live system was directly connected with Ticketmaster's systems"), 12-13 ("I was also led to believe … that Concierge Live could do everything that Spotlight could do with respect to Ticketmaster … [and that] [it] offered the same functionality as Spotlight"); *Declaration of Stew Huntley*, ¶¶ 2 [FanDuel], 6 ("Mr. Basloe … told me Concierge Live provided the exact same services as Spotlight with respect to … Ticketmaster, and that Concierge Live had a direct integration with

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Defendant, of course, then immediately pivots, alternately claiming that <u>if</u> it told customers its platform had the "same" integration and functionality as Spotlight (which it knows that it did do; *see supra*), those statements can simply be written off as non-actionable, "non-specific" generalities. *Cf.* p. 25. But Defendant was not vaguely comparing colas, *cf. id.*, or engaging in "puffery" when it spoke with customers: it was making specific claims about a characteristic of its "Concierge Live" product—namely, that it had an "integration" with Ticketmaster, just like Spotlight. And as Defendant knows, *see* p. 25 (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008)), making a false claim about a "specific … characteristic[] of a product" *is* actionable. *See id.*; *see also, e.g., Western Sugar Coop. v. Archer-Daniels-Midland Co.*, 2015 WL 12683192, *4 (C.D. Cal. 2015) (advertisements that promoted high-fructose corn syrup as "the same as sugar" were actionable); *Simpson Strong-Tie Company Inc. v. MiTek Inc.*, 2021 WL 1253803, *3 (N.D. Cal. 2021) (use of similar product numbers as plaintiff to suggest functional equivalency was actionable under the Lanham Act as false advertising).

### 4. Defendant's "Unclean Hands" Defense Bears No Relation to the Spotlight's Lanham Act Claim

To recap, Spotlight's Lanham Act claim (Count I) can basically be summed up in one sentence: Defendant is engaging in false advertising by telling prospective customers that its "Concierge Live" platform has an "integration" with Ticketmaster

---

Ticketmaster"), 10 ("During [a] meeting [four years later], [Phil Goldfarb] told me Concierge Live had come further along in their technology … [and] again said Concierge Live could do everything Spotlight could … and [] provide the same functionalities as Spotlight"); *Declaration of Stephen Sulavik*, ¶¶ 2 [MetLife], 10 ("I specifically remember that [the] Concierge Live salesperson told me that Concierge Live was 'integrated' with Ticketmaster."), 12 ("I remember the individual from Concierge Live telling me that the Concierge Live system could do everything that Spotlight could do and … [that] Concierge Live was directly connected to Ticketmaster, too."); *see also Hanscom Decl.*, ¶ 13.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   when, in reality, all client-initiated Ticketmaster requests are sent to a third-party

2   intermediary instead. *See generally* pp. 35-40.[15]

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████    Spotlight is saying that Defendant **does not have** any

9   "integrations" with Ticketmaster—"web" or otherwise.  Again, Defendant sends <u>all</u>

10  of its client-initiated Ticketmaster requests to a third-party intermediary (Automatiq).

11  JAF, Nos. P60-62, P82.  As such, only *the intermediary* potentially has an integration

12  with Ticketmaster, regardless of whether that is through "Trade Desk" or the web.

13  Furthermore, Defendant has <u>admitted</u> that is exactly how its system operates:

14      [W]hen someone makes an action in Concierge Live, we make an API
        call to Automatiq, and then Automatiq chooses which of **its integrated**

15      **channels to use** to send the mobile transfer, or whether it's through,
        colloquially, the TradeDesk channel or the web integration channel.

16

17  JAF, No. P60 at Kane Dec., ¶ 5, Ex. 4, 104:10-19[16] (emphasis added);

18

19

---

20  [15] There is, of course, nuance to that (*e.g.*, Defendant's claims about offering the

21  "same" functionality as Spotlight), as well as other asserted claims.  But, in general, Defendant's use of an intermediary is a key fact underpinning Spotlight's motion for

22  Count I.  Of course, there are other aspects of Count I not addressed in Spotlight's

23  motion as inappropriate for summary judgment, such as (i) whether "integration" implicitly means permissive interaction and (ii) whether Defendant/Automatiq lost

24  their licenses to Trade Desk by engaging in impermissible scraping/crawling.

25  [16] Mr. Basloe was testifying on behalf of Defendant pursuant to Federal Rule 30(b)(6)

26  on a number of topics, including the process by which Defendant's Concierge Live

27  system "interacts with Ticketmaster, including but not limited to, use of any APIs, automated scripts or code, or use of a third party intermediary that connects to

28  Ticketmaster."  *See* JAF, No. P81.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   *accord* JAF, No. P84 ("[A]n integration is two systems communicating with each

2   other; so I would say the request from Concierge Live to [Automatiq's] system is one

3   integration, and then the request [Automatiq is] sending over to Ticketmaster would

4   be another integration.").[17]

5   ███████████████████████████████████████████████

6   ███████████████████████████████████████████████

7   ███████████████████████████████████████████████

8   ███████████████████████████ (cited by Defendant to support JAF, No. D50).

9   The accused behavior therefore cannot have the necessary "immediate and necessary

10  relation" to the relevant equitable relief Spotlight seeks here—namely, an injunction

11  prohibiting Defendant from claiming that its "Concierge Live" platform as it currently

12  operates (through an intermediary) "has integration with Ticketmaster's platform."

13  *See Sec. Am. Compl.*, p. 35; *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 933 (9th Cir.

14  2014) (the misconduct must bear an "'immediate and necessary relation' to the

15  manner in which [the plaintiff] acquired its rights or to the equities of th[e] case")

16  (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *see*

17  *also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987)

18  (a defendant must show "[1] that the plaintiff's conduct is inequitable and ... [2] relates

19  to the subject matter of its claims"); *Republic Molding Corp. v. B. W. Photo Utils.*,

20  319 F.2d 347, 349 (9th Cir. 1963) (same); *Metal Jeans, Inc. v. Metal Sport, Inc.*, 843

21  Fed. Appx. 898, 900 (9th Cir. 2021).

22      On top of that, Defendant would also need to show that Spotlight acted with

23  "bad intent," *see Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 308

---

24

25  [17] Whether *Automatiq* actually *has* an "integration" with Ticketmaster over the web

26  is a separate story, just as whether its Trade Desk API might constitute an integration,
    and whether Concierge Live invalidated that supposed integration by having

27  Automatiq scrape. *See* JAF, Nos. P63-67, P124-125, P129-131, P139-144, P157-158,
    pp. 31-32. The Court, however, does not need to reach these issues to deny

28  Defendant's motion on its unclean hands defense.

8031213.1

(9th Cir. 1982) ("Bad intent is the essence of [unclean hands]."), and caused actual harm. *See Republic Molding*, 319 F.2d at 349–50 (9th Cir. 1963) ("[T]he extent of actual harm caused by the conduct in question ... is a highly relevant consideration."). And, of course, factual questions such as these can only be resolved on summary judgment "if the evidence presented by both sides would permit the trier of fact to come to only one conclusion," *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 871 (9th Cir. 2002), which is clearly not the case here.

**5.    Summary Judgment Cannot be Granted Against Count IV (Tortious Interference with Contractual Relations) or Count V (Tortious Interference with Prospective Business) Because There are, at a Minimum, Genuine Issues of Material Fact**

Similar to most of the rest of its brief, Defendant's arguments (pp. 29) as to why summary judgment supposedly should be granted in its favor on Spotlight's two "tortious interference" claims (Counts IV and V) are wholly derivative of those Defendant made (pp. 16-20) in support of its false advertising claim. The lynchpin in both is Spotlight's supposed lack of the "exclusive right" to integrate with Ticketmaster. *See* p. 29 (arguing that Spotlight cannot sustain its fourth cause of action [for tortious interference with the Ticketmaster Agreement] because the Ticketmaster Agreement supposedly does not provide Spotlight with "exclusivity"), *id.* ("Spotlight's false allegations of exclusivity also bar its fifth cause of action").

As Spotlight has explained, *see* pp. 34-35, the question of how to interpret the Ticketmaster Agreement properly under New York law was not briefed in Defendant's moving papers. As such, Spotlight will not go into all the legal reasons why it believes that it—contrary to Defendant's cursory assumption—most certainly <u>has</u> the "exclusive right" to integrate with Ticketmaster in the corporate and event management space. *But see* JAF, No. P103 ("Spotlight shall be the exclusive ticket managing platform for Ticketmaster."); P4-9, P104-112; *see also Long Island Med.*, 143 N.Y.S.3d at 62. All that matters for the purpose of this motion is that, at best,

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  there is a genuine dispute as to the meaning of the Agreement's terms, making its

2  interpretation inappropriate to resolve on a motion for summary judgment. *E.g.,*

3  *Maffei*, 12 F.3d at 898 ("If [a contract provision is ambiguous], ordinarily summary

4  judgment is improper because differing views of the intent of parties will raise

5  genuine issues of material fact").

6    **6.    Defendant's "Statute of Limitations" Defense Against Count I is**

7    **Not Real and Cannot Bar the Continuing Torts Alleged**

8      Finally, near the very end of its brief, Defendant appends a short argument (less

9  than a page; *see* pp. 30-31) that grandly announces that this entire case was barred

10 from the start by "Statute of Limitations" issues and we all just somehow missed it.

11 Obviously, though, that is not the real story, and Defendant knows it. After all, why

12 else wouldn't it have played this secret "get-out-of-jail-free card" ages ago?

13    **(a)    Spotlight's Lanham Act Claim (Count I) is Not Subject to a**

14    **Statute of Limitations, and the Defense of "Laches" Cannot**

15    **Bar the Continuing Torts Alleged Here**

16      As one might suspect, there are many, many things wrong with Defendant's

17 throw-away limitations argument. To start, there *is* no "Statute of Limitations" for

18 Lanham Act claims. *See* 15 U.S.C. §§ 1051 *et seq.*; *see also ImprimisRx, LLC v.*

19 *OSRX, Inc.*, 2023 WL 8604148, *12 (S.D. Cal. 2023); *Yeager v. Bowlin,* 495 F. App'x

20 780, 781-82 (9th Cir. 2012). Rather, the relevant defense is laches, and any

21 "analogous" limitations period (p. 30) can only relate to the question of whether the

22 length of any delay should be considered "unreasonable." *ImprimisRx,* 2023 WL

23 8604148 at *12-13 ("To assess a laches defense, the Court first examines whether a

24 delay occurred and then decides whether that delay was reasonable. … To assess

25 whether the delay was unreasonable, courts look to the length of the delay and the

26 reasonableness of that delay in light of the analogous limitations period.").[18] Here,

27 _____

28 [18] Even then, however, courts must still consider whether the plaintiff has proffered a

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    Spotlight sued Concierge Live within weeks of learning that it was again making these

2    false representations to the market.  JAF, Nos. P116-119.

3    The laches defense, however, also has a <u>second</u> prong: "[T]he party asserting

4    laches … must show that (1) [plaintiff's'] delay in filing suit was unreasonable, **and**

5    **(2) [defendant] would suffer prejudice** caused by the delay if the suit were to

6    continue." *Jarrow*, 304 F.3d at 838 (emphasis added); *see also Danjaq,* 263 F.3d at

7    951 ("[u]nreasonable delay … is not enough").  Defendant, however, does not claim

8    (let alone offer evidence) that it has suffered any evidentiary or expectations-based

9    prejudice because of a supposed "delay."  As such, even if the Court were to believe

10   that laches could apply to the type of claims presented here, and that Spotlight delayed

11   in bringing suit, *and* that its delay was "unreasonable" (*but see infra*), summary

12   judgment would still be inappropriate because Defendant has failed to make out a

13   *prima facie* case for laches to apply.  *Accord ImprimisRx,* 2023 WL 8604148 at *13

14   (even though defendant delayed bringing false advertising counterclaims, the court

15   denied plaintiff's motion for summary judgment on laches because it "ha[d] not

16   offered any evidence to support a finding of prejudice due to [d]efendant's delay").

17   Even more fundamental though, Defendant fails to appreciate that the false

18   advertising alleged in this case is in the nature of a *continuing* tort.  Under the

19   continuing tort doctrine, when "a tort involves continuing wrongful conduct," the

20   limitation period does not begin to run "until that conduct ends." *Flowers v. Carville*,

21   310 F.3d 1118, 1126 (9th Cir. 2002).  And relevant here, "[t]he doctrine applies where

22   there is 'no single incident' that can 'fairly or realistically be identified as the cause

23   of significant harm.'"  *Id.* (quoting *Page v. United States,* 729 F.2d 818, 821-22 (D.C.

24   _____

25   legitimate excuse for the delay in the filing suit.  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (2002); *Danjaq, LLC v. Sony Corp.*, 263 F.3d 942, 952

26   (9th Cir. 2001) (outlining several acceptable excuses for delay in filing suit); *see also, e.g., Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 718 (4th Cir. 2021); *Piper*

27   *Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 932 (7th Cir. 1984).  This subject is

28   covered more fully *infra* in this brief.  *But see generally* JAF, Nos. P116-119.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Cir.1984)); *see also, e.g., Jarrow*, 304 F.3d at 838 ("Usually, infringement is a continuing wrong, and the statute of limitations is no bar except as to damages beyond the statutory period.") (quoting *McCarthy on Trademarks and Unfair Competition* § 31.33 (4th ed. 2001)); *Sears v. Russell Road Food and Beverage, LLC*, 460 F.Supp.3d 1065, 1070-71 (D. Nev. 2020).

This is not a case where a single triggering event from the past is "identified as the cause of significant harm," such as the publication of a book (*Flowers*, 310 F.3d at 1126), the affixation of a deceptive product label (*Jarrow*, 304 F.3d at 832), or a post on someone's Facebook page (*Sears*, 460 F. Supp.3d at 1070). Defendant's wrongful conduct has been continuous, which means that prospective equitable relief remains fully available and each individual wrongful event (*e.g.*, each sales pitch to a different customer) must be subject to a separate accrual period for damages. *See, e.g., Newcal Indus., Inc. v. IKON Office Solutions, Inc.*, 2011 WL 1899404, *4 (N.D. Cal. 2011) ("Because … Plaintiffs sufficiently allege that Defendants' … practices are ongoing, 'the statute of limitations is conceivably only a bar to monetary relief for the period outside the statute of limitations; the plaintiff is free to pursue monetary and equitable relief for the time within the limitations period.'") (quoting *Jarrow*, 304 F.3d at 837); *Novell, Inc. v. Unicom Sales, Inc.*, 2004 WL 1839117, *4 (N.D. Cal. 2004); *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 2008 WL 913279, *2 (N.D. Cal. 2008); *see also, e.g., Star-Brite Distrib., Inc. v. Gold Eagle Co.*, 2016 WL 4470093, *3 (S.D. Fla. 2016) (holding plaintiff can pursue damages for false advertising claims as continuing torts for the acts committed within the limitations period)..[19]

**(b)    Summary Judgment Cannot be Granted Against Spotlight's**

---

[19] Beyond all of this is, it is also notable that laches is a highly fact-specific inquiry, making it typically inappropriate to resolve on summary judgment. *See, e.g., O'Very v. Spectratek Techs., Inc.*, 2003 WL 25781235, *5 (C.D. Cal. 2003).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

### State Law Claims (Counts II, III, IV, and V)

Lastly, buried in its argument on Spotlight's Lanham Act claim, Defendant suggests that Spotlight's state law "false advertising" claims (Counts II and III) are barred under a four-year statute of limitations, *see* p. 30, and then goes on to say that its tortious interference claims (Counts IV and V) have an even shorter window (two years). *See* p. 31. Defendant, however, does not really develop this point—it just says that the claims *should* be barred and leaves the Court to fill in the rest.

Notably, though, what Defendant fails to discuss is that like claims brought under the Lanham Act, claims brought under California's False Advertising Law and Unfair Competition Law are typically continuing torts as well. As such, with each new wrongful act, one's ability to recover equitable and legal relief reaccrues:

> Because "[a]n action for unfair competition under [the California UCL is 'substantially congruent' to a trademark infringement claim under the Lanham Act," the Court applies the ["continuing accrual"] doctrine which mirrors the approach under the Lanham Act. Under the theory of continuous accrual, "each new breach ... provides all the elements of a claim ... [and] each may be treated as an independently actionable wrong with its own time limit for recovery."

*Zox LLC v. Zox*, 2021 WL 4816664, *4 (C.D. Cal. 2021) (cites omitted); *see also In re Outlaw Laboratory, LLP*, 463 F. Supp. 3d 1068, 1087 (S.D. Cal. 2020) (considering California's FAL to also be "substantially congruent" to the Lanham Act).

Spotlight's common law "tortious inference" claims are also similar. Usually, interference claims are based on "one off" tortious events, such as a defendant using unlawful means to steal a valuable client. As a result, they are not often litigated as "continuing" wrongs. *See, e.g.*, *Boon Rawd Trading Int'l v. Paleewong Trading Co., Inc.*, 688 F.Supp.2d 940, 952 (N.D.Cal.2010). But the Ninth Circuit has explained that "the continuing accrual doctrine *can* apply to common law claims," including claims for "intentional interference with prospective business advantage." *Ramirez v. Navarro*, 2024 WL 1874993, *2 (9th Cir. 2024) (emphasis added). "What is dispositive is 'the nature of the right sued upon and the circumstances attending its

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    invocation,' not the labeling of the cause of action." *Id.* (quoting *Aryeh v. Canon Bus.*

2    *Sols., Inc.*, 292 P.3d 871, 878 (Cal. 2013)).  This is also supported by the fact that

3    there is nothing in the cited limitations section (Cal. Civ. Pro. Code, § 339; *see* p. 31)

4    that *precludes* courts from considering the common law equitable exceptions that

5    have been developed over time, including the theory of "continuous accrual."  *See*

6    *Aryeh*, 292 F.3d at 876; *cf. Quarry v. Doe I*, 272 P.3d 977 (Cal. 2012) (discussing

7    Code Civ. Proc., § 340.1, which legislatively supplants theory of delayed discovery);

8    *Jordache Enter., Inc. v. Brobeck, Phleger & Harrison*, 958 P.2d 1062 (Cal. 1998)

9    (discussing Code Civ. Proc., § 340.6, which supplants equitable tolling).

10       In the present action, Spotlight is alleging that the manner by which Defendant

11   is interfering with its contractual relations (Count IV) and its prospective economic

12   advantage (Count V) is through its *ongoing* false advertising, not any single "one off"

13   event.[20]  *See Sec. Amend. Compl.*, ¶¶ 175-76, 194-95.  And Defendant's wrongful acts

14   are *exactly* the type of conduct the theory of "continuous accrual" is meant to target.

15   *Accord Aryeh*, 292 P.3d at 880 ("The theory is a response to the inequities that would

16   arise if the expiration of the limitations period following a first … instance of

17   misconduct were treated as sufficient to bar suit for any subsequent breach or

18   misconduct; parties engaged in long-standing misfeasance would thereby obtain

19   immunity in perpetuity from suit even for recent and ongoing misfeasance.").  Thus,

20   although Spotlight *might* not be able to recover monetary relief for certain acts that

21   occurred outside the limitations window (although that issue is not before the Court),[21]

22

23   [20] Contrary to Defendant's claim (p. 31), the "alleged interference" with Spotlight's
     contractual rights (Count IV) and prospective economic advantage (Count V) is not
24   Defendant's supposed "use of its Ticketmaster TradeDesk API integration," which,
     as discussed; *see, e.g.,* pp. 56-61, 72-73, 88, is not even a thing. JAF, Nos. P60-62,
25   P82. Rather, Defendant is unlawfully diminishing the value of Spotlight's contractual
     rights and interfering with its business prospects is by falsely advertising that it has
26   an "integration" with Ticketmaster. *See Sec. Amend. Compl.*, ¶¶ 175-76, 194-95.
27

28   [21] Through its motion, Defendant is asking the Court to bar Spotlight's claims *in their*

1    it is fully entitled to pursue its claims (and seek legal and equitable relief) based on

2    Defendant's continuing wrongful conduct, which is exactly what it is doing.

3

4    **IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

5    **A.    Plaintiff's Introduction for Plaintiff's Motion**

6        If an investment advisor you were considering were to tell you that if you hired

7    them, they and Warren Buffett would "work with one another" to manage your

8    accounts, you would rightly be impressed.  Buffett is regarded as one of the most

9    successful investors of modern times, and knowing that he and your advisor would be

10   working together for you would likely put you well at ease.

11       However, if you later were to discover that this advisor had never even *met* Mr.

12   Buffett, you justifiably would feel like you had been duped.  After all, how can

13   someone claim to "work with" somebody if the two never even speak?

14       That is what is going on in this case.  Defendant advertises to prospective

15   customers that its corporate ticket management platform is "integrated" with the

16   computer system operated by third party Ticketmaster—that is, the two parties'

17   systems supposedly "work with one another."  But that is not true.  Defendant's

18   software never actually sends any data to, or receives any data from, Ticketmaster.  In

19   other words, metaphorically, the two never "speak" with one another.

20       Instead, Defendant works with a third-party intermediary ("Seat Scouts") and

21   has *Seat Scouts* interface with (and send data to / receive data from) Ticketmaster.

22   Defendant has resorted to this "workaround" because Ticketmaster has repeatedly

23   _____

24   *entireties* due to supposed "statute of limitation" concerns.  *See* pp. 30-31.  Defendant
     is <u>not</u> seeking to limit recovery arising from any specific activities occurring outside

25   the presumptive limitations period(s).  Were *that* the issue before this Court, the

26   Parties would have had to address a series of fact-intensive sub-issues, such as
     Spotlight's discovery of each such incident (to apply the "discovery rule") and the

27   overall nature of the Parties' past interactions (to assess "equitable tolling").  *See*

28   *Aryeh*, 292 F.3d at 875; *see also* JAF, Nos. P111-119.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

refused to allow Defendant to "integrate" their two systems.  Ticketmaster even *told* Defendant years ago (in March 2021) that the way Defendant operates (by using an intermediary) means that its system is **not** "integrated" with those of Ticketmaster, and Defendant telling customers otherwise would simply be "not true":

> I know you are looking and actively trying to get into the market, but any confusion that Concierge Live and Ticketmaster have an integration and/or automated process in anyway really needs to be cleared up in the market.  Assume you can understand that if a Corporation and/or TM client signs with Concierge Live thinking there is an integrated and auditable backend between our two systems, then this would be bad for all since not true.
>
> Again, I apologize for being upfront, but some concerns have arisen and so need to make sure we're all speaking from the same page.

Joint Appendix of Facts ("JAF"), No. 77.

Nonetheless, that is <u>exactly</u> what Defendant continued to do.  Defendant kept telling potential customers (usually at one-on-one sales pitches) that its "Concierge Live" ticket management software supposedly had "Ticketmaster Integration" and that it could provide customers with "Ticketmaster Integrated" accounts.  Those statements, though, were literally false.  And Defendant knew it.  *See supra*.

Things came to a head earlier this year when Ticketmaster wrote Defendant and told it, point blank, to <u>stop</u> making "integration" claims, which Ticketmaster called "patently false."  JAF, No. 76 ("Ticketmaster demands that Concierge Live immediately cease and desist from its misrepresentations to third parties that it has an integration with Ticketmaster").  Out of everyone, Ticketmaster *would know* whose systems were or were not "integrated" with theirs, and Ticketmaster, after reviewing the account Defendant had with them, told Defendant that its claim that "Concierge Live … has integration with Ticketmaster for the transfer of corporate and event tickets[] **is unequivocally false**." *Id.* (emphasis added).

Nonetheless, Defendant has persisted.  Defendant continues today to make the same false claims about "integration" that Ticketmaster told it more than four years ago were simply "not true."  *See* JAF, Nos. 8-9, 77; *see also* JAF, No. 76 ("On or about March 31, 2021, Ticketmaster provided you with a letter … indicating that these

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    activities were prohibited. Nonetheless, … Concierge Live has continued to
2    misrepresent its relationship status and/or capabilities with Ticketmaster[.]").  The
3    only difference now is that Defendant no longer does it in writing.  JAF, No. 68 at
4    Kane Dec., Exs. 45, 49-52.  The absence of a paper trail, however, does not impart
5    truth to a lie.

6        Defendant is free to advertise its workaround hack truthfully for what it is—a
7    less expensive and less elegant way to *mimic* true Ticketmaster "integration" (albeit
8    not completely).  And many customers may be satisfied with that, just as how many
9    consumers happily buy generic versions of brand name products to save money.  But
10   what Defendant <u>cannot</u> do is to claim that its system includes a feature ("Ticketmaster
11   Integration") that it objectively does not.  That is literally false, and Defendant's
12   continued consumer deception should be enjoined by this Court.

13   **B.    Defendant's Introduction for Plaintiff's Motion**

14       Spotlight's motion tells a story that, to a casual reader, might seem
15   compelling, until one realizes how to decode it. Ticketmaster offers two sets of APIs
16   that can be used to manage corporate tickets. One set, known as its TradeDesk APIs,
17   allows clients to "support ticket search, resale, and management services" (JAF ¶
18   D4), and is managed by its Resale group, while a second set, its Nexus APIs, are
19   managed by its Partnership group (JAF ¶ D5). The two group's interests are not
20   always aligned. Heisenberg Opp. Decl., Ex. 1 (Scarborough Dep.) at 51:13–20 ("We
21   had different business objectives. . . . Many times, they are aligned -- sometimes
22   they are at odds with each other."). Indeed, often the groups are unaware of what the
23   other is doing. *Id.* at 45:22–25 ("At the time, I wasn't aware of Trade Desk APIs.
24   Like I said, I can't answer that, because I thought the only ones that existed were
25   Nexus APIs for corporate ticket management."). This case demonstrates that.

26       Spotlight seizes on that bifurcation within Ticketmaster to tell a half-story.
27   Using self-defined phrases like "corporate ticket management" and a "*true*
28   integration" to mean *only* the Nexus APIs, to the exclusion of the TradeDesk APIs,

8031213.1
51

1  it makes seemingly encompassing, sweeping statements to suggest CL's lack of

2  integration, while ignoring CL's TradeDesk API integration.

3       But Spotlight's story is false. First, Ticketmaster has confirmed that

4  Ticketmaster *authorized* CL's TradeDesk API integrations in 2018 for corporate

5  ticket management purposes, and Ticketmaster acknowledges that CL *used* its

6  TradeDesk API integration for that purpose since April 2019.

7       Second, Spotlight completely ignores Ticketmaster's actual testimony that

8  reveals Spotlight's half-truth. Spotlight cites Ticketmaster's seemingly broad

9  statements denying CL's "integration," but it fails to disclose the clarifying

10 testimony by Ticketmaster's designated witness that Ticketmaster was *not* denying

11 CL's TradeDesk API integration:

> Q.  … where you say:  "Concierge Live does not have and has never had an integration with Ticketmaster." Are you speaking about the Trade Desk API or the Nexus API there?
>
> A:  I always like to clarify, as I have been throughout the day -- has never had a *Nexus integration* for Ticketmaster for corporate ticket management.

17 Heisenberg Decl., Ex. 3 (Scarborough Dep.) at 135:11–24 (emphasis added). When

18 decoded, Spotlight's evidence does not advance its case one iota.

19      The real issue is CL's TradeDesk API integration. That Spotlight considers

20 CL's TradeDesk integration to be "less elegant" than Ticketmaster's Nexus product

21 is irrelevant; the TradeDesk API *is* a corporate ticket management product provided

22 by Ticketmaster. Accordingly, Spotlight's statement that CL lacked ***any*** form of

23 integration with Ticketmaster is false.

24      It is important to remember that disputing TradeDesk as an "integration" was

25 not Spotlight's original plan. To the contrary, even Spotlight called CL's connection

26 to Ticketmaster an integration when it told Ticketmaster that it could not get clients

27 back because the former customers "tell[] us often the Ticketmaster integration

28 [through CL] is 'seamless.'" Heisenberg Decl., Ex. 52. Spotlight's true grievance

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    was that it believed that it was paying Ticketmaster's Partnership group for

2    exclusivity, meaning CL should not have <u>any integration</u>. ECF No. 83-1 at #1111

3    ("Concierge Live does not even have a legal right to engage in corporate ticket

4    management directly with Ticketmaster. That is the central point in this case."). It

5    was only after Ticketmaster confirmed that the 2016 Agreement did not provide

6    Spotlight an exclusive right to integration (and denied Spotlight's contention of an

7    under-the-table exclusivity agreement with Ticketmaster's Partnership group), that

8    Spotlight was forced to pivot and try to retrofit arguments to dispute CL's

9    TradeDesk API integration through Ticketmaster's Resale group.

10       This leaves Spotlight to argue that CL's TradeDesk API integration with

11   Ticketmaster is not an "integration," because, it contends, CL's platform does not

12   "work with" Ticketmaster.  It makes that argument even though Ticketmaster

13   confirmed, under oath, that it exchanges data *directly* with CL through its unique

14   API token, the express purpose of which is "to be able to identify the user [CL] that

15   is calling the API" and ensure that CL "could use Seat Scouts, but they would just

16   have to do it under their security key or token *so that it was being done on them*

17   *directly*." Heisenberg Opp. Decl., Ex. 2 (Volini Dep.) at 34:15–35:2.

18       Spotlight's new-found concern about "hurt[ing] consumers and disrupt[ing]

19   fair competition" rings hollow. The evidence says that is not the case with respect to

20   CL. Many customers do not want to pay extra for the Nexus API's premium features

21   that they do not need. They simply want TradeDesk's core ticket management

22   functions. Over the six years that CL has served its approximately 150 customers,

23   virtually all have renewed their contracts, many multiple times, with only a

24   minuscule number (three) having returned to Spotlight. Basloe Decl. ¶¶ 11–12.

25   Indeed, while Spotlight's motion highlights ████████████ as an example of a

26   customer that CL supposedly misled in a 2020 request for proposal ("RFP") process,

27   Spotlight fails to disclose that the client happily completed its initial three-year

28   contract with CL, and then renewed with a five-year contract. Basloe Opp. Decl. ¶ 6.

8031213.1
53

That gamesmanship reveals that Spotlight's real purpose is not to protect customers from false advertisement. Its real purpose is to eliminate competition.

## V.    STATEMENT OF UNDISPUTED FACTS

### A.    Plaintiff's Statement of Facts

#### 1.    Spotlight and Its Close Relationship with Ticketmaster

Plaintiff, Spotlight Ticket Management, Inc. (d/b/a "TicketManager"), provides event and ticket management solutions for corporations. The Company's software platform helps its corporate clients manage their ticket and sponsorship programs by offering them tools to track, distribute, and analyze spending on events, and also by providing them with systems for ticket delivery, ticket fulfillment, and mobile entry into events. JAF, No. P2.

Third Party Ticketmaster Entertainment, LLC is the preeminent ticket sales and distribution company selling tickets for live entertainment events to the public. JAF, No. P3. Since October 2016, Spotlight has been the exclusive ticket management platform for Ticketmaster in the business event and corporate ticket management space. JAF, No. P4. Spotlight is also the only company operating in that business category that Ticketmaster has allowed to integrate its systems with theirs. JAF, No. P5. This close interlinking of the two parties' systems enables Spotlight to provide its clients a seamless and direct way to transfer Ticketmaster tickets to their ultimate users, as well as perform other tasks (such as discovering available ticket inventory for desired events) in real time. JAF, No. P6.

Spotlight pays Ticketmaster a fee each year as part of this exclusive partnership, with the total paid to date running into the millions of dollars. JAF, No. P7. But it is money well spent because Spotlight's close relationship with Ticketmaster provides it with a significant competitive edge in the marketplace: Spotlight is the only company in the event and corporate ticket management space

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

that can truthfully state that its systems are integrated with those of Ticketmaster—a position that Ticketmaster itself has repeatedly (and publicly) reaffirmed:



**ticketmaster**

March 31, 2021

To Whom It May Concern,

Ticketmaster entered into an exclusive partnership agreement with TicketManager in the fall of 2015 for the business event and ticket management category. Through this partnership, Ticketmaster and TicketManager are enabling companies to integrate tickets directly with their team and venue providers with technology including the discovery of inventory, transfer of mobile tickets, and attendance scan information in real time amongst other future innovations.

It has come to our attention that there are vendors in the ticket and event management marketplace mis-representing their Nexus Partner status and/or capabilities they may have with Ticketmaster. Through our **exclusive** partnership with TicketManager, they are our **only** Nexus Certified Partner who has an integration with Ticketmaster in the event and corporate ticket management market.

David N. Scarborough
Chief Strategy Officer
Ticketmaster

JAF, No. P9; *see also* JAF, No. P76 ("Ticketmaster has engaged a single third party - Spotlight Ticket Management - for corporate ticket management services").

## 2.    The Nature of the Corporate Ticket Management Market

The corporate ticket management industry is a small, niche market. JAF, No. 10. Customers are typically large companies that need to manage the thousands to hundreds of thousands of event or entertainment tickets they either own or have acquired for various purposes across their business operations. JAF, No. P11. All told, there are perhaps five thousand potential clients that realistically could benefit from the services offered by a third-party provider. JAF, No. P12.

Given the small size of the market, it is therefore common for providers such as Spotlight and Defendant (two of the largest companies in the industry) to eschew traditional advertising methods and instead promote themselves to prospective clients through direct sales pitches tailored to that client's needs. JAF, No. P14. These pitches are often made at "one-on-one" meetings, but they can also be done through email (*e.g.*, by sending presentation "decks") or over the phone. JAF, No. P15. Following initial meetings, providers will also usually have further "back-and-forth"

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   communications with potential customers, which gives them an opportunity to answer

2   any additional client questions and provide the client with further details about the

3   offered product or possible contract terms.   JAF, No. P16.

4          One common marketing situation involves responding to a company that has

5   issued a "Request for Proposal"[22] for a ticket management solution.  JAF, No. P17.

6   When a company issues such an RFP, Spotlight and Defendant often go up against

7   one another for the same account and submit competing proposals, whether on paper

8   (usually, at least initially) or at separate in-person presentations.  JAF, Nos. P18-19.

9   Statements that a provider makes in those proposals about a product's features are

10  taken seriously by the companies being pitched and are often relied on by the

11  companies when making their purchasing decisions.  JAF, No. P20.

12         An important factor that corporate customers consider when deciding which

13  ticket management provider to retain is the ability of that provider's platform to

14  handle the transfer and management of corporate tickets seamlessly.  JAF, No. P71.

15  And in particular, it is crucial to customers that the provider be able to handle large

16  numbers of tickets sourced through Ticketmaster, which account for around half of

17  all corporate tickets that need to be managed.   JAF, Nos. P21, 72-73.   During

18  presentations (and in RFPs), customer often ask about this topic.  JAF, No. 74; *see*

19  *also* JAF, No. P21   (Defendant's CEO said that almost every customer uses

20  Ticketmaster).

21     **3.     Defendant and Its Failed Efforts to Integrate with Ticketmaster**

22         Defendant, Concierge Live, LLC, competes with Spotlight in the event and

23  corporate ticket management market and has a decidedly … "colorful" past.  JAF Nos.

24  P27-29, 33-36.  For years (going back more than a decade), Defendant has wanted to

25

26         [22] A  Request  for  Proposal  ("RFP")  is  a  formal  document  that  some
27  organizations use to solicit detailed proposals from potential vendors for a specific
    project or service. It usually outlines the project's goals, scope, requirements, and
28  budget,  and  often  includes  the  criteria  the  organization  will  use  to  evaluate  the
    submitted bids.

integrate its systems directly with Ticketmaster's "API"[23] so it could increase the features offered to clients and improve clients' overall experiences—in other words, do exactly what Spotlight is doing.  JAF, Nos. P22, 48-49. However, each time Defendant broached the subject, Ticketmaster refused to give it the requested access:

<u>2014</u>

From: Tren Hopkins <thopkins@conciergelive.com>
Sent: Wednesday, July 2, 2014 9:15 AM
To: Lucy Daniel

Hi Michelle,

For the Ticketmaster conversation, we've been in discussions with them for a couple years about integrating with client host accounts. Unfortunately they still don't allow access their API, although we continue to push the conversation. I know in last week's call, there was a discussion related to checking in attendees and scanning tickets to pull in data but that wouldn't be relevant to TM integration. The attendee data wouldn't be in TM, it would need to be in Concierge Live since TM doesn't capture attendee information, scanning the ticket wouldn't provide any useful data. The purpose of the TM integration is to make the e-ticket process seamless so for our clients that use e-tickets so they wouldn't have to download the e-tickets themselves.

If we are able to integrate, we will be sure to let you know. Any other questions, let me know.

<u>2018</u>

From: Drew Gainor
<drew@seatscouts.com>
Date: Thursday, January 4, 2018
at 2:06 PM
To: Phil Volini
<phil.volini@ticketmaster.com>
Subject: Re: Broker Payments

Question for you. Which API/Endpoint is best for automating mobile ticket transfers?
Thanks so much!

On Jan 4, 2018, at 3:14 PM, Phil Volini <phil.volini@ticketmaster.com> wrote:

Hi Drew,

Happy New Year to you also!

We have not externalized the API for mobile transfers at this time but I will definitely keep you in the loop on that one.

JAF, No. P22 at Kane Dec., Exs. 12, 13; *see also* JAF, No. P22 at Kane Dec., Ex. 14 ("We're open to continuing this discussion [about allowing access to Ticketmaster APIs], but full transparency this isn't exactly a core integration type for us.") (November 2018).

Nonetheless, that did not stop Defendant from *telling* customers it had (or soon would have) access to "Ticketmaster Integration."  For example, Defendant told one customer (in August 2018) that it was "in the process of integrating with

---

[23] An "Application Programming Interface" is a set of rules and protocols that allows different software applications to communicate and interact with each other. It helps define how one application can request and receive data from another.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    TicketMaster" and even invited another one (Adobe Systems) to be a "Beta user" for

2    their "Ticketmaster integration," which (as discussed above) did not <u>exist</u>.  *See* JAF,

3    No. P46 at Kane Dec., Exs. 31-32; *see also id.* at Kane Dec., Ex. 33  ("We are also

4    integrating with Ticketmaster") (July 2018), *id.* at Kane Dec., Ex. 34  ("we are

5    entering into the final stages of development with Ticketmaster to integrate")

6    (October 2018).

7         Unable to secure permission to integrate its corporate ticket management

8    platform with Ticketmaster's system, Defendant needed to create a workaround to

9    meet client's expectations.  *See, e.g.,* JAF, No. P47 at Kane Dec., Ex. 35 ("I'm getting

10   hammered to get something out the door") (Feb. 2019), *id.* at Kane Dec., Ex. 36

11   (promising customers they were "in the process of integrating Ticketmaster") (April

12   2019), *id.* at Kane Dec., Ex. 37 (claiming "TicketMaster Integration is currently in

13   beta testing") (June 2019).  Defendant's owner (Guinio Volpone), who had purchased

14   Defendant out of bankruptcy (JAF, No. P25), was at the time also an owner of "Seat

15   Scouts" (now called "Automatiq")[24], a technology company that services ticket

16   brokers.[25]    JAF, No. P30.  And ticket brokers often used certain Ticketmaster APIs

17

18

19

20

21   _____

22   [24] Although Automatiq may not technically be the legal successor to Seat
     Scouts, here, that is a distinction without a difference.  In December 2020, third party
23   "Broker Genius" announced that it was merging its operations with that of Seat
     Scouts, and that "Seat Scouts and its employees [would] become part of the Broker
24   Genius team," with Drew Gainor (Seat Scout's founder) "join[ing] as the company's
     Chief Product Officer."  JAF, No. P31.  Then, in June 2022, Broker Genius announced
25   a "Rebrand," explaining that it was "unifying the [Broker Genius] and [Seat Scouts]
     brands under the name Automatiq."  JAF, No. P32.

26   [25] A ticket broker is a licensed individual or company that buys event tickets
27   and then resells them for a profit on the secondary market. They usually focus on
     high-demand events and leverage technology to gain an edge over consumers in the
28   purchasing or pricing of event tickets.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   (commonly called "Broker APIs") that were designed for use by them, rather than

2   companies in the ticket management space.  JAF, No. P38.

3        One example of a Broker API is Ticketmaster's "Trade Desk."  Trade Desk is

4   an inventory management application that allows ticket brokers to upload, price, and

5   manage large quantities of tickets across various marketplaces, including by making

6   end-to-end ticket transfers.  JAF, No. P39.  Early on, Defendant tried to incorporate

7   the Trade Desk API into its own corporate ticket management system (whether

8   Ticketmaster knew what Defendant was trying to do is another story), but—as

9   multiple engineers who worked for Defendant have testified—it never worked.  JAF,

10  No. P44.  So, instead, Defendant came up with a workaround—they would simply

11  use *Seat Scouts*, whose systems already worked with Ticketmaster, and route all their

12  Ticketmaster-related requests through them.  JAF, No. P51.

13       And for some functions (such as ticket transfers), that *sort of* works.  For

14  example, if one of Defendant's corporate clients wants to transfer its Ticketmaster

15  tickets to an end user, instead of the transfer taking place through an integrated process

16  (*i.e.,* the customer pushes a button on their computer and Ticketmaster immediately

17  transfers the tickets), the workflow essentially follows this path:

18       1.   The client initiates a transfer request on Defendant's platform.

19       2.   Defendant's platform passes that request on to Seat Scouts.

20       3.   Seat Scouts then interfaces with Ticketmaster and either:

21            (a)   Uses the Trade Desk API to transfer the tickets, for which

22                  it is charged an added fee of $.50 per ticket that (when

23                  applied to thousands of tickets) can add up fast; or

24            (b)   Uses an unauthorized programming "bot" to "crawl" or

25                  "scrape"[26] Ticketmaster's site and then has that "bot"

26

27   ───────────────
        [26] A "programming bot" is an automated software application that has been
28   designed to perform specific, often repetitive, tasks online, acting as a digital agent

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

interact with the site to transfer the tickets, avoiding Ticketmaster's fees. (Not surprisingly, this is how the majority of Defendant's requests are processed).[27]

4.    Seat Scouts reports the ticket transfer back to Defendant; and

5.    Defendant updates the customer's portal, noting the transfer.

JAF Nos. P51-52

Critically, though, at no point in this process does Defendant's system <u>interact</u> with Ticketmaster. JAF Nos. P60-62. Defendant's platform does not send any data *to* Ticketmaster, nor does it receive any data *from* Ticketmaster. *Id.* In other words, there is no "cooperation" between Defendant's and Ticketmaster's unconnected systems, and it would be inaccurate to claim that their two systems were in any way "working together." JAF Nos. P50, 60-62.

Moreover, because the Trade Desk API was meant to be used by ticket brokers, rather than for corporate ticket management, JAF, Nos. P38-39, Trade Desk does not even provide end users (such as Seat Scouts) with certain functionalities, such as the ability to see live, updated seating charts for events, receive notification of when tickets are used at events, or recall tickets in case they need to be redistributed. JAF, No. 41. So, to work around *that* limitation, Defendant instead has Seat Scouts log into the Ticketmaster website (like a user would), "crawl" the site in an automated

---

for users or other programs for handling things such as web crawling and data scraping.

"Data scraping" is the process of using a software tool (usually a "bot") to extract automatically data displayed on a computer screen, such as from web pages. It works by emulating user actions (*e.g.*, clicking on different links) to capture visual information, which is then converted into a usable format, often used for tasks like data migration or aggregation, or when APIs are otherwise unavailable.

[27] Phil Volini of Ticketmaster testified that using "bots" and "crawling" or "scraping" the Ticketmaster website is prohibited. JAF, Nos P42, 52. In fact, engaging in such activities results in an automatic revocation of any license to use the Trade Desk API. JAF, No. P64-67. Nonetheless, it is undisputed that Defendant is having Seat Scouts engage in this activity for the majority of transactions (JAF, No. P59), presumably all to avoid paying Ticketmaster's $.50 per ticket transaction fee.

8031213.1

60

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  way (*i.e.*, using a "bot"), "scrape" certain publicly-viewable data off of the site (*e.g.*,
2  seating charts), analyze it, and then send that data to Defendant's platform, ultimately
3  for Defendant's clients to see.  JAF, No. P42.

4      But as has been discussed, *see* n.28, *supra*, using a "bot" or other automated
5  means to scrape data from Ticketmaster's site is a prohibited activity, *especially* if the
6  reason for doing so is to avoid paying Ticketmaster a fee.  JAF, No. P43, 57.  Deep
7  down, then, Defendant knew that what it was doing was not *really* an "integration."
8  And that is why, at the same time it was telling customers that its "Seat Scouts"
9  workaround *was* an "integration," Defendant aggressively continued to seek ways to
10  achieve an <u>actual</u> "integration" with Ticketmaster.  *See* JAF, No. P48 (email from the
11  NFL to Ticketmaster stating that Defendant's CEO (Basloe) was "an old friend" who
12  was "interested in connecting around **a possible** integration") (emphasis added) (May
13  2021); *see also* JAF, No. P49 (Defendant's CEO called Ticketmaster directly, saying
14  "we desperately need your help") (June 2021).

15      Ticketmaster, however, continued to refuse to let Defendant to integrate their
16  systems and told Defendant in no uncertain terms (in March 2021) that it needed to
17  "clear[] up" any misunderstanding in the market about whether "Concierge Live and
18  Ticketmaster have an integration."  JAF, No. P77.  Ticketmaster even warned
19  Defendant that if a customer signed up to use "Concierge Live" believing that an
20  integration existed between Ticketmaster's and Defendant's systems, "th[at] would
21  be bad for all" because it simply was "not true."  JAF, No. P77; *see also* JAF, No.
22  P76 (April 2025) (Ticketmaster reiterated the position it took in its March 2021 letter
23  and called Defendant's continued claims about "integration" "knowingly false")
24  ("Concierge Live has been on notice of this fact for several years").

25      ### 4.    Defendant's Literally False Claims About "Integration"

26      Despite performing all Ticketmaster-related functions (*e.g.,* ticket transfers)
27  through a third party (Seat Scouts), and despite being *told* by Ticketmaster that what
28  they were doing was <u>not</u> an "integration," Defendant nonetheless continues to

8031213.1

advertise to prospective clients that its system *is* "integrated" with Ticketmaster. JAF, No. 68. System integration is a desirable trait in the ticket management space because clients value the speed and accuracy it brings, and being able to claim an integration with Ticketmaster is particularly valuable. JAF, No. P70.

Multiple examples of Defendant's false advertisements are attached for the Court's review. *See* JAF, No. P68. Thematically, however, they are essentially the same: Defendant tells customers that its platform has "Ticketmaster integration," and it says this feature will provide tangible benefits to the user. *See, e.g.,* JAF, No. P68 at Kane Dec., Ex. 48 ("Ability to fully integrate between Ticketmaster and vendor application – meaning seamless ticket transfer and decline process"); Ex. 45 at 37:12 ("We have direct API with Ticketmaster").

Now, to be certain, the Parties dispute what "integration" means to the consumers to whom Defendants' false statements are directed. For the purpose of this motion, however, Spotlight <u>accepts</u> the definition that Defendant provided in response to Interrogatory No. 19 and asks the Court to apply it here:

> "'[I]ntegration,' broadly, describes items that are organized or structured so that constituent units function cooperatively. In the context of two technology applications, a general description is a process by which **two applications can work with one another**."

*See* JAF, No. P50 (emphasis added; internals quotes and cites omitted).

In light of this definition, one can quickly see that Defendant's "Ticketmaster integration" claims are <u>literally</u> false.[28] <u>If</u> Defendant truly had an "integration" with *Ticketmaster*, then, under Defendant's definition, the "two applications" that must be "work with one another" would have to be (no surprise) **Defendant's** and **Ticketmaster's**. As discussed above, however, Defendant's system does not even *connect* with Ticketmaster—it only talks to Seat Scouts. Thus, Defendant's and

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

---

[28] Defendant's claims are also literally false under the definition Spotlight advances.

Ticketmaster's systems do <u>not</u> "work with one another."  Seat Scouts is the only one that arguably is "integrated" with Ticketmaster under Defendant's definition.

If Defendant were being honest in its presentations, it would say that its platform *mimics* true Ticketmaster "integration" at a lower cost, and that it does this by outsourcing work to a third-party intermediary.  And that may be enough for some consumers, especially those that are price sensitive.  But it is deceptive for Defendant to say it offers "Ticketmaster Integration" when it does not send any data *to* Ticketmaster.  The line between marketing and lying has been well crossed.

**B.**     **Defendant CL's Statement of Facts**

**1.**     **There are Several Methods of Achieving System Integration.**

As stated in CL's interrogatory response, integration is a process by which two systems can work with one another to exchange data. JAF ¶ D45. To support that definition, CL's interrogatory response linked to industry literature (Chrystal R. China and Michael Goodwin, *What is Application Integration*, IBM, https://www.ibm.com/think/topics/application-integration) that explains that "[t]here are several technologies businesses can use (alone and in combination) to build and automate integration workflows," including the use of an intermediary hub ("middleware")[29] or the use of a web-integration to integrate the systems. Heisenberg Opp. Decl., Ex. 8. ██████████████████████████ ████████████████████████████████████ ███████████████████████████████ *Id*., Exs. 6, 7.

---

[29] There are, in fact, companies that specifically provide such integration networks between two separate platforms. *See* Heisenberg Opp. Decl., Ex. 10 ("For organizations, cross-platform systems integration usually features a middleware solution that bridges the interoperability gap. This middleware could be a third-party solution, a custom script, or an embedded application that enables time-regulated data sharing or polling."). *Accord id.*, Ex. 9 (article by Amazon Web Services).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

### 2.    Ticketmaster's APIs Constitute a Direct Integration.

The Ticketmaster APIs at issue here are gated, meaning one cannot integrate without Ticketmaster's affirmative consent. JAF ¶ D10. One needs to be provided password keys to access the APIs. Heisenberg Decl., Ex. 4 (Volini Dep.) at 19:15–22. The access is not managed in a centralized manner at Ticketmaster, but is controlled by individual groups that offer different types of integrations, often not communicating with each other, or even at cross-purposes. JAF ¶ D5.

As further explained by Ticketmaster's person-most-knowledgeable on the TradeDesk accounts, Phil Volini, an API is specific to individual Ticketmaster customer accounts, so Ticketmaster can identify the user and the individual accounts being accessed:

> There was a developer process essentially by which if you want to begin communicating with those [TradeDesk] APIs, you would – you would essentially just get a key so that we would know who was calling those APIs directly.

Heisenberg Decl., Ex. 4 (Volini Dep.) at 19:15–22; see also Heisenberg Opp. Decl., Ex.2 at 56:19–21 ("It's a key to be able to identify the user that is calling the API."); id. at 57:3–8 (it is Ticketmaster's "way to manage who is actually accessing the TradeDesk and Ticketmaster ticket inventory"). As further explained by Mr. Volini:

> A key component of the Trade Desk API is you can essentially only access tickets that you have valid credentials for, so that being the login credentials to the Ticketmaster account that would have the associated tickets in them. This API would allow you to see what tickets those credentials have access to.

Heisenberg Decl., Ex. 4 (Volini Dep.) at 43:3–10.

The API also is required for transfers, as "the Trade Desk API would allow you to initiate a transfer the same way that you would by logging directly into your account, yes, to initiate a transfer." Id. at 43:20–44:2. In other words, "users need to have their own security token within the API system to be called upon." Id. at 47:22–48:1. In sum, Ticketmaster agreed that "Seat Scouts could call those APIs on

1  behalf of another registered user." Heisenberg Opp. Decl., Ex. 2 (Volini Dep) at

2  110:4–15.

3      **3.**  **CL Was Granted, Not Refused, Permission to Integrate with**

4            **Ticketmaster's APIs.**

5      Spotlight asserts that Ticketmaster denied CL permission to integrate with it.

6  Ticketmaster's testimony is the exact opposite. Mr. Volini, testifying on behalf of

7  Ticketmaster's Resale group, confirmed that CL sought and was granted permission

8  to integrate with Ticketmaster's TradeDesk and TicketInfo APIs. JAF ¶¶ D12–D17.

9  Ticketmaster confirmed that in January 2018, Ticketmaster was presented, and

10  approved, CL's "use case" to use the TradeDesk API to provide clients management

11  of their corporate and event tickets. Heisenberg Decl., Ex. 4 (Volini Dep.) at 35:6–

12  11. Indeed, the January 2018 email that Spotlight portrays as a rejected overture

13  actually evidences that Ticketmaster approved CL's "use case" of using the

14  TradeDesk for corporate ticket management. Heisenberg Dec., Ex. 43.

15      **4.**  **CL's Integration Did Not "Fail"; CL Established the TradeDesk**

16            **API Integration Before Transferring Management of CL's API to**

17            **Seat Scouts.**

18      Ticketmaster provided CL with a TradeDesk account and access to the

19  TradeDesk API through Ticketmaster's Resale gate-keepers, Mr. Volini and

20  engineer Yehuda Grossman. Heisenberg Opp. Decl., Ex. 3 (Gainor Dep.) at 205:3–

21  6. From January 2018 to approximately April 2019, Ticketmaster assisted CL in

22  developing its integration. JAF ¶ D10. With that key, CL was able to access the

23  direct communication channel to Ticketmaster, linking CL's application to the

24  Ticketmaster accounts held by those customers. JAF ¶ D10; Heisenberg Decl., Ex. 4

25  (Volini Dep.) at 19:18–22 ("[I]f you want to begin communicating with those APIs,

26  you would -- you would essentially just get a key so that we would know who was

27  calling those APIs directly.").

28      By April 4, 2018, "Concierge Live did have an integration in place, and they

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   were able to send requests to Broker APIs at this point and receive data back"

2   through CL's APIs. JAF ¶ D12; Heisenberg Decl., Ex. 6 (Gainor Dep.) at 194:4–7.

3   Through the API, CL "had the integration in place, which usually involves some

4   authentication mechanism where you're now allowed to send requests and receive

5   data, but now you have to build functionality on top of that." *Id.* at 196:15–19. By

6   August 2018, CL was "transforming the data and making it usable for their clients."

7   *Id.* at 199:11–14.

8           **(a)      In April 2019, Ticketmaster Approved CL's Use of the**

9                    **TradeDesk and TicketInfo APIs Through Seat Scouts.**

10          Because CL's engineer, Mr. Williams, was not finishing the project as

11  quickly as expected, CL moved him to other, non-integration, projects. Heisenberg

12  Dec., Ex. 6 at 201:11–24. By February 2019, with the integration proceeding

13  without him, Mr. Williams sought to have "any role to help get the Ticketmaster

14  APIs across the finish line." Heisenberg Opp. Decl., Ex. 4.

15          The final piece to bringing CL's integration "across the finish line" was that

16  CL required access to one additional API, the TicketInfo API (a/k/a the Subscription

17  API). Heisenberg Dec., Ex. 6 at 202:4–21. CL explained to Ticketmaster that Seat

18  Scouts would manage CL's APIs out of convenience, because it had greater

19  manpower compared to CL. Heisenberg Decl., Ex. 8.

20          Ticketmaster approved CL's access to the TicketInfo API. JAF ¶¶ D13, D14;

21  *see also* Heisenberg Decl., Ex. 4 (Volini Dep.) at 30:13–18; *id.*, Ex. 6 (Gainor Dep.)

22  at 211:7–12.[30] JAF ¶¶ D13, D14.

23          CL's integration with Ticketmaster is reflected in contemporaneous

24  communications, written before any dispute arose. On April 8, 2019, CL reported to

25

26          [30] In support of its narrative that Ticketmaster rejected CL's requests for the
27  TradeDesk API, Spotlight cites a November 2018 email (Kane Ex. 14). This email
    has nothing to do with CL's TradeDesk and TicketInfo APIs. Instead, it deals with
28  a separate request to use Ticketmaster's "Commerce API."

1    Mr. Volini that "[w]e are already receiving data from those new [TicketInfo]

2    endpoints so we should be in a good place with them this week. We will also be

3    working through the rest of the sync integrations for mobile transfer, etc. …. Thanks

4    so much! *We cannot wait to finish this full TM integration*." Heisenberg Decl., Ex.

5    8 (emphasis added).

### 5.    Ticketmaster Has Confirmed CL's Completion of its TradeDesk and TicketInfo Integrations.

8    Ticketmaster has confirmed CL's approved use. First, it stipulated in a recent

9    letter from its outside counsel that "[s]ince approximately April 2019, Concierge

10   Live has used [Ticketmaster's] TradeDesk API in connection with its corporate

11   ticket management services." Heisenberg Decl., Ex. 2, ¶¶ 13, 17.

12   Second, Ticketmaster's corporate designee testified under oath that it

13   approved CL's access to the TicketInfo API. JAF ¶¶ D13, D14; *see also* Heisenberg

14   Decl., Ex. 4 (Volini Dep.) at 30:13–18.

15   By June, 2019, CL was enrolling clients in beta testing of its Ticketmaster

16   integration, a process that the clients such as BCBSNC chose to test. Kane Decl.,

17   Ex. 37.[31] In November 2019, Mr. Gainor reported to Ticketmaster that CL "recently

18   completed a very tight integration" with Ticketmaster's APIs. JAF ¶ D8.  This

19   contemporaneous communication between CL and Ticketmaster, written before any

20   dispute arose, the parties had no doubt that CL was integrating with Ticketmaster.

### 6.    CL's Web Integration Constitutes Another Form of Integration.

22   CL's interrogatory response provides that "integration" also includes the use

23   of web integration, by which information is exchanged between the two platforms.

24   JAF ¶ D45. This is accomplished by using automated actions that log in to the user's

25   account on their behalf, and through that access, can sync the account holder's ticket

---

27   [31] The integration worked, and BCBCSNC remains a loyal customer. Basloe

28   Opp. Decl. ¶ 7.

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  holdings with its CL account, or initiating some actions such as ticket transfer

2  requests. *See generally id.* ¶¶ D46–D52. CL's own web integration is a hybrid,

3  meaning it still uses the Ticketmaster TicketInfo API to transmit some of the

4  ticketing data. JAF ¶ D19.

5  **7.     Ticketmaster's Prior Hearsay Statements, Since Recanted, Do Not**

6  **Dispute CL's Integration.**

7  Against this documented record, Spotlight cites several hearsay emails or

8  writings from Ticketmaster's Nexus group that superficially appear, to varying

9  degrees, to dispute CL's having a Ticketmaster integration. But Ticketmaster's

10  subsequent deposition testimony clarified and narrowed those statements. In

11  particular, at the time of the statements, the Nexus group was unaware that

12  Ticketmaster's Resale group had provided CL with TradeDesk APIs integration, and

13  therefore its statements addressed only the lack of a *Nexus* integration. Heisenberg

14  Decl., Ex. 3 (Scarborough Dep.) at 44:22–25. Consequently, Mr. Scarborough

15  confirmed under oath that his earlier statements disputing CL's integration were

16  limited to disputing that CL had a "Nexus integration" (a type of integration CL

17  never claimed to have). *Id*. As to the existence of a TradeDesk integration—the

18  issue in the case—Mr. Scarborough deferred to Mr. Volini. *Id.* at 136:16–18) ("My

19  declarative statement would be never having a Nexus integration with

20  Ticketmaster… maybe had integration with somebody else. But what I can declare

21  on knowing myself is no Nexus integration").

22  **(a)     Ticketmaster's Clarification of the April 2025 Letter.**

23  Spotlight cites Ticketmaster's April 2025 letter, in which Ticketmaster took

24  the initial position that CL's use of the TradeDesk API for serving corporate clients

25  was not allowed. Critically, Spotlight fails to acknowledge that Ticketmaster

26  subsequently investigated and revised that position. After receipt of the letter, CL

27  immediately replied and explained that CL's use of the TradeDesk integration for

28  corporate ticket management was approved by the Retail group. *See generally*

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   Heisenberg Decl., Ex. 2 (response to CL's reply). Ticketmaster hired outside

2   counsel, Davis Wright Tramaine ("DWT"), to investigate. *See* JAF ¶¶ D31, D32

3   (citing Heisenberg Decl., Ex. 2). Based on its discovery of the additional facts,

4   Ticketmaster's counsel issued a letter on October 31, 2025, stipulating to an official

5   recitation of facts. JAF ¶ D31. Ticketmaster then designated witnesses to provide

6   sworn testimony confirming Ticketmaster's stipulated facts. *See generally* JAF ¶¶

7   D21, D33 (citing Heisenberg Decl., Ex. 3 (Scarborough deposition testimony) and

8   *id.*, Ex. 4 (Volini deposition testimony)).

9        Ticketmaster corrected its contention that CL was "misusing" the TradeDesk

10  API. JAF ¶ D21; *see also* Heisenberg Decl., Ex. 3 at 45:22–25 ("At the time, I

11  wasn't aware of Trade Desk APIs. Like I said, I can't answer that, because I thought

12  the only ones that existed were Nexus APIs for corporate ticket management.").

13  Ticketmaster stipulated that CL's use of the TradeDesk API to perform its ticket

14  management services was approved, and Mr. Volini confirmed this fact in testimony

15  as Ticketmaster's person-most-knowledgeable on the subject. JAF ¶¶ D13, D17; *see*

16  *also* Heisenberg Decl., Ex. 4 at 36:1–10 ("[A]ccess was granted to Concierge Live

17  for the TradeDesk APIs."). This testimony corrected Ticketmaster's initial belief

18  that CL's use of the TradeDesk API was inconsistent with Spotlight's Nexus rights,

19  and therefore might constitute "misuse." *See* Heisenberg Opp. Decl., Ex. 1

20  (Scarborough Dep.) at 120:25–121:2 ("We may have had some elements of the

21  [April 2025] letter that could have been clarified a little bit more, *such as misusing*

22  *the Trade Desk API*.") (emphasis added).

23               **VI.**   **ANALYSIS**

24  **A.**   **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I**

25       **1.**   **Plaintiff's Argument**

26            **(a)**   **Summary Judgment Should Be Granted on Count I Because**

27                  **Defendant's Advertising Claims About Supposedly Having**

28

**"Ticketmaster Integration" Are Literally False**

Spotlight seeks summary judgment that Defendant is engaging in false advertising by claiming that its ticket management platform provides "Ticketmaster Integration." *See* Sec. Am. Compl., pp. 20-24 (Count I). Such claims are "literally false." When assessing the "literal falsity" of an advertisement, a court must first determine the "unambiguous claims" being made in the ad and then determine whether those claims are false. *See, e.g., In-N-Out Burgers v. Smashburger IP Holder LLC*, 2019 WL 1431904, *4 (C.D. Cal. 2019) (citing authority).

**(b)    Defendant's Claim of "Ticketmaster Integration" is Unambiguous**

"Only an unambiguous message can be literally false, but a literally false message need not be explicit." *Id.* Falsity can also be "conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id.* (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms, Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002); *accord Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing authority).

Here, Defendant claims that when "integration" is used in advertisements for technology applications, consumers understand it to mean that two applications "work with one another." JAF, No. 50. So, when Defendant states in its presentations that its flagship "Concierge Live" platform is "integrated" with "Ticketmaster" (*i.e.*, "Ticketmaster Integration"), it is representing to customers that the Concierge Live application "works with" Ticketmaster's systems.

That most consumers would come away with this understanding is further reinforced by the context in which the statements are made. *Cf., e.g., Southland*, 108 F.3d at 1139 ("the claim must always be analyzed in its full context"). For example, when trying to convince a potential new client (███████) to use its service, Defendant admitted that its system (apart from a "login" API) could not "do real time

70

*(left margin)* Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  integration with [███████] applications." JAF, No. 68 at Kane Decl., Ex. 46 (Row

2  64) ("We do not have other consumable APIs at this time."). And it made sense for

3  Defendant to admit that: Defendant knew it could not hide from a prospective client

4  that its platform could not integrate with *the client's* systems.

5      But in that *same* marketing pitch, when asked to describe the "significant

6  enhancements" it had supposedly made to its platform over the past several years,

7  Defendant bragged that it had added "__Direct__ **integration with Ticketmaster**":



| | Concierge Live | |
|---|---|---|
| 37 | **Strategy and Product Technical Support** | |
| | Strategy and Product Technical Support | What are your planned major enhancements |
| 38 | | |
| 39 | Strategy and Product Technical Support | Briefly describe the significant enhancements you have made over the past 1 to 5 years. | Direct integration with Ticketmaster and SeatGeek to support inventory import directly into Concierge Live. |

12  *Id.* Row 39.[32]  The difference, of course, was that Defendant knew [██████] could

13  not verify whether Defendant's systems were *actually* "integrated" with Ticketmaster

14  and, so, had to take it on trust. And if "Concierge Live" did not live up to [██████]

15  standards, they might never know that Defendant was using a less effective

16  "workaround"—[██████] instead would most likely chalk the failings up to

17  "integration" in general. And *that* would damage the reputation of providers (such as

18  Spotlight) who go the extra mile (and incur the significant added expense) to provide

19  their clients with *actual*  "Ticketmaster Integration."

20      Defendant included similarly false statements in marketing pitches it made to

21  other potential clients. For example, in a back-and-forth with United Parcel Service

22  after making an initial sales pitch, Defendant, in response to a question from UPS

23

24

25

26

27

28

---

[32] The reference in the quoted document to "Seat Geek" (another third-party ticketing platform) should not be confused with "Seat Scouts," a different entity.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    about whether Defendant's "Concierge Live" application would have the "[a]bility

2    to fully integrate" with Ticketmaster, Defendant answered unequivocally "Yes":

3.    **Technical / Business Related Items:**

**Ticketmaster Integration**
3.)    Ability to fully integrate between Ticketmaster and vendor application – meaning seamless ticket transfer and decline process (i.e. tickets are sent back to inventory if declined by customer)
Yes.

7    JAF, No. 68 at Kane Dec., Ex. 48.  And in a sales pitch to Ally (an online banking

8    company), Defendant's CEO not only claimed that Defendant had "integrat[ed]

9    Ticketmaster into [its] system," he said Defendant did not "scrub" (i.e., scrape) the

10   Ticketmaster website for data *and* that Ticketmaster had "allowed" Defendant to

11   integrate their two systems:

On Wed, Dec 13, 2023 at 10:01 AM Kouchinsky, Tina <Tina.Kouchinsky@ally.com> wrote:

Thanks, Brian! And to confirm – the cost includes event / registration systems too?

Yeah – that would be great to chat with 1-2 of your current clients. (maybe some that came from other platforms?) Also – I know you mentioned you guys are allowed to integration Ticketmaster into your system (ie: no scrubbing) – do you have any type of agreement/letter from TM on that?

17   JAF No. 68 at Kane Dec., Ex. 47 (p. 3).

18          **(c)    Defendant's Claim of "Ticketmaster Integration" is False**

19          None of the claims Defendant made to prospective clients about "Concierge

20   Live" supposedly featuring "Ticketmaster Integration" were true.  As discussed, *see*

21   pp. 56-61, *supra*, Defendant's systems do not send data to, nor receive data from,

22   Ticketmaster.   Therefore, the two companies' systems do not "work with one

23   another," meaning that even under Defendant's proffered definition, *see* JAF, No. 50,

24   there can be no "integration."   *See also* JAF, No. 76 (Ticketmaster considers

25   Defendant's claims of "integration" to be "patently false"); *Declaration of Aaron*

26   *Zaborac*, ¶¶ 15-16 ("Based on my more than a decade of experience as a software

27   engineer, I would not consider the use of Seat Scouts to be an integration in any way

28   because something that is not an officially sanctioned API connection cannot be an

8031213.1                                    72

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

integration.  To have an actual integration, Concierge Live would need to connect directly to Ticketmaster via a sanctioned and approved API connection without using a third party like Seat Scouts as an intermediary[.]"); *Declaration of Josh Williams*, ¶¶ 27-28 ("When I worked at Concierge Live and talked to customers … I would not call it a Ticketmaster 'integration' because we did not have an integration and I did not want to lie … An 'integration' would imply that Concierge Live's software communicates with Ticketmaster's software, but it did not do that at any point while I worked at Concierge Live.").[33]

Furthermore, for Defendant's system to be "integrated" with Ticketmaster's system, that integration must have been <u>allowed</u>.  After all, it is impossible to work "*with*" someone if there are not working with you.  *Accord Zaborac Decl.*, ¶ 16 ("To have an actual integration … Concierge Live would need Ticketmaster's permission to use [an API connection] for the intended purpose"); *William Decl.*, ¶ 29 ("An 'integration' also implies that Concierge Live had permission to communicate with Ticketmaster in the way we were doing it and for the purposes we were using it for, and we did not have that either.").  Ticketmaster, though, has unequivocally stated that it never allowed Defendant to interlink its systems with theirs.  *See Declaration of David Scarborough*, ¶ 46 ("Concierge Live does not and has never had an integration with Ticketmaster for corporate ticket management.") ; *see also id.*, ¶¶ 26-45; JAF, No. 5 ("Only Spotlight … is integrated with Ticketmaster in the event and corporate ticket market, and Concierge Live does not have a right to engage in such

---

[33] Aaron Zaborac worked for Defendant as a software engineer from March 2020 to April 2021. *Zaborac Decl.*, ¶ 3. Josh Williams was Defendant's lead software engineer  (and performed the duties of "Chief Technical Officer") from November 2017 until late spring / early summary 2021.  *Williams Decl.*, ¶¶ 3-4.

1   activities with Ticketmaster.").  This is yet another reason why Defendant's claim of

2   "Ticketmaster Integration" is literally false.

### (d)   The Grant of Summary Judgment is Appropriate

4          "A false advertising claim under the Lanham Act requires (1) a false statement

5   of fact about the defendant's product in connection with its advertising; (2) deception

6   of or a tendency to deceive a substantial segment of the advertisement's audience; (3)

7   deception that is material, *i.e.,* likely to influence a purchasing decision; (4)

8   defendant's introduction of its false statement into interstate commerce; and (5) injury

9   or likely injury to the plaintiff as a result of the false statement."  *POM Wonderful*

10  *LLC v. Purely Juice, Inc.*, 2008 WL 4222045, *10 (S.D. Cal. 2008); *see also*

11  *Southland Sod Farms*, 108 F.3d at 1139.  However, where (as here) an advertisement

12  is shown to be literally false, a court does not need to inquire into the second element

13  of the test—namely, "whether consumers were deceived or misled"—thereby

14  substantially simplifying the inquiry.  *POM Wonderful*, 2008 WL 4222045 at *11 ("A

15  plaintiff is entitled to relief under the Lanham Act on proof of literal falsity alone, as

16  the court will assume that false statements actually mislead consumers.") (citing

17  authority).

18         The literal falsity of Defendant's claims of "Ticketmaster Integration" has been

19  established, *see, e.g.,* pp. 56-61, and there can be no genuine dispute that the deception

20  was "material" given that Defendant touted its supposed "Ticketmaster Integration"

21  as an inherent characteristic of its software platform.  *See* JAF, No. 68 at Kane Dec.,

22  Ex. 46 (Row 39), Ex. 48 (Item 3, Subpart 3), Ex. 47 (p. 3); *see also POM Wonderful*,

23  2008 WL 4222045 at *11 ("A plaintiff may establish this materiality requirement by

24  proving that 'the defendants misrepresented an inherent quality or characteristic of

25  the product.'") (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,

26  299 F.3d 1242, 1250 (11th Cir. 2002) (internally quoting *Nat'l Basketball Ass'n v.*

27  *Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)); *see also In-N-Out Burgers*, 2019

28  WL 1431904, *7 (same).  Likewise, it is equally undeniable that Defendant's emails

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

74

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

and one-on-one pitches to prospective customers amount to "advertising" or "promotion" in this small, niche market, *see, e.g., Sectra Comm. AB v. Absolute Software, Inc.*, 2024 WL 4593019, *6 (W.D. Wash. 2024); *Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935, *7 (C.D. Cal. 2005),[34] and that Defendant introduced those false statements into interstate commerce. *See, e.g.,* Answer to Sec. Am. Compl., ¶ 3 (Defendant admits it is based in Georgia); *cf.* JAF No. 68 at Kane Dec., Exs. 46, 48; JAF Nos. 79-80 (false statements that were electronically sent to, among other companies, ██████ [based in New York] and Ally Financial [Michigan]).

That leaves only "injury or likely injury" to Spotlight. It is undisputed, though, that Defendant <u>directly competes</u> with Spotlight for the same customers in the corporate ticket management market, JAF, No. 18, which is sufficient to trigger a presumption of injury and satisfy this element prong. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011) ("We have generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers"); *see also, e.g., Longbridge Fin., LLC v. Mut. of Omaha Mortg., Inc.*, 2025 U.S. Dist. LEXIS 91179, *37 (S.D. Cal. 2025) (same); *Heitkoetter v. Domm*, 2025 U.S. Dist. LEXIS 159971, *47-49 (E.D. Cal. 2025) (discussing and applying *TrafficSchool*).

Reinforcing this, note also that after Defendant made its false pitch to Ally (in which it claimed that it was "allowed to integrate Ticketmaster into [its] system" without "scrubbing"), it put Ally in contact with some of its current clients who had

---

[34] *See also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) ("In order for representations to constitute commercial advertising or promotion under Section 43(a) (1) (B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.") (quote omitted).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   used both "TicketManager [Spotlight's product] <u>and</u> Concierge Live." JAF, Nos. 68

2   at Kane Dec., Ex. 47 (p. 3) (emphasis added), 69. This shows that the Parties directly

3   compete for the same business *and* that "Ticketmaster Integration" is an important

4   feature that Defendant had to pretend that its software had when trying to win the Ally

5   account. *See also* Answer to Sec. Am. Compl., Counterclaims, ¶¶ 76-80, 84, 88-90;

6   JAF, No. 70 at Kane Dec., Ex. 5. As such, there's a high likelihood of further injury

7   if Defendant is allowed to continue to deceive prospective customers in this way and

8   dilute the perceived value of "Ticketmaster Integration" (which only Spotlight can

9   provide). *See TrafficSchool.com*, 653 F.3d at 826 ("There are good reasons to

10  presume that a competitor bringing a false advertising claim has suffered a

11  commercial injury. Competitors vie for the same dollars from the same consumer

12  group, and a misleading ad can upset their relative competitive positions.") (quote

13  omitted); *Heitkoetter*, 2025 U.S. Dist. LEXIS 159971 at *49 (applying the

14  presumption of commercial injury where the parties were competitors, even though

15  the false advertisements only referenced the advertiser's own products).[35]

16      Given the above, the grant of summary judgment on Count I is appropriate.

17  There is no genuine issue that the claims Defendant made in their advertising pitches

18  to prospective clients about their "Concierge Live" product supposedly having

19  _____

20      [35] Although *TrafficSchool* also said proof a party suffered actual harm is
typically required to support an award of *lost profits* in cases not involving

21  comparative advertisements, *see* 653 F.3d at 831, such a showing is not required to
support an *injunction*, which is all that a party needs to show at the summary judgment

22  stage. *See Southland*, 108 F.3d at 1145 ("[A] competitor need not prove injury when
suing to enjoin conduct that violates [15 U.S.C. 1125(a)].") (citing *Harper House,*

23  *Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989); *see also Lexmark Int'l,*

24  *Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) ("Even when a
plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may

25  still be entitled to injunctive relief under §1116(a) (assuming it can prove a likelihood
of future injury) or disgorgement of the defendant's ill-gotten profits under

26  §1117(a).") (citing *TrafficSchool*, 653 F.3d at 831); *Heitkoetter*, 2025 U.S. Dist.
LEXIS 159971, *49 n.14; *Longbridge*, 2025 U.S. Dist. LEXIS 91179, *37.

27      With that being said, Spotlight *has* lost customers to Defendant. JAF, No.

28  75.

"Ticketmaster Integration" were both literally false and likely to influence a client's purchasing decisions. And it also cannot reasonably be disputed that those false statements were made in interstate commerce and were likely to injure Spotlight through diverted sales. Defendant's conduct hurts consumers and disrupts fair competition. It should not be allowed to continue.

### 2.    Defendant CL's Response

Spotlight's cross-motion fails on multiple grounds.

### (a)    Spotlight's Motion Fails Because it Cannot Establish Falsity.

False advertising requires falsity, and Spotlight cannot show falsity. CL is integrated directly with Ticketmaster. Ticketmaster has confirmed that from April 2019 to the present, CL was provided its own API to the TradeDesk and TicketInfo APIs, and has used them. JAF ¶¶ D13, D17. Apart from these API integrations, CL also utilizes its hybrid web integration, an additional means through which data is exchanged with Ticketmaster. JAF ¶ D19. Consequently, any advertising by CL that it offers "platform integration" was true. Spotlight's contrary arguments fail to apply standard definitions of integration, including Spotlight's usage of the term outside of the litigation context and CL's own definition, which Spotlight misreads. Since CL had both API integration and web integration, any assertions by CL that it was integrated with Ticketmaster were true.

### (i)    CL's Definition of "Integration" Includes Indirect Integrations and Web Integrations.

To overcome CL's integrations with Ticketmaster, Spotlight argues that CL's link to Ticketmaster does not constitute an "integration" because it does not "work with" with Ticketmaster. Although Spotlight *purports* to be applying CL's own definition of integration in an interrogatory response, it is not, as Spotlight attempts to inject a requirement that this can only occur directly. CL's interrogatory response (Kane Decl., Ex. 16) incorporates a computer industry publication that recognizes that an integration between systems can take several forms, only one of which is a

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    direct API integration. It recognizes the use of middleware hubs as well as web

2    integrations to integrate system platforms. The industry publication cited in CL's

3    interrogatory response plainly disproves Spotlight's contention that two systems

4    (i.e., Ticketmaster and CL) can only be integrated if they are directly linked.[36]

5        Spotlight knows this. Indeed, Spotlight's argument—that two systems cannot

6    "work together" unless directly connected—is inconsistent with its own statements

7    outside of litigation. ████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████ *See* Heisenberg

11   Opp. Decl., Exs. 6, 7 (Spotlight's promotional materials) (emphasis added). That is

12   not Spotlight's only contradiction. Its Complaint alleged that Spotlight "was granted

13   the exclusive right to _**directly** integrate_ its technology with Ticketmaster's software

14   and systems platform." Compl. ¶ 22 (emphasis added). Spotlight's use of the

15   modifier "directly" acknowledges that integrations can also be "indirect."

16          **(ii)    CL's API Integration is Direct.**

17       Besides misconstruing CL's interrogatory, Spotlight's argument fails because

18   CL and Ticketmaster systems in fact <u>do</u> interact with each other directly. CL's

19   transactions flow through CL's TradeDesk API key (or token). The key associates

20   the data requests and exchanges with CL's account, so that those account details are

21   shared between the two systems. Heisenberg Opp. Decl., Ex. 2 (Volini Dep.) at

22

---

23       [36] Applying the Warren Buffett analogy used by Spotlight in its brief, under
     Spotlight's narrow litigation-crafted definition of integration, if Mr. Buffet shared
24   his private email address to exchange stock information, Spotlight would still argue
25   that that person is not communicating with Mr. Buffett because of the involvement
     of a third-party intermediary (e.g., Google's Gmail) that transmits the emails on that
26   person's behalf. Or, to use another analogy, diplomats would not be communicating
     with one another because they speak through a translator. Those examples illustrate
27   the fallacy in Spotlight's argument.

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

56:19–22 ("It's a key to be able to identify the user that is calling the API."). The key is required for the syncing function, so Ticketmaster knows which CL clients' accounts to update, and is also required for mobile transfers, as it allows Ticketmaster to know which of CL's tickets to transfer. The API also shows Ticketmaster the requests originating from CL, so that Ticketmaster can charge CL for its transactions. Thus, the private API key is conclusive evidence that Ticketmaster and CL's systems are sharing data on an individualized basis. Indeed, CL's *direct* role in the data exchanges through the API is why Ticketmaster required CL to sign its API Agreement in April 2019 in the first place.

### (iii)    Ticketmaster Cannot Show Falsity Through Hearsay Statements that are Not Probative of CL's TradeDesk Integration.

Although Ticketmaster has recently confirmed CL's TradeDesk integration in deposition testimony under oath, Spotlight's motion attempts to prove falsity through several earlier hearsay statements by Ticketmaster which Ticketmaster now acknowledge were based on incomplete information. Those hearsay statements, which Spotlight attempts to cite for the truth of the matter asserted, are in the form of three statements in 2021 by Ticketmaster's Nexus group (Messrs. Scarborough and Bonder) and an April 2025 letter. Not only are these statements inadmissible hearsay, but Spotlight ignores that Ticketmaster has since corrected the earlier statements in its sworn testimony.

### A)    Ticketmaster's Hearsay Statements are Inadmissible.

Spotlight starts by arguing that Ticketmaster rejected CL's requests to integrate, and cites to a series of statements by the Nexus group as purported evidence that CL otherwise lacked an integration. JAF ¶¶ D75–D77. For example, Spotlight cites two emails from June 2021, where Ticketmaster's Nexus group denied CL's request to speak about becoming a Nexus partner, stating that CL

lacked integration. It also refers to a March 2021 letter from Mr. Scarborough on behalf of Spotlight, that states that Spotlight is Ticketmaster's only *Nexus* partner, a letter that Spotlight suggests was directed at CL. The statements are classic hearsay, in that they are out-of-court statements by a third party being offered by Spotlight for the truth of the matter stated. *See* Fed. R. Evid. 801(c) ("hearsay" is a statement that "the declarant does not make while testifying at the current trial or hearing" and that is "offer[ed] in evidence to prove the truth of the matter asserted in the statement"); *Del Mar Woods v. Philadelphia Indemnity Insurance Company*, 791 F.Supp.3d 1170 (S.D. Cal. 2025).

These hearsay statements were written by the Nexus group, which now admits that it had knowledge of only the Nexus program and lacked knowledge of CL's actual integration via the Resale group's TradeDesk program.  Spotlight ignores Ticketmaster's sworn testimony, offered after its outside counsel investigated all of the facts, and repudiated those earlier statements.

### B)    Ticketmaster has Since Withdrawn or Clarified Its Earlier Statements.

Spotlight resorts to additional hearsay when it argues that "[t]hings came to a head earlier this year" in April 2025, when Ticketmaster sent CL a cease and desist letter. *See* Section IV.A, *supra*. This letter also is hearsay. But more than that, the April letter does not reflect Ticketmaster's ultimate position, as Spotlight claims. Rather, April marked the start of Ticketmaster's investigation of the facts, and the results of that investigation contradict Spotlight's position.

CL responded to the April letter by documenting that Ticketmaster's Resale group had provided the required approvals. Ticketmaster engaged outside counsel, DWT, in July 2025 to investigate the facts. Ticketmaster released its findings in an October 31, 2025 letter, amending and supplementing its April letter.

These communications also show why the hearsay rule exists—the importance of having the declarant subject to examination, under oath, to explain his

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   or her out of court statements. When Ticketmaster's corporate designees were

2   deposed on November 18, 2025, they confirmed the facts stipulated to by

3   Ticketmaster in the letter from its outside counsel.

4          Ticketmaster's designated witnesses retracted or clarified each of the prior

5   hearsay statements, or conceded that they lacked probative value because they were

6   made by persons lacking foundational knowledge. The most glaring example of this

7   was Ticketmaster's clarification of its prior statements that seemed to deny that CL

8   was integrated with Ticketmaster. In its testimony, Ticketmaster confirmed that

9   these statements concerned only the Nexus APIs that fell within the Partnership

10  group. Heisenberg Decl., Ex. 3 (Scarborough Dep.) at 135:21–24 ("I always like to

11  clarify, as I have been throughout the day—has never had a Nexus integration for

12  Ticketmaster for corporate ticket management."). As to the existence of CL's

13  TradeDesk API integration—the issue in the case—Mr. Scarborough deferred to Mr.

14  Volini. *Id.*, 136:16–18 ("My declarative statement would be never having a Nexus

15  integration with Ticketmaster… maybe had integration with somebody else. But

16  what I can declare on knowing myself is no Nexus integration"). Mr. Volini

17  confirmed CL's approved use of the TradeDesk API to perform its ticket

18  management services. JAF ¶¶ D13, D17; *see also* Heisenberg Decl., Ex. 4 at 36:1–

19  10 ("[A]ccess was granted to Concierge Live for the TradeDesk APIs.")

20         Spotlight has no answer for this, and therefore does not even mention any of

21  Ticketmaster's deposition testimony. But Spotlight goes beyond omission; it

22  presents the earlier hearsay statements notwithstanding that they were later

23  repudiated or clarified by Ticketmaster representatives under oath. Spotlight

24  portrays Mr. Scarborough's May 2021 letter as if it specifically addressed CL's

25  TradeDesk integration. Mr. Scarborough testified that the statements could not

26  address the Resale Group/TradeDesk APIs *because he was unaware of it at the time*.

27  Heisenberg Opp. Decl., Ex. 1 (Scarborough Dep.) at 45:22–25 ("At the time, I

28  wasn't aware of Trade Desk APIs. Like I said, I can't answer that, because I

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    thought the only ones that existed were Nexus APIs for corporate ticket

2    management."); Heisenberg Decl., Ex. 3 (Scarborough Dep.) at 135:2–10 ("At the

3    time they acquired them, I did not. After reviewing in preparation for this

4    deposition, it's my understanding that they did get access to TradeDesk areas in

5    April of 2018.").

6         A final example is Spotlight's citation to Ticketmaster's April 2025 letter as

7    supporting Spotlight's assertion that CL was not authorized to use TradeDesk for

8    client services. That is classic hearsay, but Spotlight's citation is more pernicious,

9    because Spotlight fails to note that Ticketmaster's later testimony corrected this

10   assertion. Heisenberg Opp. Decl., Ex. 1 (Scarborough Dep.) at 120:25–121:2 ("We

11   may have had some elements of the [April 2025] letter that could have been clarified

12   a little bit more, *such as misusing the Trade Desk API*."). These examples of

13   Spotlight citing prior hearsay at the expense of subsequent sworn testimony show

14   that Spotlight's motion lacks any genuine foundation.

15         **(iv)    The Conclusory Characterizations from Former**

16         **Employees are not Admissible Evidence.**

17         Rule 56(e) states that a declaration "must be made on personal knowledge."

18   Fed. R. Civ. P. 56. A declaration does not satisfy the requirements where the

19   declarant merely states that they "believe" certain things, yet lack personal

20   knowledge of the statements' details. *Columbia Pictures Indus., Inc. v. Prof'l Real

21   Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991). Conclusory statements

22   that are legal conclusions or speculative assertions, and statements of hearsay

23   evidence, do not satisfy the standards of personal knowledge, admissibility, and

24   competence required by Rule 56(e). *See Parks v. McEvoy*, 2015 WL 435463, at *4

25   (N.D. Cal. Feb. 2, 2015) (plaintiff's conclusory statement unaccompanied by any

26   details as to the basis for it was insufficient for summary judgment); *Gordon v.

27   Cate*, 2014 WL 848212, at *8 (N.D. Cal. Feb. 28, 2014) ("conclusory statements,

28   unsupported by factual data," insufficient to raise a triable issue of material fact on

8031213.1

82

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1   summary judgment); *Dish Network L.L.C. v. Jadoo TV, Inc.*, 2023 WL 4004115, at

2   *6 (N.D. Cal. 2023) (same).

3        The declarations are inadmissible because the declarants lacked relevant

4   personal knowledge—in particular, that Ticketmaster authorized CL to use its

5   TradeDesk APIs.[37] The former employees' ultimate opinions that the TradeDesk

6   API connection is not an "integration" are founded in their "belief" that

7   Ticketmaster did not provide CL permission to use the TradeDesk APIs for purposes

8   of corporate ticket management. On that incorrect basis, they conclude that CL's

9   integration is not "official." This premise is false, because Ticketmaster has

10  stipulated and testified that CL did have access to the APIs, and that it was fully

11  authorized to use those for corporate ticket management purposes. JAF ¶ D9.

12       A closer look further reveals the declarations' unreliability. For example,

13  Brandon Casci confirmed that with Ticketmaster's help, he created the ability to

14  sync tickets between the CL and Ticketmaster accounts. Casci Decl. ¶¶ 12–13. Yet,

15  Mr. Casci speculates that Ticketmaster did not understand that CL was using this for

16  corporate client ticket management. *Id*. ¶¶13, 14. That speculation was incorrect.

17       Similarly, Mr. Zaborac, who did not work on the integration with

18  Ticketmaster (Zaborac Decl. ¶5), repeats hearsay from another employee, Mr.

19  Williams, that "Ticketmaster did not want Concierge Live to have access to the

20  API," and that "Concierge Live did not have access to Ticketmaster's APIs." *Id*. ¶¶

21  12, 13. Mr. Zaborac is stating a conclusion, not a fact, when he says he "would not

22

23       [37] These declarations may have been obtained through dubious ethical

24  practices. Each former consultant or employee signed a non-disclosure agreement

    that precludes them from disclosing confidential information. When a lawyer is

25  communicating with a person who is not represented by counsel, the lawyer shall

    not seek to obtain other confidential information the lawyer knows or reasonably

26  should know the person may not reveal without violating a duty to another.

27  California Rule of Professional Conduct, Rule 4.3; *Elijah W. v. Superior Court*, 216

28  Cal. App. 4th 140 (2013).

1  classify" the API as an integration because "I do not believe" that the API was
2  "officially sanctioned." *Id.* ¶ 17. Once again, the declarant lacked actual knowledge
3  about Ticketmaster's 2018 and 2019 approvals.[38]

4       Likewise, Mr. Williams's declaration is unreliable. In February 2019, he was
5  asking to be allowed to participate in helping get the TradeDesk integration across
6  the finish line. Heisenberg Opp. Decl., Ex. 4. Yet, his declaration cites rumors of
7  Spotlight's supposed exclusive right to integrate, and based on that, he surmised that
8  CL's use of Ticketmaster's APIs was without Ticketmaster's permission. Williams
9  Decl. ¶ 18 ("I did not know if Concierge Live had permission from Ticketmaster to
10 do this, and I did not ask because I did not want to be using them knowing that
11 Ticketmaster [sic] was a company that had exclusive integration with Ticketmaster
12 for operating in the corporate ticket management space…"); *see id.* ¶ 29 ("An
13 'integration' also implies that Concierge Live had permission…").

14      Those speculative conclusions, without proper foundation of personal
15 knowledge, are not competent evidence for this motion.

16      **(v)    Spotlight's Attempt to Portray CL's Web Integration**
17             **As Not Being an Integration Also Fails.**

18      As explained in the industry article cited in CL's interrogatory response,
19 integration can also be accomplished via a web integration. ████████████████
20 ██████████████████████████████████████████████████████████████
21 ██████████████████████████████████████████████████████████████
22 ████████████████████████████████████████████ *E.g.,*
23 Heisenberg Opp. Decl., Exs. 6, 7. █████████████████████████

24

25      [38] None of the former employee-declarants was involved in the discussions
26 between Gainor and Ticketmaster in which Ticketmaster approved CL use of the
   TradeDesk and TicketInfo APIs. Spotlight's counsel certainly did not inform the
27 witnesses of this, even when they had a copy of Ticketmaster's October 31, 2025
28 letter.

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499



1

2

3

4     *See id.* Aside from being a party admission,

5 Spotlight's conduct estops Spotlight from contesting CL's alleged use of the term.

6

7

8     constitutes unclean hands

9 precludes Spotlight's motion for summary judgment. *Haagen-Dazs, Inc. v. Frusen*

10 *Gladje Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980).

11     **(vi)   Spotlight Lacks Standing to Argue Supposed**

12          **Violations of Ticketmaster's Terms of Use.**

13     Spotlight's own corporate representatives confirmed that using automation in

14 this manner is not improper. Heisenberg Opp. Dec., Ex 12 (Hanscom Dep.) at

15 206:22–207:16. CL's witnesses agreed. *Id.*, Ex. 3 (Gainor Dep.) at 24:21–25:23.

16 Using software script to log-in to the platform on behalf of individual customers and

17 transfer tickets is being done through automation on behalf of the customer. *Id.*, Ex.

18 11 (Ho Dep.) at 74:17–76:5.

19

20     Spotlight's motion

21 uses pejorative labels (e.g., bots and scraping) to argue that CL may, theoretically,

22 be violating Ticketmaster's terms of use.  But that is an issue for Ticketmaster to

23 decide. *Id.*, Ex. 12 (Hanscom Dep.) at 198:4–19 ("Other entities may or may not be

24 able to use that [web] capability to access the system and that would be up to

25 Ticketmaster."). In the end, Spotlight simply lacks standing to create a hypothetical

26 issue, where Ticketmaster has been aware of the issue but has not disputed the web

27 integration process.

28

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Ticketmaster was aware, has been since at least 2018, that we do web automation on Ticketmaster. There's been various conversations with them about it.

Heisenberg Decl., Ex. 6 (Gainor Dep.) at 224:5–10.

### (b)    Spotlight Can Show No Advertising.

Spotlight's Lanham Act claim also fails because, as stated in section I.C.1.f, *supra*, of CL's own motion, in late 2021 CL ceased advertising or promoting its Ticketmaster integration. Spotlight admits that "Defendant no longer does it in writing." Section IV.A. However, Spotlight has produced no testimony or other evidence to suggest any oral statements during any of the thousands of meetings, with the exception of two or three instances in which CL responds to customer questions. This confirms that the topic was not part of an organized demonstration, and merely responding to one-off customer questions.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**B.**   **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST COUNTERCLAIM**

**1.**   **Plaintiff's Argument**

**(a)**   **Partial Summary Judgment Should Be Granted on the First Counterclaim Because Even Under Defendant's Definition, Its Systems are <u>Not</u> "Integrated" With Ticketmaster**

Spotlight additionally seeks partial summary judgment on Defendant's First Counterclaim, specifically Defendant's contention that Spotlight somehow engaged in false advertising by telling consumers the truth—namely, that Defendant's "Concierge Live" platform lacks "Ticketmaster Integration." *See* Answer to Sec. Am. Compl., Counterclaims, ¶ 99(a); *see also id.*, ¶¶ 39(a), 42-43.[39]

To prove up its false advertising counterclaim at trial, Defendant will need to meet the same test Spotlight detailed in its Motion on Count I and establish, among other elements, the falsity, deception, and materiality of the challenged statements. *See* pp. 74-75, *supra*; *see also POM Wonderful*, 2008 WL 4222045 at *10; *Southland Sod Farms*, 108 F.3d at 1139.  However, when a party against whom a claim has been asserted moves for summary judgment on the non-movant's claim, it need only show the absence of evidence supporting <u>one</u> of the claim's essential elements.  *Celotex*

---

[39]  Although Defendant alleges this first "category" of supposed false advertising in both the conjunctive and disjunctive, *Answer to Sec. Am. Compl., Counterclaims*, ¶ 99(a) (alleging that Spotlight "falsely claim[s] that Concierge Live lacks integration with Ticketmaster[] and/or … that any integration is unauthorized"), the trailing clause need not be considered here.  If Defendant lacks "Ticketmaster Integration" (and it does), it naturally follows that its nonexistent integration could not—by definition—have been "authorized."  The category thus rises or falls as one.

8031213.1

87

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

*Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).

That missing essential element here is falsity (and, by extension) deception.[40] Simply put, Spotlight's statements that Defendant's "Concierge Live" platform lacks "Ticketmaster Integration" are <u>literally true</u>, even under the exceedingly broad definition that Defendant has proffered (JAF, No. 50 [p. 7]) for the term.

Because the explanation for why saying that Defendant lacks "Ticketmaster Integration" is "literally true" is congruent with Spotlight's earlier explanation (*see* pp. 56-61, *supra*) for why Defendant's claims *of* "Ticketmaster Integration" are "literally false," it will not be repeated here.  It is worth reiterating, though, that Spotlight is not alone in this conclusion.  As discussed, *see, e.g.,* pp. 61-62 *supra*, <u>Ticketmaster</u> has unequivocally stated that Defendant does not have an integration with it (and if anyone should know, it is Ticketmaster), *see* JAF, No. 76 (calling Defendant's "integration" claims as "patently false"), and even Defendant's *own software engineers—i.e.*, the technical people responsible for coding Defendant's platform and who tried (unsuccessfully) to get the system to work—consider Defendant's "integration" claims to be "absolutely false" and an outright "lie."  *See Zaborac Decl.*, ¶¶ 15-16, 18; *William Decl.*, ¶¶ 14, 16, 19-20, 25-30.

The grant of partial summary judgment on the First Counterclaim is therefore appropriate.  There is no genuine issue that Defendant's "Concierge Live" platform does not send data to, nor receive data from, Ticketmaster—it communicates solely with a third-party intermediary (Seat Scouts).   JAF Nos. 60-62   As a result,

---

[40] To be sure, Spotlight believes Defendant cannot establish certain other essential elements as well.  This motion, however, is limited solely to "falsity."

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  Defendant's and Ticketmaster's systems do not actually "work with one another" and,

2  under Defendant's definition (JAF, No. 50 [p. 7]), there is no "integration."

3      Because Defendant, in fact, does not *have* "Ticketmaster Integration," any

4  statements by Spotlight to that same effect cannot be false or misleading. The truth

5  in this case is an absolute defense, and partial summary judgement is warranted.

6      **2.    Defendant's Response**

7      Spotlight's motion seeking summary judgment regarding CL's counterclaim

8  fails for the same reasons its affirmative motion fails—CL does have Ticketmaster

9  integration. However, CL's counterclaim also asserts two claims that exist

10  independent of the existence, nor non-existence, of CL's integration. Count I of

11  CL's counterclaim alleges that Spotlight made the additional two false statements:

12  - That Spotlight's 2016 Agreement provided it the exclusive right to

13    integrate with Ticketmaster. ECF No. 71 (Counterclaim) ¶ 5. As

14    detailed in CL's motion, the 2016 Agreement's language, and

15    Ticketmaster's testimony, shows that this assertion is literally false.

16  - That Spotlight has advertised being "integrated", and even having an

17    "exclusive integration," with AXS, SeatGeek and Paciolan. *See* SAC

18    ¶¶ 117–24. ████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████

21      Because Spotlight's motion does not address these two bases for the first

22  counterclaim, its motion for judgment on that counterclaim fails.

23      **VII.    <u>CONCLUSION</u>**

24  **A.    <u>CL's Brief Conclusion</u>**

25      CL respectfully requests the entry of partial summary judgment (i) finding

26  that Spotlight has liability on CL's Counterclaims One through Three and Five, (ii)

27  dismissing Spotlight's SAC; and (iii) setting a hearing and/or trial on the issue of

28  CL's remedy.

8031213.1

**B.**     <u>**Opposing Party Spotlight's Brief Conclusion**</u>

Contrary to its representations, Defendant is still telling customers that its "Concierge Live" platform provides an "integration" with Ticketmaster when that simply is untrue.  Because all the arguments Defendant raises in its "kitchen sink" motion essentially stem from those two undeniable facts, Defendant's motion should be denied and this Court should instead grant summary judgment to Spotlight on Count I of its cross-motion and protect consumers from continued deception.

DATED:  January 6, 2026          HINCKLEY & HEISENBERG LLP

By:      */s/ - Christoph C. Heisenberg*
CHRISTOPH C. HEISENBERG
Attorney for Defendant-Counterclaimant
Concierge Live LLC

DATED:  January 6, 2026          ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

By:      */s/ - Eric J. Lorenzini*
ERIC J. LORENZINI
Attorneys for Defendant-Counterclaimant
Concierge Live LLC

DATED: January 6, 2026          HUNTON ANDREWS KURTH LLP

By:   */s/ Katherine P. Sandberg*
Katherine P. Sandberg
Christopher M. Pardo
Edward T. Colbert
Erik C. Kane

*Attorneys for Plaintiff*
*Spotlight Ticket Management, Inc.*

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8031213.1

JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT